## 10    BUSINESS OVERVIEW

The Company has entered into the Acquisition Agreement, pursuant to which it will acquire all the shares in the ten Predecessor Companies which currently own and operate the Initial Fleet consisting of five Aframax and five Suezmax tankers described below in Section 10.3 "—Fleet Overview". For further description of the Acquisition Agreement, and the purchase price for the shares in the ten Predecessor Companies, see Section 5 "The acquisition of the Initial Fleet".

The Initial Fleet of ten vessels are all employed on long-term time charter contracts providing for 100% commercial utilization for a minimum period of three to five years. See Section 10.4 "—Contract coverage overview" for further information on the timecharters.

### 10.1    Business strategy and opportunities

#### 10.1.1    Business strategy

Universal's strategy is to assemble a fleet of modern crude tankers. The Initial Fleet will consist of Aframax and Suezmax tankers which will be employed in a manner that Management believes provide downside protection while preserving upside potential. Universal plans to expand its relationship with Shell, as described below, and pursue growth through adding additional vessels to its existing fleet. To facilitate Universal's growth strategy in the short term, Geden has agreed to grant the Company a fixed rate purchase option on two Suezmax vessels (the "**Option Agreement**"). The purchase price for the two vessels are, pursuant to the Option Agreement, set to be $56 million for the 2011 built Hero and $58 million for the 2012 built Prima (not delivered from the yard yet). This fixed price option is valid for 12 months after Listing. The Option Agreement is described further in Section 15.2 "Related party transactions—Option Agreement".

Universal will also seek to expand its fleet through acquisitions of secondhand tonnage, if and when this is determined appropriate. Universal may elect to place additional vessels on similar structured time charters, in the spot market or on fixed-rate time charters, depending on what is considered most profitable given the markets at that time.

Universal's growth strategy relies on balancing what Management believes is the most attractive vessel employment profile, combined with a sound capital structure. Management believes that by relying on a combination of equity and debt financing for future vessel acquisitions, Universal will be in a better position to withstand the volatility of the spot market and will have more cash available to support future growth and pay dividends in the future, than if Universal relied primarily on debt financing.

Key elements of the business strategy include:

#### Deploying the fleet on long-term spot market index-related time charters with reputable and creditworthy counterparties

Universal's unique fleet employment profile with creditworthy counterparties will provide shareholders with the opportunity to invest in a company that delivers returns based on the tanker spot market index as well as protecting investors against volatile markets. Eight of Universal's vessels are on time charters to Shell. Shell, together with its affiliates, is a major international charterer with a strong reputation as a creditworthy counterparty.

Two of Universal's other Suezmax tankers are on time charters to ST Shipping.

Upon the expiration of the charters with ST Shipping, Universal may choose to deploy these vessels in the spot or time charter markets, with either Shell or other reputable and creditworthy counterparties.

*Strategically expanding the fleet size*

Universal intends to acquire modern, high-specification crude tankers through selective and timely acquisitions in a manner that is accretive to earnings and cash flow. In accordance with the Option Agreement, the Company has the option to acquire two additional Suezmax tankers from Geden. This option can be declared for one or both of the vessels within the first 12 months of being listed. In addition, the Company has entered into an agreement regarding right of first refusal with Geden on all time charters over 12 months and contracts of affreightment in the crude tanker sector as well as all sale and purchase opportunities in the crude sector ("**Agreement on Right of First Refusal**"). This agreement will provide the Company the right to purchase any crude tanker from Geden as well as timecharters and contracts of affreightment. Universal's Initial Fleet will be comprised of Aframax and Suezmax tankers, which due to their size and draft (depth below the water line) have significantly more trade-lane options than VLCCs. Management believes these vessels will exhibit relatively lower spot market volatility due to shorter ballast (non-revenue cargo) voyages, however Universal, will evaluate all classes of tankers in the future. A key element to Universal's acquisition strategy will be to pursue vessels at attractive prices and Universal believes that current tanker values present attractive opportunities to grow the fleet. Given Universal's strong relationship with Geden and Shell, as well as its existing connections to third parties, there will be numerous opportunities to acquire and employ vessels in the future.

*Maintaining conservative leverage levels*

Universal believes that the use of a combination of equity and debt to finance new vessel acquisitions will strengthen the balance sheet. The intention is to maintain a conservative debt level to permit additional vessel purchases. Universal expects to finance borrowings through future equity and/or debt issuances. Universal expects to finance borrowings through future equity and/or debt issuances. Universal believes that managing Universal's monthly expenditures by keeping a moderate debt level will improve its ability to better withstand any market volatility, while also maintaining the ability to earn attractive risk-adjusted returns during improving spot market conditions. This flexibility combined with the protection of the Shell charters base rate floors for the next 24 months and the high rate premium ST Shipping charters offer downside protection and while preserving upside opportunity.

*Maintaining a low overhead structure by outsourcing key functions to experienced vessel managers*

Universal intends to outsource technical management functions of the Initial Fleet to GDAS, thereby leveraging the global service platforms and long tenured expertise of the entity. Universal believes that GDAS will be able to manage the vessels at a cost that would be lower than what could be achieved by performing these functions in-house and that the rates of GDAS is competitive with those that would be available through third-party managers. Universal believes that vessel management is a business that benefits from a worldwide presence, well-developed infrastructure and a broad network of strong customer relationships.

*Providing a high level of customer service by maintaining high reliability, safety, environmental and quality standards*

Major oil companies are looking for reliable partners who can deliver, are reputable and can provide both quality and safety. Universal intends to deliver a high level of customer service by: demonstrating responsiveness, reliability, professionalism and integrity; adopting responsible environmental practices and adhering strictly to environmental regulations; demonstrating a dedication to safe operations; and using customer feedback and industry and internal performance measures to drive continuous improvements.

10.1.2    Chartering strategy

The eight vessels in the Initial Fleet chartered to Shell are on a base rate for a period up until May 31, 2014 plus a 50/50 profit share calculated on a monthly basis for the difference between spot-indexed rates achieved above the base rate for the trade routes described in Section 10.4 "—Contract coverage overview". At the option of Universal before May 31, 2014 or automatically after that date, the rate for the charters will be based on a spot-indexed rate formula for the relevant trade routes. The two remaining vessels in the Initial Fleet are on charter to

ST Shipping with base rates of $37,300 (M/T Pink) and $37,550 (M/T Reef), respectively for the entire period of the charter less a 1.25% broker's commission. If a basket of spot market rates is above the base rates, there will be a 50/50 profit share for the difference between the rates achieved above the base rate indicated and the base rate. Hence, the charters for all vessels in the Initial Fleet provide both downside protection until May 31, 2014 and preserve upside potential for the entire duration of the charters. As further described in Section 10.7.2 "–Litigation and disputes–Pink Shipping Ltd. versus ST Shipping", the time charter for M/T Pink is subject to dispute. As such, the earnings of M/T Pink under the original charter party have been guaranteed by Geden as part of the Acquisition Agreement.

Any vessels acquired in the future may be employed under a combination of various charter structures on spot market index-related, on base rate plus profit share, on fixed rate, pure spot, as well as in tanker pools. Universal intends to expand its relationship with Shell and will also look to employ its vessels in the best manner possible to achieve maximum returns for investors without compromising protection. Spot market revenues may generate increased profit margins during times of escalating rates, while fixed-rate time charter revenues tend to provide more stable cash flows. Universal's charter portfolio provides a blend of both these elements while still delivering 100% commercial utilization. Universal will seek to deploy the vessels in a manner that maximizes cash flow while balancing the need to account for potential changes to the freight rate market and global economic conditions.

*10.1.3    Operations*

There are two key components to the operation of the fleet:

- commercial and strategic management; and
- technical management.

**Commercial and strategic management**

The Company will carry out the commercial and strategic management of the fleet and perform certain administrative functions through the Company's wholly-owned subsidiary, UM (USA) LLC, a Delaware limited liability company that was formed in March 2011 and maintains its principal executive offices in New York, New York. Universal has entered into a Service Agreement with GDAS for various management services such as supervising, expediting and procuring insurance as well as processing any various types of claims.

Commercial management includes, among other things, negotiating charters, monitoring vessel performance, managing chartering relationships and supervising the technical management. In this regard, the Initial Fleet has been employed under charters that provide 100% commercial utilization of all vessels up until March 31, 2015.

**Technical management**

Technical management of the Initial Fleet will be provided by GDAS. Technical management includes managing day-to-day vessel operations, performing general vessel maintenance, ensuring regulatory and classification society compliance, supervising the maintenance and general efficiency of vessels, arranging the hire of qualified officers and crew, arranging and supervising drydocking and repairs, arranging for the purchase of supplies, spare parts and new equipment for vessels, appointing supervisors and technical consultants and providing technical support. The technical manager will provide these services pursuant to industry-standard form management agreements, which are described under Section 15.4 "Related party transactions—Technical management agreements". Universal will review the performance of the technical managers on a periodic basis.

Universal believes that GDAS is a leader in providing independent ship management and related services and that having GDAS as a vessel manager will increase efficiency, operational excellence and cost control. GDAS currently provides technical management services for Geden's fleet, which currently consists of 44 tankers and drybulk carriers, including newbuilds and the Initial Fleet. GDAS maintains a staff of approximately 1,000 off-shore crew members and 120 shore-based personnel. In addition, GDAS will also manage and process all crew insurance claims.

The technical management agreements have durations equal to the duration of the current charter parties entered into by the Predecessor Companies. The Predecessor Companies may terminate the management agreement with GDAS if GDAS defaults on any obligation to the Predecessor Companies, and such default is not remedied within a reasonable period of time or in a reasonable manner.

GDAS will maintain records of all costs and expenditures incurred in connection with its services that will be available for the Predecessor Companies review on a daily basis. As the technical manager, GDAS will receive fees for the services it provides at rates that Universal believes are comparable to other third-party management rates. Further, the Predecessor Companies shall reimburse the technical manager for its costs and expenses incurred in providing certain of the services.

## 10.2     Competitive strengths and position

Universal believes that it possesses a number of competitive strengths that will allow them to capitalize on growth opportunities in the crude oil tanker market, including the following strengths:

### 10.2.1   Modern, high-specification fleet of tankers

Universal's Initial Fleet will have high specifications, satisfying the highest levels of regulatory and classification society compliance. The Initial Fleet will have an average age profile of approximately 1.8 years as of the date of the Prospectus. Universal's vessel acquisition strategy will target modern double-hull tankers built in recognized shipyards. Management believes that owning a modern, high-specification fleet of double-hull tankers reduces operating costs and fuel consumption and will allow the fleet to be more reliable and attractive to charterers and oil majors. The fleet's five Suezmax and five Aframax tankers are sister ships built under the supervision of GDAS. The operation of sister ships can result in cost efficiencies by maintaining fewer spare parts, because various parts are inter-changeable between sister ships. Where applicable, Universal will seek to acquire sister ships in the future. The tanker shipping industry is highly regulated and Universal aims to own and operate high-specification vessels that satisfy all current and pending safety and environmental regulations. Universal believes that with the high specifications and young age, the vessels in the Initial Fleet will be acceptable to all of the oil majors and other major charterers and thereby provide Universal with a competitive advantage in securing favorable employment for the vessels.

### 10.2.2   High utilization of Universal's fleet on spot market index-related time charters

Pursuant to the terms of the Master Umbrella Agreement, as further described in Section 10.5.1 "—Material agreements—Master Umbrella Agreement", Universal will operate eight of the vessels that will comprise the Initial Fleet on three- and five-year time charters with Shell or its affiliates. In addition Universal has two Suezmax vessels on three year timecharters to ST Shipping. Universal believes that the unique combination of time charters will provide the benefit of 100% commercial utilization, exclusive of drydocking and unscheduled off-hire days. In addition, Management believes that these time charters will provide the benefit of creditworthy charter counterparties for the duration of the vessel charters as well as any exercised optional renewal periods. The timecharters will allow Universal to operate with considerably less working capital than vessels operating solely on a spot market basis or in a pool because under the timecharters with Shell or its affiliates will be paid monthly in advance and the payment of bunker fuel costs and port disbursements will be the responsibility of the charterer as well as all other risks associated with operating in the spot market, such as the risk of weather, delay and demand. Management believes that the combination of charters with spot market exposure and base rate charters will enable Universal to take advantage of prevailing market conditions while enjoying the stability associated with time charter employment.

### 10.2.3   Significant growth opportunities through Universal's relationship with Geden

Universal has entered into the Option Agreement with Geden for the purchase of two Suezmaxes. The purchase price for the two vessels are agreed to be $56 million and $58 million. The option is valid for 12 months following the completion on the Offering. In addition, Universal has entered into the Agreement on Right of First Refusal with Geden on all time charters over 12 months and contracts of affreightment in the crude tanker sector as well as all sale and purchase opportunities in the crude sector.

Universal Maritime Inc. – Prospectus

*10.2.4   Technical management expertise and experience of GDAS*

GDAS provides technical management services for all of Geden's tankers and drybulk carriers. Universal intends to benefit from the relationships that GDAS has developed over decades with classification societies and ship and repair yards. GDAS has developed operating processes, vessel maintenance monitoring programs and information systems from which Universal can also benefit from. GDAS also has a strong reputation within the shipping industry for providing high-quality vessel technical management services.

*10.2.5   Conservative debt level resulting in a strong balance sheet*

Following the Offering, Universal expects to have a moderate loan-to-value debt facility in place. Universal may finance future vessel acquisitions on an interim basis with a combination of equity and debt financing. Universal intends to maintain a conservative level of debt by making purchases at times when equity offerings will be available at attractive terms, allowing Universal to refinance borrowings with future equity issuances. Having borrowing capacity under the New Debt Facility and a strong balance sheet with a conservative debt level will enable Universal to move quickly in acquiring vessels as opportunities arise and support the ability to pay dividends in the future.

*10.2.6   Experienced corporate management*

The management team has an average of 20 years' experience in the international shipping industry, including the tanker sector as well as in public companies. As a result, Universal believes that the management team has built strong relationships with major international charterers, third-party suppliers, shipbuilders and financial institutions, and developed extensive operational capabilities and strong vessel acquisition capabilities. Please see Section 11.2 "Board, Management and Employees—Management" for further biographical information.

## 10.3     Fleet overview

Universal's Initial Fleet is composed of 5 modern Suezmax crude tankers and 5 modern Aframax crude tankers totalling 4.8 million deadweight tons with an average age of 1.8 years as of the date of this Prospectus.

*10.3.1   Suezmax fleet*

**"M/T Profit"**



| | |
|---|---|
| Name | M/T Profit |
| Built | August 2009 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Profit Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Blue"**



| | |
|---|---|
| Name | M/T Blue |
| Built | February 2010 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Blue Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

Universal Maritime Inc. – Prospectus

**"M/T Pink"**



| | |
|---|---|
| Name | M/T Pink |
| Built | June 2010 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Pink Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Reef"**



| | |
|---|---|
| Name | M/T Reef |
| Built | July 2010 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Reef Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Blank"**



| | |
|---|---|
| Name | M/T Blank |
| Built | January 2011 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Ship owning company | Blank Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

*10.3.2    Aframax fleet*

**"M/T Target"**



| | |
|---|---|
| Name | M/T Target |
| Built | November 2009 |
| Place of registration | Malta |
| Capacity | 115,000 |
| Yard | Samsung |
| Ship owning company | Target Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T True"**



| | |
|---|---|
| Name | M/T True |
| Built | June 2010 |
| Place of registration | Malta |
| Capacity | 115,000 |
| Yard | Samsung |
| Ship owning company | True Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

Universal Maritime Inc. – Prospectus

**"M/T Bravo"**



| | |
|---|---|
| Name | M/T Bravo |
| Built | July 2011 |
| Place of registration | Malta |
| Capacity | 115,000 |
| Yard | Samsung |
| Ship owning company | Bravo Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Value"**



| | |
|---|---|
| Name | M/T Value |
| Built | July 2011 |
| Place of registration | Malta |
| Capacity | 115,000 |
| Yard | Samsung |
| Ship owning company | Value Shipping Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

**"M/T Power"**



| | |
|---|---|
| Name | M/T Power |
| Built | September 2011 |
| Place of registration | Malta |
| Capacity | 115,000 |
| Yard | Samsung |
| Ship owning company | Barbaros Maritime Ltd. |
| Commercial manager | UM (USA) LLC |
| Technical manager | GDAS |

*10.3.3    Fixed price option vessels*

**"M/T Hero"**



| | |
|---|---|
| Name | M/T Hero |
| Built | June 2011 |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Purchase option | $56 million |
| Expiry of option | 12 months post Offering |

**"M/T Prima"**



| | |
|---|---|
| Name | M/T Prima |
| Built | July 2012 (scheduled) |
| Place of registration | Malta |
| Capacity | 156,000 |
| Yard | Rongsheng |
| Purchase option | $58 million |
| Expiry of option | 12 months post Offering |

*10.3.4    Valuation of the Initial Fleet*

The table below lists the valuations of the Initial Fleet on the basis of prompt charter free delivery, as between a willing seller and a willing buyer for cash payment under normal commercial terms according to the Clarkson Valuations Limited valuation as attached as Appendix F to the Prospectus.

Universal Maritime Inc. – Prospectus

| Name of vessel | Charter free values as at May 21, 2012 (in $ millions) |
|---|---|
| M/T Power | $44.5 |
| M/T Blue | $53.25 |
| M/T Pink | $53.25 |
| M/T Profit | $50.25 |
| M/T True | $41.75 |
| M/T Target | $39.0 |
| M/T Blank | $56.0 |
| M/T Reef | $53.25 |
| M/T Value | $44.5 |
| M/T Bravo | $44.5 |

The charter free values were prepared by Clarkson Valuations Limited and are based on recent transactions, negotiations and broker's market knowledge. The valuation relates to May 21, 2012 and is not a guide to the market value of the vessels at any other time. The vessels have been valued individually and if the ships were to be placed on the market at the same time, no assurance may be given that the amount realisable would be equal to the total of the individual values. Market values in the shipping industry are volatile. The vessels have not been inspected by Clarkson Valuations Limited.

**10.4    Contract coverage overview**

The Initial Fleet of ten vessels are all employed on long-term time charter contracts providing for 100% commercial utilization for a minimum period of three to five years. The charter agreements will provide for payment of charterhire to Universal 365 days per year, with the exception of off-hire days.  All ten vessels have been approved, vetted and commenced the time charters with their respective charterers.

Universal's fleet consists of:

| Vessel Name | Vessel Type* | Dwt | Delivery from Shipyard | Shipyard | Initial Charterer and Charter Duration | Shell's Optional Charter Renewal Period | Base Rate or Benchmark Index |
|---|---|---|---|---|---|---|---|
| M/T Profit | Suezmax | 156,000 | August 2009 | Rongsheng-China | Shell -Three Years from June 1 2012 | Three Years | $13,500/TD5 ** |
| M/T Blue | Suezmax | 156,000 | February 2010 | Rongsheng-China | Shell - Three Years from June 1 2012 | Three Years | $13,500/TD5 ** |
| M/T Blank | Suezmax | 156,000 | January 2011 | Rongsheng-China | Shell -Three Years from June 1 2012 | Three Years | $13,500/TD5 ** |
| M/T Target | Aframax | 115,000 | November 2009 | Samsung-Korea | Shell - Five Years from June 1 2012 | Five Years | $11,500/TD9 ** |
| M/T True | Aframax | 115,000 | June 2010 | Samsung-Korea | Shell - Five Years from June 1 2012 | Five Years | $11,500/TD7 ** |
| M/T Value | Aframax | 115,000 | July 2011 | Samsung-Korea | Shell - Five Years from June 1 2012 | Five Years | $11,500/TD7 ** |
| M/T Bravo | Aframax | 115,000 | July 2011 | Samsung-Korea | Shell - Five Years from June 1l 2012 | Five Years | $11,500/TD7 ** |
| M/T Power | Aframax | 115,000 | September 2011 | Samsung-Korea | Shell - Five Years from June 1 2012 | Five Years | $11,500/TD9 ** |

Universal Maritime Inc. – Prospectus

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| *M/T Pink***** | Suezmax | 156,000 | June 2010 | Rongsheng-China | ST Shipping - Five Years from 24 June 2010 | N/A | $37,300 *** |
| *M/T Reef* | Suezmax | 156,000 | July 2010 | Rongsheng-China | ST Shipping - Five Years from 27 July 2010 | N/A | $37,550 *** |

\* Each vessel is a sister ship of each other vessel of the same type
\*\* The eight vessels in the Initial Fleet chartered to Shell are on a base rate indicated in the table for a period of up to two years as of 1 June 2012 plus a 50/50 profit share calculated on a monthly basis for the difference between spot-indexed rates achieved above the base rate for the trade routes indicated. At the option of Universal before the two years or automatically after the two years, the rate for the charter will be based solely on a spot-indexed rate formula for the trade routes indicated. The formula for rates are based on the monthly average of the daily charter rates for crude oil-carrying tankers published by The Baltic Exchange Limited (the "Baltic Exchange"), a 250-year old shipping institution located in London. England. The daily rates that the Baltic Exchange publishes are known as freight assessments. The freight assessments represent the cost of shipping crude oil and oil products by sea on each of the 24 Baltic International Tanker Routes ("BITRs"), including the TD5, TD7 and TD9 routes on which the charter rates that Shell will pay are based. TD7 reflects a spot voyage for 80,000 metric tons of crude oil from the North Sea to continental Europe. TD9 reflects a spot voyage for 70,000 metric tons of crude oil from the Caribbean to the U.S. Gulf, which reflects a spot voyage for 130,000 metric tons of crude oil from West Africa to the United States Atlantic coast.
\*\*\* The two Suezmax vessels on charter to ST Shipping have base rates as indicated for the entire period of the charter less a 1.25% broker's commission. If a basket of spot market rates is above the base rates, then there will be a 50/50 profit share for the difference between the rates achieved above the base rate indicated and the base rate with a 1.25% address commission for such difference. The basket of spot rates based on Clarkson's Suezmax earnings averaged on four trade routes weighed as follows 21% Cross Mediterranean Sea, 27% West African-Mediterranean, 27% West Africa-U.S. Atlantic Cost, and 25% Arabian Gulf/South China
\*\*\*\* The stated rate for the M/T Pink are being guaranteed by Geden, cf. Section 10.7.2 "—Litigation and disputes—Pink Shipping Ltd. versus ST Shipping.

### 10.5 Material Agreements

#### 10.5.1 Master Umbrella Agreement

The Company has entered into a Master Umbrella Agreement with Shell on May 11, 2012. The Master Umbrella Agreement relates to, among other things, the charter agreements currently in place between Shell and eight of the SPV's to be acquired by the Company pursuant to the Acquisition Agreement upon completion of the Offering. The said charter agreements were entered into March 13, 2012 and relate to five Aframax tankers and three Suezmax tankers owned by the following subsidiaries: True Shipping Ltd., Blue Shipping Ltd., Profit Shipping Ltd. Barbaros Maritime Limited., Value Shipping Ltd., Blank Shipping Ltd., Bravo Shipping Ltd. and Target Shipping Ltd.. According to the charter agreements the period of time charter for Suezmax tankers is 36 months and for Aframax tankers 60 months. The vessels in the Initial Fleet were delivered under these charters in the period from March 26, 2012 to May 8, 2012.

The Master Umbrella Agreement shall become effective upon the completion of the Acquisition Agreement as described in Section 5.2 "The acquisition of the Initial Fleet—The Acquisition Agreement", the listing of the Company's shares on the Oslo Stock Exchange, or alternatively Oslo Axess, and the Company having executed the warrant instrument described below. When the Master Umbrella Agreement becomes effective, Geden and Shell shall terminate their current master umbrella agreement regarding the same eight vessels.

The Master Umbrella Agreement requires that the Company, directly or indirectly, charters to Shell or its affiliates, and that Shell or its affiliates charters from Universal, five Aframax vessels and three Suezmax vessels which all may not exceed 15 years in age. The charters shall have a duration of five and three years, respectively, as of the commencement date of the charters as set forth above, and Shell has a renewal option for each of these charters for an additional five or three years, respectively. Should the number of tankers that the Company make available to Shell or its affiliates fall below five and/or the age of one or more of the vessels in the fleet under the charter agreements rise above 15 years, then Shell or its affiliates may require the Company, within a reasonable time, to substitute and charter to Shell or its affiliates further vessels to maintain the minimum number or age requirements. If the Company should not substitute an appropriate tanker, then Shell or its affiliates will further have the option to charter other vessels themselves or to terminate the Master Umbrella Agreement, and thus indirectly all charters governed thereunder, on three months' written notice.

Pursuant to the Master Umbrella Agreement, the Company shall issue non-forteiable, fully-vested warrants to Shell, giving Shell the right to purchase such number of shares in the Company as is equal to 7% of the Offer Shares, including any Shares issued pursuant to the Over-Allotment Option, at an exercise price equal to the Offer Price. The warrants become exercisable upon the charter renewal period, i.e. three-eighths of these warrants become exercisable April 2015 and five-eighths become exercisable April 2017. The warrants will have an exercise period of five business days (if not exercised within this period, they expire worthless), and will include customary anti-dilution provisions. These warrants will not have voting or dividend rights. For further

discussion of these warrants, please see Section 13.12 "Operational and financial review—Application of critical accounting principles, estimates and judgments". The effectiveness of the warrants is conditional on the closing of the Offering and the listing of the Shares.

The Master Umbrella Agreement further provides that: (i) the Initial Fleet chartered by Shell shall be managed by GDAS (ii) in the event that GDAS ceases to manage any of the vessels, Shell International Trading and Shipping Company or another technical manager approved by Shell shall manage the vessels; (iii) all vessels shall be flagged in either Malta, the Marshall Islands or the Isle of Man; and (iv) the Company will, when the Master Umbrella Agreement becomes effective, discuss with Shell an option to employ three further Aframax or Suezmax tankers with Shell or its affiliates on time charters with similar terms to the terms of the current time charters.

Once in effect the Master Umbrella Agreement shall continue in force until the later of (i) the fifth anniversary of the effective date of the agreement or (ii) the expiry of the last charter agreement to expire (including charter parties extended by Shell under the agreement. However, the Master Umbrella Agreement and all time charters governed by it may terminate at an earlier point in time if a termination event, being including but not limited a material breach of either party, an insolvency event in relation to either party or Geden (for as long as Geden holds at least 20% of all Shares in the Company), change of control in relation to the Company (following the completion of the Offering) or Shell and force majeure or material adverse changes as defined in the Master Umbrella Agreement.

The Company is dependent upon the Master Umbrella Agreement as the majority of the Initial Fleet is chartered out based on this agreement.

### 10.5.2   Other material agreements
Universal has is in addition entered into a number of other commercial contracts of importance to its business such as the time charter contracts entered into with ST Shipping described in Section 10.4 "—Contract coverage overview", the Option Agreement described in Section 15.2 "Related party transactions—Option Agreement", the Agreement on Right of First Refusal described in Section 15.3 "Related party transactions—Agreement on Right of First Refusal", the technical management agreements described in Section 15.4 "Related party transactions—Technical management agreements" and the New Debt Facility described in Section 13.11.2 "Operational and financial review—Capital resources—The New Debt Facility".

## 10.6   Health, environment, safety and quality policy
Universal's policy is to operate its business in a manner designed to protect the health and safety of its employees, its customers, the public, and the environment, and in accordance with all applicable safety, environmental and safety laws and regulations so as to ensure the protection of the environment and Universal's personnel and property. All employees should conduct themselves in a manner that is consistent with this policy. Any departure or suspected departure from this policy must be reported promptly.

Universal shall be a professional and positive workplace with an inclusive working environment.

All Universal's employees shall help to create a work environment free from any discrimination, due to religion, skin color, gender, sexual orientation, age, nationality, race and disability.

## 10.7   Litigation and disputes
From time to time, Universal expects to be involved in litigation, disputes and other legal proceedings arising in the normal course of business. Neither the Company, UM (USA) LLC nor any of the Predecessor Companies are, nor have been during the course of the preceding 12 months been involved in any legal, governmental or arbitrational proceedings which may have, or have had in the recent past significant effects on the Company's or Universal's financial position or profitability except the three legal proceedings listed below:

### 10.7.1   BP Oil International versus Target Shipping Ltd.
In December 2011 and January 2012 a trial took place in the English courts between BP Oil International ("**BP Oil**") and one of the Predecessor Companies, Target Shipping Ltd. ("**Target**"). The subject matter of the trial was

that BP Oil claimed repayment of overpaid freight under a voyage charter party from Target. BP Oil argued that Target had rendered an incorrect invoice and that BP Oil had paid the invoice by mistake. The allegedly overpaid freight was in the amount of $1,015,353. On June 16 2012, the judgment was handed down without any conclusive result. Pursuant to the judgment, BP Oil were not awarded any money, but the judgment left open the opportunity of BP Oil making a recovery of an amount which is yet to be determined. The judgment concludes that there should be an enquiry into the amount, if any, that BP Oil shall recover. Target may choose to appeal the judgment before such enquiry is held. In any event, a conclusive determination from the court is not expected until the autumn of 2012 and such determination may be appealed.

The Acquisition Agreement contains a provision pursuant to which Geden shall receive compensation from the Company equal to such amount as may be received by Target pursuant to a judgment or, if appealed, by any other court.

If the judgment is in favor of BP Oil, the Acquisition Agreement includes a provision according to which Geden undertakes to carry all costs associated with the Target dispute going forward and indemnify Target for any liability arising from this dispute or the facts on which it is based.

### 10.7.2   Pink Shipping Ltd. versus ST Shipping

There is an ongoing dispute between ST Shipping and one of the Predecessor Companies, Pink Shipping Ltd., over the rate payable by ST Shipping under a charter party over the vessel M/T Pink (the "**Pink Charter**").

The charter party signed by the parties was to take effect from June 24, 2010, when the construction of M/T Pink was to be completed. ST Shipping refused to take delivery, alleging that the M/T Pink as delivered was not the vessel they had contracted for. Pink Shipping Ltd. commenced arbitration against ST Shipping, claiming that ST Shipping was in breach of the charter party. Then the parties agreed that ST Shipping could take Pink on a mitigation charter at a rate of $29,000 per day on the basis that if they lost the arbitration ST Shipping would pay to Pink Shipping Ltd. the accrued difference between $37,300 per day (the "**Original Charter Rate**") and $29,000 per day (the "**Mitigation Rate**"). ST Shipping currently pays the difference between the Original Rate and the Mitigation Rate into an escrow account.

This dispute has been subject to arbitration in which Pink Shipping Ltd. arguments prevailed. The arbitrators' decision has however been appealed by ST Shipping.

Per the Acquisition Agreement, Geden guarantees that Pink Shipping Ltd receives the Original Charter Rate throughout the term of the Pink Charter. Further, Geden shall be responsible for the conducting of any appeals proceedings relevant to the arbitration award, and shall cover all costs thereof, always keeping the Company reasonably updated on the developments.

### 10.7.3   Blue Shipping Ltd. versus ST Shipping

One of the Predecessor Companies, Blue Shipping Ltd. ("**Blue**") is party to a dispute with ST Shipping relevant to the vessel M/T Blue.

This dispute has been subject to arbitration in which Blue was awarded damages based on the unjustified cancelation by ST Shipping of the time charter relevant to M/T Blue. The award has however been appealed by ST Shipping.

Geden and the Company have agreed in the Acquisition Agreement that Geden shall receive compensation from the Company equal to such amount as may be received by Blue pursuant to the final decision in the Blue Dispute. Further, per the Acquisition Agreement, Geden undertakes to be responsible for all costs associated with this dispute going forward and to indemnify Blue for any liability arising from the dispute or the facts and circumstances on which it is based.

Blue is currently one of the vessels being chartered to Shell.

Universal Maritime Inc. – Prospectus

## 11    BOARD, MANAGEMENT AND EMPLOYEES

### 11.1    The Board

#### 11.1.1    Overview of the Board

The Board Members are elected by a plurality of the votes cast by shareholders entitled to vote. The Bylaws require the Board to consist of at least one member. As of the date of this Prospectus, the Board consists of three members. The Bylaws may be amended by the vote of a majority of the entire Board or by the vote of at least two-thirds of the votes cast at an annual meeting of shareholders.

The Board is elected annually on a staggered basis, and each director elected will hold office for a three-year term or until his successor shall have been duly elected and qualified, except in the event of his death, resignation, removal or the earlier termination of his term of office. The initial term of office of each director is as follows: two will serve for a term expiring at the 2013 annual meeting of shareholders, two will serve for a term expiring at the 2014 annual meeting of shareholders and two will serve for a term expiring at the 2015 annual meeting of the shareholders.

As of the date of this Prospectus the Board is composed of three members. From the first day of listing, three new and independent board members, James Drakos, Claus Plougmand and Jens Ismar, will take office in addition to the existing board members.

The names and positions of the current Board Members are set out in the table below.

| Name | Position | Served since | Term expires |
|------|----------|--------------|--------------|
| M. Bülent Ergin | Chairman | March 2011 | 2015 |
| A. Tuğrul Tokgöz | Vice Chairman | March 2011 | 2014 |
| Mehmet Mat | Director | March 2011 | 2013 |

The names and positions of the Board Members as of listing are set out in the table below:

| Name | Position | Served since | Term expires |
|------|----------|--------------|--------------|
| M. Bülent Ergin | Chairman | March 2011 | 2015 |
| A. Tuğrul Tokgöz | Vice Chairman | March 2011 | 2014 |
| Mehmet Mat | Director | March 2011 | 2013 |
| Jens Ismar | Director | First day of listing | 2013 |
| James A. Drakos | Director | First day of listing | 2014 |
| Claus Plougmand | Director | First day of listing | 2015 |

The composition of the Board as of listing will be in compliance with the independence requirements of Oslo Stock Exchange (or alternatively Oslo Axess) listing requirements. The composition of the Board as of listing will not be in compliance with the independence requirements of the Norwegian Code of Practice for Corporate Governance of October 21, 2010 as amended (the "**Corporate Governance Code**") as only three out of six Board Members are independent from the Company's material business contacts.

Of the current Board, Mr Ergin holds the position as the chairman of the board of directors of Geden and GDAS. Mr. Tokgöz is a board member and the chief executive officer of Geden and GDAS and Mr. Mat is the chief financial officer of Geden and GDAS. GDAS is an affiliate of Geden. Thus, by holding these positions Messrs. Ergin, Tokgöz and Mat will not be independent of GDAS, which, through the technical management agreements and the services agreement (as further described in Section 15 "Related party transactions"), is a material business contact. The requirement of the Code that at least two of the Board Members shall be independent of the Company's larger shareholders is fulfilled as Mr Ismar, Mr Drakos and Mr Plougmand are independent of Geden. All of the Board Members are independent from the Company's executive management, so the requirement of the Code that a majority of the Board Members shall be independent from the Company's executive management is fulfilled.

The business address for each director is the address of the Company's principal executive office which is c/o UM (USA) LLC, 545 Madison Avenue, New York, NY 10022.

### 11.1.2    Brief biographies of the members of the Board

Set out below are brief biographies of the Board Members, including their relevant management expertise and experience, an indication of any significant principal activities performed by them outside the Company and names of companies and partnerships of which a Board Member is or has been a member of the administrative, management or supervisory bodies or partner the previous five years (not including directorships and executive management positions in subsidiaries of the Company).

### M. Bülent Ergin, Chairman

M. Bülent Ergin has served as the Chairman of the Board since its incorporation in March 2011. Mr. Ergin has extensive experience in the shipping industry, having served as the chairman of the board of directors of GDAS since 1993 and Geden since 2002. Mr. Ergin graduated from the Department of Constructional Engineering of Robert College in Istanbul, Turkey.

### A. Tuğrul Tokgöz, Vice Chairman

Mr. Tokgöz has served as the Vice-Chairman of the Board since its incorporation in March 2011. Mr. Tokgöz has been involved in the shipping industry for over 17 years, and since 1997, he has been the chief executive officer and director of GDAS since 1997 and in Geden since 2002. Mr. Tokgöz graduated from the Faculty of Business Administration of Bilkent University in Ankara, Turkey

### Mehmet Mat, Director

Mr. Mat has served as a member of the Board since March 2011. Mr. Mat has more than 12 years of experience in the shipping industry. Mr. Mat has served as the chief financial officer of GDAS since 2000 and Geden since 2002. Before joining GDAS, he worked for commercial banks in Turkey acting as relationship manager for corporate clients. Mr. Mat currently also heads the finance function at certain other Çukurova Group companies. Mr. Mat holds a bachelor's degree in economics from the Faculty of Political Science at the University of Ankara in Turkey and a master's of business administration degree from the University of Dallas.

### James A. Drakos, Director

Mr. Drakos has agreed to serve as a member of the Board upon the completion of the Offering. Mr. Drakos has served as the chief executive officer and president of Groton Pacific Carriers Inc., or Groton, since 1975. During his career, Mr. Drakos has purchased, financed, operated, invested in and sold over 50 vessels, including tankers. In recent years, Groton has been primarily focused on the Aframax tanker sector, although it has also owned and operated other sizes of tankers. Groton has a long history of partnerships with individuals, public companies and investment funds. Mr. Drakos is also a managing director of GP Trading Inc., a position he has held since 2000, and currently a member of the American Bureau of Shipping and of Intertanko North American Panel. Mr. Drakos received a liberal arts degree from Washington and Lee University in 1972.

### Claus Plougmand, Director

Mr. Plougmand has agreed to serve as a member of the Board upon the completion of the Offering. Mr. Plougmand has been employed in a wide variety of roles within the Maersk Group since 1994. He is currently vice-president/deputy to the chief executive for Maresk Borker Asia, a position he has held since 2009 with overall responsibility for Maresk Broker activities in North East Asia. He is a graduate of Støvring High School, Denmark and has completed studies at INSEAD in France.

### Jens Ismar, Director

Mr. Ismar has agreed to serve as a member of the Board upon the completion of the Offering. Mr. Ismar has been employed as chief executive officer of Western Bulk AS since 2008. During Mr. Ismar's career, he has held several positions within shipping, including director of chartering and project in Bergesen d.y. ASA from 2001 to

2008 and as managing director of Lorentzen & Stemoco AS from 1997 to 2001. Mr. Ismar holds a bachelor's degree in business administration from Lund University in Sweden.

## 11.2    Management

### 11.2.1    Overview

The Management of Universal currently consists of:

| Name | Employed with Universal since | Current position within Universal |
| --- | --- | --- |
| Ronald A. Dal Bello | April 2011 | Chief Executive Officer |
| Richard M. Lemanski | April 2011 | Chief Financial Officer, Treasurer and Secretary |
| Christos G. Papanicolaou | April 2011 | Senior Vice President |

The business address for each executive officer is the address of the Company's principal executive office which is c/o UM (USA) LLC, 545 Madison Avenue, New York, NY 10022.

### 11.2.2    Brief biographies of the members of the Management

Set out below are brief biographies of the Management, including their relevant management expertise and experience, an indication of any significant principal activities performed by them outside the Company.

**Ronald A. Dal Bello – Chief Executive Officer**

Mr. Dal Bello has served as the Company's Chief Executive Officer since April 2011 and has 20 years of experience in international shipping and maritime corporate finance. From 2006 to 2010, Mr. Dal Bello was a member of First Ship Lease Trust's senior management team where he was primarily responsible for the establishment of the company's European offices in Zurich, Switzerland, as well as the development of First Ship Lease's West of Suez strategic platform, the growth of the portfolio and the public listing of the company on the Singapore Stock Exchange. From 2001 to 2006, Mr. Dal Bello, while a director and head of marine financing originations at GE Capital/GE Commercial Finance, led a wide range of financing and investing activities for international shipping entities, including equity, debt and leasing in the U.S., Russia, South America, Europe, Asia and the Middle East. From 1999 to 2001, Mr. Dal Bello was a Vice-President at BancBoston Capital (now Bank of America) where he handled the originating, structuring and negotiating of tax, non-tax enhanced and synthetic lease financing for companies in the maritime industry. From 1997 to 1999, Mr. Dal Bello served as Vice-President at American Marine Advisors, or AMA, where he was responsible for arranging debt, equity and lease transactions as well as providing advisory services for established and emerging maritime companies. From 1990 to 1997, Mr. Dal Bello held various positions at Mitsui & Co, where he managed the operational (new shipbuilding) and financial side of maritime transactions. Mr. Dal Bello holds a Masters of Business Administration degree from New York University and a Bachelor of Arts degree in Economics from Columbia University.

**Richard M. Lemanski – Chief Financial Officer**

Mr. Lemanski has served as the Company's Chief Financial Officer since April 2011 and has over 20 years of experience in international shipping and maritime corporate finance. Mr. Lemanski has worked as a consultant from 2009 to 2011, serving Groton Pacific Carriers Inc., the MTI Network, a leading crisis responder for shipowners in both the maritime and energy industries, and the trustee for the insolvency of Eastwind Maritime Inc., or Eastwind, a diversified owner and operator of over 100 vessels in the tanker, drybulk, container and reefer sectors that filed for Chapter 7 bankruptcy protection on June 24, 2009. From 2007 to 2009, Mr. Lemanski was employed as the Chief Financial Officer of Eastwind, and from 1990 to 2007, he was employed by Stolt-Nielsen Ltd., or Stolt-Nielsen, a publicly-traded holding company operating in 30 countries with international interests in chemical transportation and storage, subsea engineering and construction, aquaculture and e-commerce. Mr. Lemanski held a series of progressive assignments at Stolt-Nielsen with broad exposure to all aspects of finance, accounting, reporting, control, information technology, investor relations and corporate communications. Most recently, he served as Stolt-Nielsen's Senior Vice-President from 2004 to 2007 and Vice-President from 1998 to 2003. Mr. Lemanski holds a Masters of Business Administration degree in Finance and Accounting from the

University of Chicago and a Bachelor of Arts degree in Economics from Northwestern University.

**Christos G. Papanicolaou – Senior Vice-President**

Mr. Papanicolaou has served as the Company's Senior Vice-President since April 2011 and has over twenty years of experience in international shipping. From 1991 to 2011, he was employed by Groton Pacific Carriers Inc and served as its vice president from 2002 to 2011. Mr. Papanicolaou has extensive experience in all aspects of commercial shipping including the purchasing, selling, financing, chartering and operations of vessels with a particular focus on crude tankers and has developed relationships with many major crude oil companies and traders including Royal Dutch Shell plc. Mr. Papanicolaou has purchased, financed, operated, invested in and/or sold over 15 vessels. He is also the founder and a managing director of GP Trading Inc., a ship brokerage firm focused in the lightering business in the Gulf of Mexico which facilitated over 1,000 lighterings in the Gulf of Mexico involving over 500 million barrels of oil. Over the last several years, Mr. Papanicolaou has also worked with leasing companies in developing and procuring assets with long-term leases. He holds a Bachelor of Business Administration from Hofstra University.

**11.3    Directorships and management positions held by the board members and the senior management**

The following table sets forth all companies and partnerships in which the Board Members and senior management have been members of the administrative, management and supervisory bodies in the previous five years (not including directorships and executive management positions in subsidiaries of the Company)

| Name of officer | Position held | Company or partnership | Date of commencement and cessation |
|---|---|---|---|
| M. Bülent Ergin | Board member | Geden Holdings Ltd | 2002 – present |
| | Board member | Turkcell Iletisim A.Ş. | 2005 – present |
| | Board member | Digiturk A.Ş. | 2003 – present |
| | Board member | Genel Denizcilik Nakliyati A.Ş. | 1992 – present |
| | Board member | Çukurova Ithalat A.Ş | 2000 – present |
| | Board member | Çukurova Jenerator A.Ş | 2007 – present |
| | Board member | Show TV | 2003 – present |
| | Board member | Turk Medya | 2003 – present |
| | Board member | Mepaş | 2003 – present |
| | Board member | Zedpaş | 2003 – present |
| | Board member | SkyTurk | 2003 – present |
| | Board member | Maysan Mando | 1999 – present |
| | Board member | Demir Toprak | 1995 – present |
| | Board member | Anadolu Taşımacılık | 1990 – present |
| | Board member | Genel Enerji A.Ş. | 2008 – present |
| | Board member | Digital Platform Teknoloji Hizmetleri | 2002 – present |
| | Board member | İnta Uzay Sistemleri | 2007 – present |
| | Board member | Çukurova Holding A.Ş | 1999 – present |
| | Board member | West of England P&I Club | 2006 – present |
| | Board member | Turkcell Iletisim Hizmetleri A.Ş. | 2005 – present |
| A. Tuğrul Tokgöz | Chief executive officer and board member | Geden Holdings Ltd | 2002 – present |
| | Board member | Çukurova Holding A.Ş. | 2002 – present |
| | Board member | P&I The Swedish Club | 2008 – present |
| | Chief executive officer and board member | Genel Denizcilik Nakliyati A.Ş. | 1997 – present |
| | Board member | Genel Enerji A.Ş. | 2008 – present |

|  |  |  |  |
|---|---|---|---|
|  | Board member | Çukurova İthalat ve İhracat | 2004 – present |
|  | Board member | Çukurova Jeneratör A.Ş. | 2007 – present |
|  | Board member | Inta Uzay Sistemleri | 2007 – present |
|  | Board member | Mepaş and Zedpaş | 2005 – present |
|  | Board member | Intertanko Council | 2008 – present |
| Mehmet Mat | Chief financial officer | Geden Holdings Ltd | 2002 – present |
|  | Chief financial officer | Genel Denizcilik Nakliyati A.Ş. | 2000 – present |
|  | Board member | Çukurova Jeneratör | 2007 – present |
|  | Chief financial officer | Çukurova İthalat ve İhracat | 2004 – present |
| James A. Drakos | Board member and vice chairman | West of England P&I Club | 1999 – present |
|  | Board member | GPC Maritime Corp. | 2011 – 2012 |
|  | Board member | Alpha Aframax Corp. | 2008 – present |
|  | Board member | Glen Carriers Ltd | 2007 – present |
|  | Board member | Loch Carriers Ltd | 2007 – present |
|  | Board member | Sapphire Transport Ltd | 2006 – present |
|  | Board member | Indo Pacific Carriers Ltd | 1975 – present |
|  | Board member | Gainey Shipping Ltd | 1998 – present |
|  | Board member | Star Transport Ltd | 2003 – present |
|  | Board member | Leader Transport Ltd | 2003 – present |
|  | Board member | Sea Shipping Ltd | 2003 – present |
|  | Board member | Ocean Shipping Ltd | 2003 – present |
|  | Board member | SPT Rich Dutchness Inc. | 1997 – present |
|  | Board member | Groton Pacific Carriers Inc. | 1975 – present |
|  | Managing member | Steamboat Harbor LLC | 1997 – present |
|  | Managing member | Greenwich Landing LLC | 2002 – present |
|  | Managing member | 70 Seaview Avenue LLC | 1997 – present |
|  | Managing member | Southport 19 Investment LLC | 2009 – present |
| Claus Plougmand | Vice president/deputy to the chief executive | Maersk Broker Asia | 2009 – present |
| Jens Ismar | Chief executive officer | Western Bulk AS | 2008 – present |
|  | Director of chartering and projecting | Lorentzen & Stemoco AS | 2001 – 2008 |
|  | Board member | Exmar N.V. | 2010 – 2012 |
|  | Chairman | Oslo Shipowners' Association | 2009 – 2012 |
|  | Director | SIGTTO | 2007 – 2008 |
| Ronald A. Dal Bello | Senior vice president | First Ship Lease Trust | 2006 – 2010 |
| Richard M. Lemanski | Chief financial officer | Eastwind Maritime Inc. | 2007 – 2009 |
|  | Senior vice president | Stolt-Nielsen Ltd | 2004 - 2007 |
| Christos G. Papanicolaou | Vice president | Groton Pacific Carriers Inc. | 1991 – 2011 |
|  | Managing director | GP Trading | 2002 – 2011 |

## 11.4 Remuneration and benefits

### 11.4.1 Remuneration and Benefits for the Board Members

The Company paid no remuneration to the Board Members in 2011.

No Board Member holds any options, warrants, convertible loans or other instruments that would entitle a holder of any such instrument to subscribe for any shares in the Company.

*11.4.2     Remuneration and Benefits for the Management*

The remuneration paid to the Management in 2011 was a total of $ 336,750. No bonus payments were paid in 2011. The table below sets out the remuneration paid to each of the members of the Management in 2011:

| Name | Current position | Remuneration paid in 2011 |
|---|---|---|
| Ronald A. Dal Bello | Chief Executive Officer | $150,000 |
| Richard M. Lemanski | Chief Financial Officer, Treasurer and Secretary | $68,250 |
| Christos G. Papanicolaou | Senior Vice-President | $118,500 |

No member of the Management holds any options, warrants, convertible loans or other instruments that would entitle a holder of any such instrument to subscribe for any shares in the Company.

*11.4.3     Bonus scheme*

As the date of this Prospectus there are no formal bonus schemes for any member of the Management

**11.5        Benefits upon Termination**

There are no agreements between Universal and the Board Members for compensation upon termination of their office.

All three members of the Management have employment contracts granting them severance pay in the event of a termination by UM (USA) LLC other than for cause for the remaining term of the employment contract or for 12 months if the employment contract is terminated during the last year of the contract's term.

In addition, if the employment contract is terminated by UM (USA) LLC other than for cause within two years following a change of control (only related to Geden) in the Company, the employee shall be entitled to a bonus equalling 100 % of the base salary plus a lump sum payment of USD 500,000 (Lemanski), USD 850,000 (Papanicolaou) USD 950,000 (Dal Bello). The lump sum payment is also applicable in the event of a change of control (only related to Geden) in a severance pay period as described in the paragraph above, but in such case, an amount equalling any severance pay received up to the date of the change of control event shall be deducted and the employee shall no longer be entitled to severance pay.

**11.6        Pensions**

There are no defined benefit plans for employees. None of the Board Members are entitled to any defined pension benefits from Universal.

**11.7        Loans and guarantees**

The Company has not granted any loans, guarantees or other commitments to any of the Board Members or to any member of the Management.

**11.8        Conflicts of interests etc.**

During the last five years preceding the date of this Prospectus, no member of the Board or the Management has;

- any convictions in relation to indictable offences or convictions in relation to fraudulent offences;

- received any official public incrimination and/or sanctions by any statutory or regulatory authorities (including designated professional bodies) or ever been disqualified by a court from acting as a member of the administrative, management or supervisory bodies of a company or from acting in the management or conduct of the affairs of any company; or

- been declared bankrupt or been associated with any bankruptcy, receivership or liquidation in his capacity as a founder, director or senior manager of a company except for Richard Lemanski.

Universal Maritime Inc. – Prospectus

12.2.5    *Combined cash flow statements*

The table set out below is derived from the audited Combined Statement of Cash Flows for the Predecessor Companies for the three years ended December 31, 2011, 2010 and 2009 and the unaudited Combined Interim Statement of Cash Flows for the Predecessor Companies for the three month periods ended March 31, 2012 and 2011.

| | Year Ended December 31, | | | Three Month Period Ended March 31, | |
|---|---|---|---|---|---|
| **Combined cash flow statements** | | | | | |
| *(in thousands of $)* | **2011** | **2010** | **2009** | **2012** | **2011** |
| *Cash flows provided by /(used in) operating activities* | | | | | |
| Net income /(loss) | (1,203) | 9,388 | (969) | 1,636 | 547 |
| *Adjustments to reconcile net income /(loss) to cash provided by /(used in) operating activities:* | | | | | |
| Depreciation of property and Equipment | 21,388 | 11,412 | 1,196 | 6,461 | 4,435 |
| Amortization of deferred revenue | (965) | (795) | -- | (2,532) | (965) |
| Deferred financing charge | 163 | -- | -- | 76 | 17 |
| *Changes in operating assets and liabilities:* | | | | | |
| Accounts receivables | 2,459 | (5,920) | -- | (1,347) | (1,152) |
| Inventory | (2,686) | (1,607) | (496) | 805 | (1,072) |
| Other current assets | (53) | (560) | (85) | (823) | (1,690) |
| Other non-current assets | (6,988) | -- | -- | (28) | (89) |
| Other current liabilities | 607 | 606 | 192 | (163) | 1,103 |
| Due to related parties | (644) | 882 | -- | 119 | (882) |
| Accounts payable | 2,523 | 5,081 | 1,394 | 266 | 10,577 |
| Deferred revenue | 2,532 | 965 | 795 | 2,605 | 1,461 |
| **Net cash provided by operating Activities** | **17,133** | **19,452** | **2,027** | **7,075** | **12,290** |
| *Cash flows from investing activities:* | | | | | |
| Capital expenditures | (199,275) | (214,834) | (141,029) | -- | (25,401) |
| **Net cash used in investing Activities** | **(199,275)** | **(214,834)** | **(141,029)** | **--** | **(25,401)** |
| *Cash flows from financing activities:* | | | | | |
| Proceeds from long-term debt | 138,755 | 193,058 | 61,103 | -- | 8,480 |
| Repayments on debt to banks | (29,351) | (13,814) | (804) | (6,955) | (4,079) |
| Changes in due from related parties | 7,830 | 248 | (14) | -- | 206 |
| Deferred financing charge | (1,730) | -- | -- | -- | (50) |
| Changes in due to related parties | 74,238 | 16,943 | 81,712 | 2,163 | 11,403 |
| **Net cash provided by financing Activities** | **189,742** | **196,435** | **141,997** | **(4,792)** | **15,960** |
| **Net increase in cash and cash Equivalents** | **7,600** | **1,053** | **2,995** | **2,283** | **2,849** |
| Cash and cash equivalents at beginning of the year | 4,051 | 2,998 | 3 | 11,651 | 4,051 |
| **Cash and cash equivalents at end of the year** | **11,651** | **4,051** | **2,998** | **13,934** | **6,900** |
| **Supplemental information** | | | | | |
| Cash paid for interest during the period | 9,769 | 7,767 | 3,273 | 3,368 | 1,513 |
| Capitalized interest cost and financing charges added to capital expenditures as a non-cash item | 37 | 341 | 63 | -- | 5 |
| Additions to capital expenditures incurred with accounts payable | 594 | 469 | 962 | -- | 8,539 |

Universal Maritime Inc. – Prospectus

**17    DESCRIPTION OF THE SHARES AND SHARE CAPITAL**

*The following is a summary of certain material information relating to the Shares and share capital of the Company and certain other shareholder matters, including summaries of certain provisions of the Articles of Incorporation, Bylaws and applicable Norwegian and Marshall Islands law in effect as of the date of this Prospectus, including the Marshall Islands Business Corporations Act, (the "BCA"). The summary does not purport to be complete and is qualified in its entirety by the Articles of Incorporation, Bylaws and applicable law.*

**17.1    Share capital and share capital history**

The issued share capital of the Company as of the date of this Prospectus is $5, divided into 500 ordinary shares, each with a par value of $0.01. All shares in the Company are currently owned by Geden which in turn is 100% indirectly owned by the Karamehmet family in Turkey.

The issued share capital of the Company will, following issuance of the Consideration Shares to Geden, be increased to $106,111.47 divided into 10,611,147 Shares, each with a par value of $0.01.

The issued share capital of the Company will be further increased through completion of the Offering, see Section 6, "The Offering" for further details on the Offering.

The Company does not hold any treasury shares.

The table below shows the development in the Company's authorized share capital development for the period from incorporation to the date hereof:

| Date | Type of change | Capital increase | New share capital | No. of Shares | Par value per Share |
|------|----------------|------------------|-------------------|---------------|---------------------|
| March 3, 2011 | Incorporation | - | $0 | 0 | - |
| March 3, 2011 | Capital increase | $500 | $5 | 500 | $0.01 |

**17.2    VPS registration of the Shares**

The Company has appointed VPS as the Company's register of shareholders so that, upon Listing, title to the Shares may be evidenced and transferred without a written instrument by VPS. The Shares (and not only the beneficial interests in the Shares) are expected to be registered in the VPS with effect from the Listing (see also Section 18.4 "Securities Trading in Norway—VPS and transfer of shares").

**17.3    Shareholders**

As of the date of this Prospectus, the Company has one shareholder, Geden, which owns 100% of the Shares. The Shares held by the majority shareholder do not and will not carry any different voting rights than the Offer Shares to be issued in connection with the Offering, nor any of the existing issued Shares. Thus, all the Shares carry the right to vote as described in Section 17.7.3 "—The Articles of Incorporation, the Bylaws and Marshall Islands law—Common shares".

As further described in Section 5.2 "The acquisition of the Initial Fleet—The Acquisition Agreement", Geden will receive 10,610,647 Shares in the Company as compensation for the sale of Initial Fleet. Furthermore, Geden will subscribe for up to 2 million Offer Shares in the Offering. Assuming that Geden is allocated 2 million Offer Shares in the Offering, Geden will have an ownership interest in the Company following completion of the Offering of at least 37.68% if the Company raises $200 million in the Offering and 41.98% if the Company raises $170 million in the Offering assuming final Offer Price is set in the mid-point of the Indicative Price Range set out on the front page of the Prospectus. Geden's ownership interest will be reduced to 35.27% and 39.43% respectively if the Over-Allotment Option is exercised in full.

As a result of Geden's substantial ownership interest in the Company, Geden has the ability to exert significant influence over certain actions requiring shareholder approval. The influence must be exercised in accordance with the Bylaws. Apart from aforesaid, there are no specific measures in place regulating the exercise of influence which a follows from holding a significant share or majority of the Shares. Geden will however not control the Company following the Offering as they will not own the majority of the Shares.

## 21    DEFINITIONS AND GLOSSARY

In the Prospectus, the following defined terms have the following meanings:

| | |
|---|---|
| Acquisition Agreement...................... | The acquisition agreement entered into between the Company and Geden on May 28, 2012 regarding the purchase of all outstanding shares in the Predecessor Companies. |
| Additional Shares .............................. | The additional Offer Shares issued pursuant to the over-allotment by the Stabilization Manager (with the consent of the Board) up to 10% of the number of Offer Shares issued in the Offering. |
| Agreement on Right of First Refusal............................................ | The agreement entered into between the Company and Geden which grants the Company rights of first refusal to any and all long term business opportunities developed by Geden in the crude oil, blue water, transportation segment for as long as Geden remains a major shareholder of the Company. |
| Anti-Money Laundering Legislation... | Norwegian Money Laundering Act of March 6, 2009 No. 11 and the Norwegian Money Laundering Regulations of March 13, 2009 No. 302, collectively. |
| Application Period ............................ | The application period for the Retail Offering which is expected to take place from 09:00 hours (CET) on June 20, 2012 to 12:00 hours (CET) on June 29, 2012, unless shortened or extended. |
| Articles of Incorporation................... | The Company's amended and restated articles of incorporation attached as Appendix A to this Prospectus. |
| Audit Committee................................ | The Company's audit committee. |
| Baltic Exchange................................ | Baltic Exchange Limited |
| BCA ................................................. | Marshall Islands Business Corporations Act |
| BITR................................................. | Baltic International Tanker Routes. |
| Blue................................................. | Blue Shipping Ltd. |
| Board .............................................. | The board of directors of the Company. |
| Board Members................................ | The members of the Board |
| Bookbuilding Period ......................... | The bookbuilding period for the Institutional Offering which is expected to take place from 09:00 hours (CET) on June 20, 2012 to 17:30 hours (CET) on June 29, 2012, unless shortened or extended. |
| Borrowed Shares.............................. | Shares made available to the Managers by Geden pursuant to a share lending agreement to facilitate delivery-versus-payment in the Offering. |
| Business Day ................................... | Any day the banks are open in Norway |
| BP .................................................. | British Petroleum Plc. |
| BP Oil............................................... | BP Oil International. |
| Bylaws............................................. | The Company's amended and restated bylaws attached as Appendix A to this Prospectus. |
| CET................................................. | Central European Time. |
| Chairman ......................................... | The chairman of the Board. |
| Clarkson........................................... | Clarkson Valuations Limited. |
| Closing Date..................................... | The date the shares in the 10 SPVs will be transferred to the Company, assumed to be on or about July 9, 2012. |
| Company.......................................... | Universal Maritime Inc. |
| Combined Financial Information ....... | The Combined Financial Statements and the Combined Interim Financial Statements. |
| Combined Financial Statements....... | The combined financial statements of Predecessor Companies as of and for the years ended December 31, 2011, 2010 and 2009. |
| Combined Interim Financial Statements ....................................... | The unaudited combined interim financial statements of Predecessor Companies for the three months ended March 31, 2012 and 2011. |
| Consideration Shares ....................... | 10,610,647 Shares to be issued to Geden at a subscription price of $10 as compensation for the Initial Purchase Price. |

Universal Maritime Inc. – Prospectus

| | |
|---|---|
| Consolidated Financial Information... | The Consolidated Financial Statements and the Consolidated Interim Financial Statements. |
| Consolidated Financial Statements .. | Universal's audited consolidated financial statements for the period from its inception to December 31, 2011. |
| Consolidated Interim Financial Statements ...................................... | Universal's unaudited interim consolidated financial statements as of and for the three months ended March 31, 2012 and from March 3, 2011 (the date of inception) to March 31, 2011. |
| Corporate Governance Code........... | The Norwegian Code of Practice for Corporate Governance, recommended by Norsk Utvalg for Eierstyring og Selskapsledelse (NUES) of October 21, 2010, as updated October 20, 2011. |
| Current Debt Facilities ...................... | The current credit facilities held by the Predecessor Companies and which will be settled upon closing of the Offering. |
| DNB Markets ...................................... | DNB Markets, a part of DNB Bank ASA. |
| Drewry............................................... | Drewry Shipping Consultants Limited. |
| DVB Capital Markets ......................... | DVB Capital Markets LLC. |
| EEA................................................... | The European Economic Area. |
| EUR .................................................. | The lawful currency of the participating member states in the European Union. |
| Existing Debt .................................... | The loans owed by the ten Predecessor Companies to their financial lenders on the closing date of the Transaction and costs incurred as a consequence of the prepayment of the loans. |
| Fearnley Fonds ................................. | Fearnley Fonds ASA. |
| FSMA................................................ | The Financial Services and Markets Act 2000. |
| Geden ............................................... | Geden Holding Ltd. |
| IEA.................................................... | International Energy Agency. |
| IMF.................................................... | International Monetary Fund. |
| Indicative Price Range...................... | The indicative price range in the Offering of NOK 45 to NOK 60 ($~7.5 to $~10) per Offer Share. |
| Initial Fleet....................................... | The ten vessels, five Aframax and five Suezmax tankers, owned by the Predecessor Companies. |
| Initial Purchase Price........................ | $106,106,470. |
| Institutional Offering ........................ | An institutional offering which comprises of (a) institutional and professional investors in the EEA pursuant to the provisions of Article 3(2) of the EU Prospectus Directive 2003/71/EC, (b) in the United States, to QIBs as defined in, and in reliance on, Rule 144A under the U.S. Securities Act, and (c) to institutional investors outside the EEA and the United States pursuant to applicable exceptions from local prospectus requirements; subject to a lower limit per application of an amount of NOK 1,000,000. |
| Joint Bookrunners ............................. | DNB Markets, Fearnley Fonds and RS Platou Markets. |
| Joint Lead Managers......................... | DNB Markets, Fearnley Fonds and RS Platou Markets. |
| KPMG Turkey.................................... | KPMG Akis Bagimsiz Denetim ve SMMM A.Ş. |
| Listing............................................... | The listing of the Shares on the Oslo Stock Exchange or, alternatively, Oslo Axess. |
| Management ...................................... | The senior management group of Universal Maritime Inc. |
| Managers .......................................... | DNB Markets, DVB Capital Markets, Fearnley Fonds and RS Platou Markets as Joint Lead Managers. |
| Managers' Representatives ............... | The Managers' affiliates, representatives, officers, employees or advisors. |
| Master Umbrella Agreement.............. | An agreement between the Company and Shell relating to, among other things, the charter agreements currently in place between Shell and eight of the SPV's to be acquired by the Company pursuant to the Acquisition Agreement upon completion of the Offering. |
| Member States................................... | The participating member states of the European Union. |
| Mitigation Rate ................................. | $29,000 per day. |
| New Debt Facility ............................. | The senior credit facility agreement between the Predecessor Companies as borrowers, the Company as guarantor and a syndicate of banks in the amount of $275.000.000. |
| NOK .................................................. | Norwegian Kroner, the lawful currency of Norway. |

Universal Maritime Inc. – Prospectus

| | |
|---|---|
| NOKUS ............................................. | Controlled foreign corporation taxation |
| Norwegian Corporate Shareholder ... | Norwegian shareholders who are limited liability companies, equities funds, savings banks. mutual insurance companies or similar entities tax-resident in Norway. |
| Norwegian FSA ................................. | The Financial Supervisory Authority of Norway (Nw.: *Finanstilsynet*). |
| Norwegian Personal Shareholder ..... | Norwegian shareholders who are individuals. |
| Norwegian Securities Trading Act..... | The Norwegian Securities Trading Act of June 28, 2007, no. 75 *(Nw.: verdipapirhandelloven)*. |
| Offering ........................................... | The global offering including the Institutional Offering and the Retail Offering taken together. The Offering is expected to be in the region of $170 million and $200 million (equivalent to minimum NOK 1,020 million and maximum NOK 1,200 million using exchange rate of 6.0 Norwegian kroner to U.S. Dollars) prior to exercise of the Over-Allotment Option. |
| Offer Price ........................................ | The final offer price for the Offer Shares in the Offering. The Offer Price may be set above or below the Indicative Price Range. |
| Offer Shares..................................... | The Shares issued in and pursuant to the Offering. |
| Option Agreement ............................ | The agreement between the Company and Geden, pursuant to which the Company has an option to purchase up to two crude oil tankers from Geden. |
| Option Period .................................. | 12 months from the first date of listing of the Shares. |
| Order................................................ | The Financial Services and Markets Act 2000 (Financial Promotion) Order 2005, as amended. |
| Original Charter Rate....................... | $37,300 per day. |
| Oslo Axess ...................................... | A Norwegian regulated market place, operated by Oslo Børs ASA. |
| Oslo Stock Exchange ....................... | Oslo Børs ASA, or, as the context may require, Oslo Børs, a Norwegian regulated stock exchange operated by Oslo Børs ASA. |
| Over-Allotment Option ..................... | Option granted to DNB Markets to buy the Additional Shares initially allocated in the Offering to cover over-allotments in connection with the Offering hand short positions, if any, exercisable within a 30-day period commencing at the time trading in the Shares on the Oslo Stock Exchange (alternatively Oslo Axess). |
| Payment Date .................................. | The payment date for the Offer Shares, expected to be July 4, 2012 in the Retail Offering and July 5, 2012 in the Institutional Offering 2012. |
| Pink Charter ..................................... | The charter party regarding the vessel M/T Pink. |
| Predecessor Companies .................. | The ten special purpose companies owning the Initial Fleet that will be acquired by the Company from Geden pursuant to the Acquisition Agreement. |
| Prospectus ....................................... | This Prospectus dated June 19, 2012. |
| Prospectus Directive......................... | Directive 2003/71/EC of the European Parliament and of the Council of November 4, 2003. |
| QIBs ................................................. | Qualified institutional buyers as defined in Rule 144A. |
| Reimbursed Parties.......................... | Groton Pacific Carriers Inc, GPC Maritime Corp, Universal Maritime (USA) LLC, James Drakos, Christos G Papanicolaou and Richard Lemanski. |
| Regulation S..................................... | Regulation S under the U.S. Securities Act. |
| Relevant Persons ............................. | Persons in the UK that are (i) investment professionals falling within Article 19(5) of the Order or (ii) high net worth entities, and other persons to whom the Prospectus may lawfully be communicated, falling within Article 49(2)(a) to (d) of the Order. |
| Retail Application Form .................... | Application form to be used to apply for Offer Shares in the Retail Offering, attached to this Prospectus as Appendix G. |
| Retail Offering .................................. | An offering to the public in Norway subject to a lower limit per application of an amount of NOK 10,500 and an upper limit per application of an amount of NOK 999,999 for each investor. |
| Relevant Member State .................... | Each Member State of the European Economic Area which has implemented the Prospectus Directive. |
| RSA .................................................. | The New Hampshire revised statutes. |
| RS Platou Markets ............................ | RS Platou Markets AS. |

| | |
|---|---|
| Rule 144A | Rule 144A under the U.S. Securities Act. |
| SEC | U.S. Securities and Exchange Commission. |
| Share(s) | Means common shares in the capital of the Company, each with a par value of $0.01, or any one of them, including the Offer Shares. |
| Shareholder Loans | The current shareholder loans from Geden to the Predecessor Companies. |
| Shell | Shell Western Supply and Trading Limited, a wholly-owned subsidiary of Royal Dutch Shell plc. |
| Sponsor Agreement | The sponsor loan and guarantee agreement dated April 27, 2012 between Geden and the Company, pursuant to which Geden has provided to the Company a financial facility in the amount of $5.0 million in connection with the establishment of Universal and the Offering. |
| SPVs | The ten special purpose companies owning the Initial Fleet that will be acquired by the Company from Geden pursuant to the Acquisition Agreement. |
| Stabilization Manager | DNB Markets. |
| ST Shipping | S.T. Shipping & Transport PTE |
| Target | Target Shipping Ltd. |
| Transaction | The Company's purchase of all outstanding shares in the Predecessor Companies. |
| UK | United Kingdom. |
| Universal | Universal Maritime Inc. and its subsidiaries |
| U.S. or United States | The United States of America. |
| U.S. Exchange Act | U.S. Securities Exchange Act of 1934, as amended. |
| USGAAP | Generally accepted accounting principles in the United States |
| U.S. Holder | A beneficial owner of Shares. |
| U.S. Investor | Prospective investors that are U.S. persons or have a registered U.S. address. |
| U.S. Securities Act | The United States Securities Act of 1933, as amended. |
| $ or U.S. Dollar | United States Dollars, the lawful currency of the United States. |
| Valuation | A valuation of the Initial Fleet on a charter free basis as of May 21, 2012 provided by Clarkson. |
| Vessels | The vessels the Company may acquire from Geden pursuant to the Option Agreement. |
| VLCC | Very Large Crude Carrier. |
| VPS | The Norwegian Central Securities Depository (Nw.: Verdipapirsentralen). |
| VPS Account | An account with VPS for the registration of holdings of securities. |
| Wiersholm | Advokatfirmaet Wiersholm AS |