United States District Court
Southern District of Texas

**ENTERED**

July 06, 2016

David J. Bradley, Clerk

IN THE UNITED STATES DISTRICT COURT
FOR THE SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION

| | | |
|---|---|---|
| TANK PUNK, INC., | § | |
| | § | |
| Plaintiff, | § | |
| | § | |
| V. | § | CIVIL ACTION NO. H-15-1645 |
| | § | Consolidated with |
| SPIKE SHIPPING, LTD., ADVANTAGE | § | CIVIL ACTION NO. H-15-1675 |
| ARROW SHIPPING, LLC, GEDEN | § | |
| HOLDINGS LTD., GENEL DENIZCILIK | § | |
| NAKLAYATI A.S. a/k/a GEDEN LINES, | § | |
| ADVANTAGE TANKERS, LLC, | § | |
| ADVANTAGE HOLDINGS, LLC, | § | |
| FORWARD HOLDINGS, LLC., | § | |
| MEHMET EMIN KARAMEHMET and | § | |
| GULSUN NAZLI KARAMEHMET | § | |
| WILLIAMS, | § | |
| | § | |
| Defendants. | § | |

**MEMORANDUM AND RECOMMENDATION GRANTING DEFENDANTS'
AMENDED MOTION TO VACATE ATTACHMENTS AND DISMISS**

Before the Magistrate Judge upon referral from the District Judge is Defendants' Amended

Motion to Vacate Attachment and Dismiss (Document No. 52), in which Defendants Advantage

Arrow Shipping LLC, Advantage Tankers LLC, Advantage Holdings LLC, and Gulsun Nazli

Karamehmet Williams (the "Advantage Defendants") seek an Order vacating the Rule B attachment

and dismissing Plaintiff Tank Punk, Inc.'s claims against them. Having considered the motion, the

response, the parties' additional briefing, the argument at a hearing held on February 9, 2016, and

the evidence in the record, the Magistrate Judge RECOMMENDS, for the reasons set forth below,

that Defendants' Amended Motion to Vacate Attachment and Dismiss (Document No. 52) be

GRANTED.

I.      **Background and Procedural History**

This is a proceeding under Rule B of the Supplemental Rules for Admiralty or Maritime Claims, pursuant to which the M/V ADVANTAGE ARROW was attached.  But this is not a straight-forward  Rule B attachment case.  Here, the attachment of M/V ADVANTAGE ARROW was based on allegations that the M/V ARROW ADVANTAGE was *nominally* owned by the Advantage Defendants, but *beneficially* owned and controlled by Geden Holdings Ltd. and its principal, Mehmet Emin Karamehmet, through a series of business structure transactions, pursuant to which Geden Holdings Ltd. and its principal Mehmet Emin Karamehmet have attempted to insulate themselves from their creditors.  Stated differently, the attachment in this case was based on an alter ego/piercing the corporate veil theory that Geden Holdings Ltd., by and through its principal, Mehmet Emin Karamehmet, is one and the same as the Advantage Defendants, thereby justifying the attachment of the Advantage Defendants' property to satisfy and/or provide security for claims against Geden Holdings, Ltd.

Since the attachment, there have been several notable developments.  First, by agreement of the parties, security in the amount of $2,200,000.00 was posted and deposited in the registry of the court, and the M/T ADVANTAGE ARROW was released.  Second, again by agreement of the parties, $682,800.00 of that posted security was disbursed to the Advantage Defendants through their escrow agent.  Third, the claims of Plaintiff Eclipse Liquidity, Inc. and Plaintiff Psara Energy Ltd. for security in this case have been resolved, leaving only the claims of Tank Punk, Inc.  And finally, on February 24, 2016, Tank Punk filed a First Amended Complaint (Document No. 47), adding, for the first time, Spike Shipping, Ltd., Geden Holdings, Ltd., Mehmet Emin Karamehmet and Gulsun

Nazli Karamehmet Williams as Defendants, and reflecting that only Plaintiff Tank Punk has claims remaining in this case. Those claims are based on an alleged breach of a charter agreement[1] between Plaintiff Tank Punk, Inc. (the vessel owner) on the one side, and Geden Holdings, Ltd. (the original charterer and subsequent performance guarantor) and Spike Shipping, Ltd. (the subsequent charterer), on the other, for the charter of the M/T SPIKE, with the alleged damages consisting of unpaid charter hire ($232,796.82), hull and machinery repairs, drydocking, and a 60-month coating application ($1,070,000.00), off-hire damages for time spent completing repairs ($1,225,000.00), interest ($155,114.00) and attorneys' fees ($200,000.00). Amended Complaint (Document No. 47) at 6, 23. In addition to seeking to maintain the attachment of the funds remaining in the registry of the court ($1,517,200.00), the First Amended Complaint also seeks to attach additional assets of Defendants in this District up to the amount of Tank Punk's claims.[2]

The current alter ego/piercing the corporate veil allegations in support of Tank Punk's claims are that the "Advantage Defendants" are the "successor business entities of" the "Geden-Group" entities (Spike Shipping, Ltd., Geden Holdings Ltd., Genel Denizcilik Nakliyati A.S. a/k/a Geden Lines, and Mehmet Emin Karamehmet), and that the Advantage Defendants: (1) "have acquired and are . . . in possession of the trading assets of" the Geden-Group entities; (2) "occupy and carry on

---

[1] A "charter party is the principal document of the tramp shipping industry. It is a specialized form of contract for the hire of an entire ship, specified by name. . . . The party that obtains the use and service of the ship is called the charterer or shipper; the party supplying the ship is the carrier or shipowner." 2 Thomas J. Schoenbaum, Admiralty & Maritime Law § 11-1 (5th ed.).

[2] In response to the Amended Motion to Vacate Attachment, Tank Punk, Inc. argues, somewhat inconsistently with its position in its Amended Complaint, that it is only the sum of $1,517,200.00, currently in the registry of the Court, that is subject to attachment. Document No. 56 at 2-3.

3

business from the same business premises as" the Geden-Group entities; (3) "act by and through identical personnel as" the Geden-Group entities; (4) "have common officers and directors with" the Geden Group entities; (5) "have taken over and are servicing the same customers as were being serviced by" the Geden-Group entities; (6) "have virtually the same financing banks financing their business as" the Geden-Group entities; and (7) "have as shareholders members of the same family group" as that of the Geden-Group entities.  First Amended Complaint (Document No. 47) at 8. Against those alter ego allegations is the Advantage Defendants' Amended Motion to Vacate the Attachment and Dismiss.  In that motion, the Advantage Defendants first argue that Tank Punk's alter ego allegations, and the evidence it has submitted, are insufficient to support a Rule B attachment of the Advantage Defendants' assets  based on an alter ego theory.  The Advantage Defendants then argue, additionally and alternatively, that the Rule B attachment cannot be maintained by Tank Punk because Geden Holdings, Ltd. – now named as Defendant – is present in this District, rendering Rule B inapplicable.

The parties have conducted discovery on the alter ego issue, have argued their positions at a hearing held on February 9, 2016, and have submitted substantial briefing and evidence.  The Advantage Defendants' Amended Motion to Vacate is ripe for ruling.

## II.     Standard of Review

Rule B provides for the attachment of a defendant's property when the defendant "is not found within the district":

> If a defendant is not found within the district when a verified complaint praying for attachment and the affidavit required by Rule B(1)(b) are filed, a verified complaint may contain a prayer for process to attach the defendant's tangible or intangible personal property – up to the amount sued for – in the hands of garnishees named in

the process.

"'Rule B allows a district court to take jurisdiction over a defendant in an admiralty or maritime action by attaching property of the defendant.' The rule has two purposes: 'to secure a respondent's appearance and to assure satisfaction in case the suit is successful.'" *Malin Int'l Ship Repair and Drydock, Inc. v. Oceanografia, S.A. de C.V.*, 817 F.3d 241, 244 (5th Cir. 2016) (quoting *Submersible Sys., Inc. v. Perforadora Cent., S.A. de C.V.*, 249 F.3d 413, 421 (5th Cir. 2001) and *Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A.*, 339 U.S. 684, 693 (1950)). [3]

A Rule B attachment is warranted if four requirements are met: 1) the plaintiff "has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006). It is the plaintiff's initial burden to show that each of these four requirements have been met. *Id.* Rule B cannot be used when a defendant can be "found" in the district, meaning that "1) the defendant can be found within the district in terms of jurisdiction, and 2) the defendant can be found within the district for service of process." *Heidmar, Inc. v. Anomina Ravennate Di Armamento Sp.A. of Ravenna*, 132 F.3d 264, 268 (5th Cir. 1998); *see also Navieros*

---

[3] The difference between a Rule B attachment and an in rem action under Rule C was succinctly explained by the First Circuit as follows:

> An *in rem* action [under Rule C] differs from maritime attachment [under Rule B] in that an *in rem* action is brought against the vessel itself as defendant. By contrast, a vessel is attached only as an auxiliary to an in personam claim because the vessel is property belonging to the defendant.

*Navieros Inter-Americanos v. M/V Vasilla Express*, 120 F.3d 304, 313 (1st Cir. 1997) (quoting 2 Schoenbaum, Admiralty & Maritime Law § 21-3, at 478-49).

*Inter-Americanos, S.A. de C.V. v. M/V Vasilla Express*, 120 F. 3d 304, 315 (1st Cir. 1997) (explaining Rule B's "found" language in terms of personal jurisdiction and amenability to service of process).

Once property has been attached pursuant to Rule B, the property can be released upon the posting of a bond, upon the agreement of the parties, or upon an order of the court. *See* FED. R. CIV. P. SUPP. E(5)(a),(b),(c). A person claiming an interest in the attached property may also seek its release by filing a motion pursuant to Rule E(4)(f), which provides:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

When a motion to vacate an attachment is filed under Rule E(4)(f), it is the plaintiff's burden to show that the Rule B attachment was warranted. FED. R. CIV. P. SUPP. E(4)(f) ("the plaintiff shall be required to show"); *Vitol, S.A. v. Primerose Shipping Co., Ltd.*, 708 F.3d 527, 541 (4th Cir. 2013) ("To avoid vacatur of attachment, it is the plaintiff's burden to show. . . "). In addition, when, as here, the attachment is based on alter ego/piercing the corporate veil allegations, the party relying on those allegations for a Rule B attachment must allege and show: "(1) the owner exercised complete control over the corporation with respect to the transaction at issue and (2) such control was used to commit a fraud or wrong that injured the party seeking to pierce the veil." *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 345 F.3d 347, 359 (5th Cir. 2003) (*Bridas I*), *cert. denied*, 541 U.S. 937 (2004); *Naftomar Shipping and Trading Co., Ltd. v. KMA Int'l S.A.*, Civil Action No. V-11-2, 2011 WL 888951 *4 (S.D. Tex. March 10, 2011) (citing *Bridas I*). That burden on plaintiff is heightened when the parties have conducted discovery on the alter ego veil piercing theory and have been afforded the opportunity for an evidentiary hearing. *See Olendorff Carriers Gmbh & Co., KG v. Grand China Shipping (Hong Kong) Co., Ltd.*, Civ. Case No. 2:12-CV-00074, 2013 WL

6

3937450 *2 (S.D. Tex. July 30, 2013) ("While a plaintiff initially need only make a *prima facie* showing that a defendant is amenable to suit, when a district court permits jurisdictional discovery and conducts a full evidentiary hearing on the issue of jurisdiction, the plaintiff must then prove its jurisdictional facts by a preponderance of the evidence.") (internal citations omitted); *see also Seatrade Group N.V. v. 6,785.5 Metric Tons of Cement*, No. Civ. A. H-05-2771, 2005 WL 3878026 *2 (S.D. Tex. Dec. 7, 2005) ("The plaintiff must show by a preponderance of the evidence that it is entitled to a valid lien.").[4]   In those circumstances, it is for the Court to determine, from a preponderance of the evidence. whether the Plaintiff has proven the "jurisdictional facts" supporting the attachment. *Olendorff*, 2013 WL 3937450 at *2.[5]   That effectively means that in the face of a Rule E(4)(f) Motion to Vacate an Attachment, a plaintiff must prove, by a preponderance of the evidence, each of the four requirements for a Rule B attachment.   In also means, when an alter ego theory is asserted as a basis for the Rule B requirement of a "admiralty claim," that a plaintiff must prove, by a preponderance of the evidence, that one entity exercised complete dominion and control over another and that the control was used to commit a fraud or a wrong. *Id.* at *4-5.

In determining, for alter ego purposes, whether one entity is subject to the dominion and control of another, the totality of the circumstances are considered, with reference being made to the following non-exhaustive list of relevant factors:

(1) the parent and subsidiary have common stock ownership; (2) the parent and

---

[4] In a Joint Stipulation (Document No. 9), the parties agreed that there would be no "live" witnesses at the hearing and that the evidence to be considered would be filed with the parties' briefing.

[5] *But see Naftomar Shipping and Trading Co., Ltd. v. KMA Int'l S.A.*, Civil Action No. V-11-2, 2011 WL 888951 (S.D. Tex. March 10, 2011) (utilizing a "probable cause" standard of proof for a plaintiff opposing a Rule E(4)(f) Motion to Vacate a Rule B attachment).

> subsidiary have common directors or officers; (3) the parent and subsidiary have common business departments; (4) the parent and subsidiary file consolidated financial statements; (5) the parent finances the subsidiary; (6) the parent caused the incorporation of the subsidiary; (7) the subsidiary operated with grossly inadequate capital; (8) the parent pays salaries and other expenses of subsidiary; (9) the subsidiary receives no business except that given by the parent; (10) the parent uses the subsidiary's property as its own; (11) the daily operations of the two corporations are not kept separate; (12) the subsidiary does not observe corporate formalities

*Oxford Capital Corp. v. United States*, 211 F.3d 280, 284 n. 2 (5th Cir. 2000).  However, none of these factors are, by themselves, determinative.  *Bridas I*, 345 F.3d at 359.  Instead, all aspects of the relationship between the alleged alter ego entities must be considered.  *Id.*; *see also Bridas S.A.P.I.C. v. Government of Turkmenistan*, 447 F.3d 411, 416 (5th Cir. 2006) (*Bridas II*) ("In making an alter ego determination, a court is 'concerned with reality and not form, [and with] how the corporation operated.'"), *cert. denied*, 549 U.S. 1051 (2006).  As for determining whether one entity has exercised control over another to commit a fraud or a wrong – the second prong of the alter ego veil piercing analysis – while proof of actual fraud is not required, a party seeking to pierce the corporate veil must show that one entity used another to "commit a 'fraud or injustice' *against* [the plaintiff]." *Bridas II*, 447 F.3d at 416-17 (emphasis added); *see also Tejas, Inc. v. Siemers*, No. A-09-CV-0281 LY, 2009 WL 2762066 *4  (W.D. Tex. Aug, 26, 2009) (the second prong of the alter ego test requires proof of control "to commit a 'fraud or injustice'" against the party alleging alter ego liability); *Mills v. City of Port Arthur, Texas*, Civil Action No. 1:05-CV-298, 2006 WL 3531460 *10 (E.D. Tex. Dec. 4, 2006) (refusing to pierce the corporate veil where plaintiff "made no showing that he suffered any particular harm intrinsic to the [defendant's] purported misuse of [ ] corporate form," and there was no allegation that the defendant "would be unable to satisfy a potential award of damages and thereby avoid liability"), *aff'd*, 234 F.App'x 285 (5th Cir. 2007).  "The alter ego doctrine, like all variations of piercing the corporate veil doctrine, is reserved for exceptional cases."

*Bridas*, 447 F.3d at 416.

### III.     Discussion - Alter Ego Veil Piercing Theory

As set forth above, this proceeding is only about security – not about the underlying substantive claims that are pending in London arbitration proceedings between the parties to a charter agreement (Tank Punk as the owner of the M/T SPIKE and Geden Holdings Ltd. and Spike Shipping Ltd. as the charterers/performance guarantor).  For that reason, the relationship among and between Defendants is especially important.

The hierarchical relationship between the "Advantage Group" Defendants is as follows: Defendant Gulsun Nazli Karamehmet Williams ("Williams") owns 85% of Defendant Forward Holdings LLC.  The remaining 15% is owned by Ali Turgrul Tokgoz; Defendant Forward Holdings LLC owns 100% of Defendant Advantage Holdings LLC.; Defendant Advantage Holdings LLC owns 100% of Defendant Advantage Tankers LLC. ; and Advantage Tankers LLC owns (100%), through eleven separate LLCs, eleven oil tankers, including the M/T ADVANTAGE ARROW, which is owned by Defendant Advantage Arrow Shipping LLC, and which is the vessel that was initially attached in this case.  With respect to the M/T ADVANTAGE ARROW, the entirety of the evidence shows that as of the date the original Complaint was filed, through the date of Tank Punk's Amended Complaint, the ADVANTAGE ARROW was owned by Advantage Arrow Shipping, LLC. – one of the Advantage Defendants.  Prior to March 24, 2015, however, the M/T ADVANTAGE ARROW was owned by Geden Holdings, Ltd. through its subsidiary Target Shipping Ltd. and was named the M/T TARGET.  *See* Exhibit 1 to Declaration of Neil A. Quartaro (Document No. 44-1 at pp. 23-25).  On March 24, 2015, the M/T ADVANTAGE ARROW (formerly known as the M/T

TARGET), was sold for the sum of $44,000,000.00.  *Id.*   That sale is reflected in a "Memorandum of Agreement," a "Bill of Sale" and several wire transfer records, which show that more than $20 million was paid to Target Shipping Ltd. for its equity interest in the vessel.  *Id.* (Bill of Sale and wire transfer documents); Exhibit 22 to Declaration of George A. Gaitas (Document No. 42-7 at 100-106) ("Memorandum of Agreement").

As for the relationships between the "Geden Group" Defendants, it is undisputed that Defendant Mehmet Emin Karamehmet owns 100% of Defendants Geden Holdings Ltd. and Genel Denizcilik Nakliyati A.S. a/k/a Geden Lines.  It now also appears, without dispute, that Geden Holdings, Ltd., used to own, through eleven wholly owned subsidiaries, the eleven oil tankers that were sold to Advantage Tankers LLC, over a period of four months, between February 15, 2015 and May 27, 2015.  Exhibit 1 to Declaration of Neil A. Quartaro (Document No. 44-1 at pp. 1-44). Genel Denizcilik Nakliyati A.S. ("Geden Lines") did not own any of those tankers, but instead, from the evidence in the record, was the manager/operator of those tankers.  *See* Declaration of Ali Togrul Tokgoz (Document No. 43-1).[6]   As is relevant to the underlying substantive dispute, the evidence

---

[6] In its pleadings, particularly its Original Complaint, Tank Punk tended to conflate Geden Holdings, Ltd. with Geden Lines, at times referring to them interchangeably.   The evidence, as developed through the parties' discovery efforts, now make it clear that Geden Lines never owned any of the tankers that were sold to the Advantage Defendants – Geden Holdings, Ltd. did.  And, as explained by Tokgoz in his Declaration, Geden Lines provided to Geden Holdings, Ltd., and now provides to the Advantage Defendants, technical and managerial services for ocean going ships.  Tokgoz states in his Declaration as follows:

　　3.　　　[Geden Lines] is a technical manager of ocean going ships, meaning that it supplies management services to third party ship owners.

　　4.　　　Specifically, [Geden Lines] provides a "turn-key" solution for ship owners that wish to outsource the day to day management of shipping assets, such as arranging and paying crew, maintaining vessels, obtaining insurance and supplies, and other specialized functions.

　　5.　　　[Geden Lines] does not own any vessels, but manages vessels owned by numerous owners, including Advantage Tankers but also including other well-

shows, and neither side disputes, that Geden Holdings, Ltd. was the original charterer of Tank

Punk's vessel, the M/T SPIKE.  Exhibit 1 to Tank Punk's First Amended Complaint (Document No.

47-1 at 2-21).   Subsequently, Spike Shipping Ltd., a wholly owned subsidiary of Geden Holdings

Ltd., was substituted as the charterer of the M/T SPIKE, with Geden Holdings, Ltd. then becoming

the charter performance guarantor. *Id*. at 22, 33-35; Exhibit 3 to First Amended Complaint

(Document No. 47-1 at 33-35).

As between the Advantage Defendants and the Geden Group Defendants, the most important

relationship, and that relied upon by Tank Punk as a significant basis for its opposition to the Motion

to Vacate Attachment and Dismiss, is that between the individual Defendants, Mehmet Emin

Karamehmet ("Karamehmet") and Gulsun Nazli Karamehmet Williams ("Williams").  Williams is

Karamehmet's daughter and only child.

---

known publicly traded companies.

6.      In the case of oil tankers, [Geden Lines] has built a reputation as an
experienced and competent technical manager and manages numerous vessels
under charter to the group of large oil companies colloquially referred to as the
"oil majors".

7.      In my experience, when an oil tankers is chartered to an oil major, it must
first undergo an extensive vetting process which, if successful, allows the vessel
to be "entered" with these oil majors and hence chartered by them.  A vessel
entered with the oil majors commands a premium.

8.      Changing technical managers usually results in the loss of a vessel's
approval to carry cargoes for the oil majors, and charter agreements with oil
majors typically require that the technical manager stays the same.

9.      With respect to the Vessels, defined in the Motion to Dismiss, [Geden
Lines] was retained as a technical manager when the Vessels were sold by Geden
Holdings, or its subsidiaries, to Advantage Tankers and its subsidiaries.

10.      This is not unusual, and the lenders to Advantage Tankers, who took a
security interest in the charters covering the Vessels, also insisted that [Geden
Lines] be retained as the technical manager.

Declaration of  Ali Togrul Tokgoz (Document No. 43-1).  Tank Punk has not challenged or
contested any of the statements in Tokgoz' Declaration.

In their Amended Motion to Vacate Attachment and Dismiss, the Advantage Defendants argue that Tank Punk's alter ego allegations of dominion and control are conclusory and unsupported, and that there are no allegations and no evidence that the Geden Group Defendants' assets were sold for less than market value or that the sale was used or intended to commit fraud or some other wrong against Tank Punk.  In support of their arguments, the Advantage Defendants point to the uncontroverted evidence – in the form of bank records – that Williams used her own funds (close to $200 million) to purchase certain of the Geden Group Defendants' assets, including the M/T ADVANTAGE ARROW, and the absence of *any* evidence that: (1)  the Geden Group Defendants actually exercise(d) any dominion or control over the Advantage Defendants; (2) Defendant Karamehmet and Williams conspired or colluded in connection with the sale of the Geden Group Defendants' assets; or (3) that there was any fraud or wrong associated with the sale of the Geden Group Defendants' assets which has resulted in injury to Tank Punk.

Against these arguments is Tank Punk's reliance on: (1) the familial relationship between Defendant Karamehmet and Williams; (2) the evidence that the Advantage Defendants have practically and effectively taken over the Geden Group Defendants' business, utilizing Geden Lines as the technical manager and operator of the vessels, looking to virtually the same lenders to provide financing for the purchase of the vessels, and maintaining the charter agreement and relationship Geden Holdings, Ltd. had with Shell Western Supply and Trading Limited; and (3) the terms of a unsuccessful re-structuring effort, outlined in a "Project Hermitage Report," which were designed to "ring-fence" the Geden Group Defendants' creditors.

A.        **Dominion and Control Prong**

Neither Tank Punk's allegations in the First Amended Complaint nor the evidence in the record supports a conclusion that the Geden Group Defendants have exercised complete control and dominion over the Advantage Defendants.   Tank Punk alleges that everything the Advantage Defendants do, and have ever done, has been at the behest of, and for the benefit of, Defendant Karamehmet and the Geden Group Defendants.   But the evidence in the record does not support Tank Punk's allegations.   Instead, the evidence shows that only *some* of the Geden Group Defendants' assets[7] were sold  to the Advantage Defendants, and this was only *after* the Geden Group Defendants had explored several other re-structuring and re-financing options.   Exhibits 9 ("Prospectus Universal Maritime") & 10 ("AlixPartners Project Hermitage Restructuring") to Tank Punk's Amended Complaint (Document No. 47-2 at 12-87); Deposition of Tokgoz at 43-47; 67-71 (Document No. 41-1 at 45-49; 69-73); Deposition of Mat at 26-28; 34-42 (Document No. 41-3 at 28-30; 36-44).   In addition, the evidence in the record shows that the sale of assets to the Advantage Defendants was upon terms which were objectively reasonable to both the Geden Group Defendants and the Advantage Defendants at the time, with the value of the 11 tankers that were sold being set by third party brokers.   Williams Deposition at pp. 27-31 (Document No. 41-2 at 29-33).

As part of the discovery conducted in this case, Tank Punk took the depositions of Ali Togrul Tokgoz ("Tokgoz"), Mehmet Mat ("Mat"), and Defendant Williams.   Defendant Williams has an 85% ownership interest in Advantage Tankers, LLC, with the remaining 15% being owned by

---

[7] In their depositions, Tokgoz and Mat explained how Geden Holdings, Ltd. over a period of five to six years, sold most of its vessels ("about 50 to 60 ships roughly"), including the 11 tankers that were sold to the Advantage Defendants in 2015.  Tokgoz Deposition at 45 (Document No. 41-1 at 47); Mat Deposition at 36, 40 (Document No. 41-3 at pp. 38, 42).

Tokgoz.  Tokgoz currently serves as the CEO of Advantage Tankers, LLC, and a director of both Geden Holdings, Ltd. and Geden Lines.  Prior to the sale of the 11 tankers to the Advantage Defendants, he served as the CEO of both Geden Holdings, Ltd. and Geden Lines.  Somewhat similarly, Mat currently serves as the CFO of Advantage Tankers, LLC, and as the CFO of both Geden Holdings, Ltd. and Geden Lines.

As was made clear during the depositions of Tokgoz, Mat and Williams, and uncontroverted by Tank Punk, it was Tokgoz who approached Williams in 2014 about purchasing the 11 tankers from Geden Holdings, Ltd., which at that time was in the process of selling all of its vessels.  Tokgoz Deposition at 71 (Document No. 41-1 at 73).  Tokgoz testified that he did not approach Williams at the request or behest of Karamehmet, and only told Karamehmet about Williams' involvement after she had expressed an interest in the proposed investment.  *Id.* at 73 (Document No. 41-1 at 75).  Tokgoz explained, as follows, his reasons for approaching Williams, following the inability to re-structure or refinance Geden Holdings, Ltd's debt:

Q:    How did it come about [that] she [Williams] expressed an interest?

A:    I approached her.

Q:    Why did you approach her?

A:    I mean I just didn't want to lose the fleet, which was, I believe, a young and good fleet with a good chartered attached with oil major like Shell, and I asked if she would be interested to invest and after some discussions and explaining what it is and what can be done she said she was interested but not the full equity.  She didn't want to go putting – taking all.  She said if there is any other party who would co-invest with her she can proceed, and that is how it started.

*Id.* at 71 (Document No. 41-1 at 73).  Mat similarly explained at his deposition how Williams became involved and ultimately purchased the 11 tankers by and through Advantage Tankers, LLC:

14

A:     So maybe I should go back one step.

Q:     Yes?

A:     And talk about what has happened after Alix Partners proposal has been declined.  After that I said we have seen that the restructuring of Geden Holdings indebtedness with the banks was not going to go through.  We have decided to sell the assets in Geden Holdings and, as I said earlier, we have sold almost 20 ships within that year only.  While market these ships to the market as managers, Tugrul [Tokgoz] and myself, we believe that the business is a nice business and there is a good value in it considering the Shell charter relationship that we have developed personally.

Then at that time Tugrul [Tokgoz] came up with the idea that Mrs. Williams herself could be the investor. . . .

\* \* \*

In the new structure what we proposed to Mrs. Williams is to get a guaranteed return from Shell charterers so that she would be more willing to invest more money because she would know that her returns would be granted to a certain extent.  She has accepted.  We approached Shell to get the charters with the floor rates, and by doing so we not only give comfort to Mrs. Williams but at the same time we managed to get better terms from the banks because they, as you may have seen from here, some of the banks have increased their commitments.

Mat Deposition at 40-42 (Document No. 41-3 at 42-44).  Mat also testified that he did not discuss the proposed sale or Williams' involvement in the purchase of the 11 tankers with Karamehmet.  *Id.* at 47 (Document No. 41-3 at 49).

In addition to this uncontroverted deposition testimony that Karamehmet did not instigate or control Williams' acquisition of the 11 tankers, there is documentary evidence which shows that Williams, in 2015, paid the fair market value for the 11 tankers that were purchased by the Advantage Defendants, using nearly $200 million of her own funds, and securing hundreds of millions more in loans.  Exhibits 1 and 2 to Supplemental Declaration of Neil A. Quartaro (Document No. 52-1 at 4-75).  The documentary evidence also shows that the Geden Group

15

Defendants received, in cash, their equity interests in each of the 11 tankers that were sold to the Advantage Defendants – totaling nearly $200 million – cash that was paid by Williams to Geden Holdings, Ltd. through its subsidiaries.  Exhibit 1 to Declaration of Neil A. Quartaro (Document No. 44-1 at pp. 2-44); Exhibit 1 to Supplemental Declaration of Neil A. Quartaro (Document No. 52-1 at 4).[8]

In the face of this evidence, Tank Punk points to language in a "Hermitage Report," prepared by AlixPartners in March 2013, as evidence that the Geden Group Defendants, all along, planned to restructure in such a way that their creditors would be "ring-fence[d]."  *See* Amended Complaint (Document No. 47) at 13; AlixPartners Report, Exhibit 10 to Amended Complaint (Document No.47-1 at pp. 35-87).   But, as explained by Tokgoz and Mat at their depositions, the proposals contained in the March 2013 "Hermitage Report" were not implemented because the banks providing financing to Geden Holdings, Ltd. would not, or could not, agree on the course of action proposed in the report.  Tokgoz Deposition at 43-44 (Document No. 41-1 at 45-46); Mat Deposition at 37 (Document No. 41-3 at 39).  As such, any language about "ring-fencing" in the March 2013 Hermitage Report has little relevance to the actual sale of the 11 tankers to the Advantage

---

[8]In its Sur-Reply (Document No. 59-1), Tank Punk points out certain discrepancies in the documents evidencing the sale of the M/T ADVANTAGE ARROW, discrepancies which do not consistently reflect or suggest that the M/T ADVANTAGE ARROW was not actually sold for $44 million.  Despite the identified discrepancies between the sales and the loan documents for the ADVANTAGE ARROW as to the value of the ADVANTAGE ARROW, Tank Punk has not shown, by a preponderance of the evidence, that any discrepancy reflects a "sham" sale or continued control over the ADVANTAGE ARROW by the Geden Group Defendants following the sale.  In addition, although Tokgoz testified at his deposition that he could not explain the dollar-number discrepancies between the sale and the loan documents, he believed that they may have been typographical errors, and was adamant that the entire $44 million for the sale of the M/T ADVANTAGE ARROW was "paid."  Tokgoz Deposition at 114-119 (Document No. 41-1 at 116-121).

Defendants in 2015.

Tank Punk also makes much of the fact that Williams is Karamehmet's daughter and suggests that such a familial relationship, coupled with broad ownership references to the "Karamehmet family" in Geden Group Defendant documents, suggests either that Williams and Karamehmet should be considered one and the same for purposes of this case, or that Karamehmet has control over Williams and the Advantage Defendants. There is, however, no evidence in the record that there is any financial unity between Karamehmet and Williams, no evidence in the record that Karamehmet exerted any influence or control over Williams with respect to her purchase of the 11 tankers, and no evidence that the Geden Group Defendants have dominion and control over the Advantage Defendants. The evidence is simply that Williams is extremely wealthy, and was born wealthy. Williams Deposition at 61-63 (Document No. 41-2 at 63-65). Any argument that her father (Karamehmet) controls her, the funds she used to purchase those 11 tankers, or any of the Advantage Defendants is nothing more than mere speculation. Such speculation is insufficient to support an alter ego theory of liability. *Estate of Lisle v. Commissioner of Internal Revenue*, 341 F.3d 364, 377 (5th Cir. 2003), *mandate recalled*, 431 F.3d 439 (2005); *Settlement Funding, LLC v. RSL Funding, LLC*, Civil Action No. H-12-2044, 2013 WL 5231475 *7 (S.D. Tex. Sept. 16, 2013).

As for Tank Punk's allegation that the Advantage Defendants merely continued the business of the Geden Group Defendants following the sale of the 11 tankers, and are, in that sense, the alter ego(s) of the Geden Group Defendants, the only evidence in the record to support that allegation is a June 2, 2015, "Consent Letter" between Geden Holdings, Ltd. and Shell Western Supply and Trading Limited ("Shell Western"), whereby Geden Holdings, Ltd. facilitated the continued charter arrangement of 9 of the tankers that were sold to the Advantage Defendants. Tank Punk alleges in

17

its First Amended Complaint that this "Consent Letter" contains Geden Holdings Ltd.'s representations and assurances that Geden Holdings, Ltd. would retain ownership interest over the vessels despite their sale.  *See* First Amended Complaint (Document No. 47) at 9 ("GEDEN HOLDINGS represented and warranted to the Geden-Group's sole customer – Shell Western Supply and Trading, Ltd – that it retained ownership over the Advantage-Group one-ship companies.  *Id.* at Bates No. D01248, at ¶ 2.").   However, *nothing* in that Consent Letter, particularly paragraph 2 referenced by Tank Punk in its Amended Complaint, can be read as such a representation by Geden Holdings.  Paragraph 2 of the Consent letter provides as follows:

> 2.    As part of certain reorganisation efforts being conducted by the existing shareholders of each Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as new owners (and each wholly owned by the Shareholder, the "New Owners").

"Consent Letter", attached as Exhibit 5 to Amended Complaint (Document No. 47-1 at pp. 37-41). As explained by Tokgoz in his Declaration and at his deposition, the continued charter arrangement with Shell Western was key to the sale of the 11 tankers to the Advantage Defendants, and it was both Shell Western and the banks financing part of the sale that insisted Geden Lines continue as manager/operator of the nine tankers under charter.  Declaration of Tokgoz (Document No. 43-1); Tokgoz Deposition at 99 (Document No. 41-1 at 101) ("Correct, it was a requirement by the charter of Shell that the management should be kept the same.").  Neither the terms of the Consent Letter nor the Advantage Defendants' subsequent charter agreements with Shell Western in any way evidence that the Geden Group Defendants retained control over any of the tankers following their sale.  In fact, the terms of the Consent Letter indicate to the contrary.  Paragraph 3(c) of the Consent Letter contemplates Shell Western's agreement to charter nine of the oil tankers to be sold to the

Advantage Defendants, upon the "New Owners being acceptable" to Shell Western following its "KYC and other relevant checks."   Exhibit 5 to Amended Complaint (Document No.  47-1 at 37). While Tank Punk is correct that Geden Lines continued to act as the technical manager/operator of the tankers after they were sold, Geden Lines' continued role as a manager/operator of the tankers does not equate to the type of dominion and/or control over the Advantage Defendants that is required to pierce the corporate veil.[9]

As for the particular dominion and control factors identified by the Fifth Circuit as relevant to an alter ego theory, *Oxford Capital*, 211 F.3d at 284 n.2, only one supports Tank Punk's alter ego veil piercing theory.  The Geden Group Defendants and the Advantage Defendants do not have common stock ownership, and there is no evidence the Geden Group Defendants and the Advantage Defendants file consolidated financial statements, no evidence the Geden Group Defendants finance the Advantage Defendants, no evidence the Geden Group Defendants "caused" the incorporation of the Advantage Defendants, no evidence the Advantage Defendants have operated with grossly inadequate capital, no evidence the Geden Group Defendants pay the salaries and other expenses of the Advantage Defendants, no evidence the Geden Group Defendants use the Advantage Defendants' property as its own, no evidence the daily operations of the Geden Group Defendants and the Advantage Defendants are not kept separate, and no evidence the Advantage Defendants do not observe corporate formalities.  While the Geden Group Defendants and the Advantage Defendants both utilize Geden Lines to manage and/or operate their vessels, and while the Geden Group Defendants did facilitate the Advantage Defendants' acquisition of the Shell Western charter

---

[9] As explained by Tokgoz in his Declaration, *see infra* note 6, there were both practical and financial considerations that necessitated Geden Lines continuing as the technical manager/operator of the tankers that were chartered to Shell Western.

business, in the context of this case neither circumstance evidences continuing dominion and control by the Geden Group Defendants over the Advantage Defendants.  It was Tokgoz and Mat who arranged for the Advantage Defendants to take over the Shell Western charter business, and it was Shell Western that insisted Geden Lines continue on as operator/manager of the nine tankers under charter.  Tokgoz Deposition at 99 (Document No. 41-1 at 101).  As for the one factor that is significantly present in this case – the commonality of directors and or/officers – the evidence is that both Tokgoz and Mat have interconnected and overlapping interests in both the Geden Group Defendants and the Advantage Defendants.  But, despite those overlapping interests, there is no evidence that either Tokgoz nor Mat are, or have, utilized their positions with the Geden Group Defendants to control the Advantage Defendants.  Instead, all the evidence shows is that Tokgoz and Mat, realizing the value of the tankers if a charter relationship could be continued with Shell Western, coordinated the sale for the benefit of the Geden Group Defendants, which had to sell the tankers, the Advantage Defendants, which were in a position to buy the tankers, and themselves, so that they could continue to benefit personally (in the case of Tokgoz) and professionally.

In all, Tank Punk's evidence of control, which is predicated primarily on the familial relationship between Karamehmet and Williams, and secondarily on the charter business with Shell Western the Advantage Defendants retained following their purchase of the 11 tankers, is simply insufficient, under a preponderance of the evidence standard, to meet the dominion and control prong of the alter ego test.

### B.    Fraud/Wrong/Injustice Prong

Similarly, neither Tank Punk's allegations nor the evidence in the record supports a conclusion that the Geden Group Defendants exercised control over the Advantage Defendants "to

commit a fraud or wrong that injured" Tank Punk.  Tank Punk alleges in its First Amended Complaint that Defendants have engaged "in fraudulent corporate restructuring and asset reallocation practices in order to escape their liability for failing to pay bareboat charter hire and redeliver the vessel to her owners in a proper state and condition as required under the bareboat charter."  First Amended Complaint (Document No. 47) at 23.  This allegation is conclusory and falls far short of the particularized allegations that are required for a Rule B attachment.  *See* Rule E(2)(a) (requiring particularized allegations); *Dry Handy Investments, Ltd. v. Corvina Shipping Co. S.A.*, 988 F.Supp.2d 579, 584 (E.D. Va. 2013) (granting motion to vacate Rule B attachment which was based on alter ego theory where there were no particularized allegations of "injustice or fundamental unfairness").  Moreover, and more importantly, there is no evidence in the record that the Geden Group Defendants sold their assets to commit or perpetuate a fraud or wrong *against* Tank Punk.  There is also no evidence that Tank Punk has been injured in any way by the Geden Group Defendants' sale of the 11 tankers to the Advantage Defendants.   The uncontroverted evidence in the record is that: (1) the Geden Group  Defendants received close to $200 million in cash for their equity interests in the 11 tankers that were sold to the Advantage Defendants; and (2) the 11 tankers were sold for fair market value.   The evidence also shows that Tank Punk could not have been disadvantaged by the sale of the 11 tankers to the Advantage Defendants because Geden Holdings, Ltd. received its full equity value in the vessels.   Despoina Bacha, Tank Punk's corporate representative, testified in this regard at her deposition as follows:

> Q:     I'm not asking you that.  I'm asking you if Geden received the value of its equity, if any, in the vessels listed in paragraph 36 –
>
> A:     Yes.
>
> Q:     – how is plaintiff disadvantaged?

21

A:      It's not disadvantaged.  They – if Geden managed to pay creditors, like Stealth, after this new restructuring plan, we don't have any problem.  We don't have any objections what Geden will do with this corporate structure.  We have no interest if we receive our hires.  But we don't receive our hires, that's where we starting to investigate.  We don't have any problem with Geden receiving the capital or nor or equity or anything.

* * *

Q:      . . . . If the vessels listed in paragraph – if Geden when it sold the vessels listed in paragraph 36, received the value of its equity in those vessels, how is the plaintiff in this action disadvantaged by that sale?

A:      It could not be disadvantaged.  If they pay our money, we have no problem.  We would have no problem with this.

Q:      So am I to understand, ma'am, that even though the – if the sale of these vessels, if Geden received the value of its equity in these vessels, plaintiffs could not have been disadvantaged by that sale.   Is that what you're saying?

A:      Yes.

Exhibit 3 to Supplemental Declaration of Neil A. Quartaro (Document No. 52-1 at 79, 80-81).

Despite the absence of fraud/wrong/injustice allegations in the Amended Complaint, and despite this testimony from Tank Punk's corporate representative that Tank Punk was not disadvantaged by the sale of the sale of the tankers, for which the Geden Group Defendants received, in cash, their equity value in the tankers, Tank Punk argues that the second prong of the alter ego test has been, or can be, met on this record because the facts of this case are essentially the same as that at issue in *Bridas II*.  But, Tank Punk mis-reads both the breadth and applicability of *Bridas II* to the facts in this case.

In *Bridas I* and *II*, the Fifth Circuit explained and developed the law on alter ego veil piercing.  At issue was an arbitration award following the demise of a joint venture between Bridas S.A.P.I.C. (an Argentinian company) and State Concern Turkmenneft, and the determinations at the

District Court level that the State Concern Turkmenneft was not the alter ego of the Government of Turkmenistan.  "Because the district court failed to take into account all of the aspects of the relationship between the Government [of Turkmenistan] and Turkmenneft," the Fifth Circuit, in *Bridas I*, remanded the case to the District Court to reconsider its alter ego determination.  *Bridas I*, 345 F.3d at 359-360.  In *Bridas II*, the Fifth Circuit reversed the subsequent decision of the District Court and rendered a decision in favor of Bridas "[b]ecause the totality of the record demonstrated that the Government [of Turkmenistan] should be bound as an alter ego of State Concern Turkmenneft."  *Bridas II*, 447 F.3d at 414.  In determining that Turkmenneft and the Government of Turkmenistan were alter egos, the Fifth Circuit focused on the undercapitalization of Turkmenneft, the Government's legislative actions which rendered Turkmenneft "immune from seizure under newly enacted Turkmenian law," and the Government's issuance of a "number of decrees distancing itself from the joint venture and attempting to limit its potential exposure to liability."  *Id.* at 417, 420.  In concluding that the District Court's alter ego determination was incorrect, the Fifth Circuit explained the unique circumstances of the case that justified its alter ego determination on appeal:

> Despite some indicia of separateness, the reality was that when the Government's export ban forced Bridas out of the joint venture, the Government then exercised its power as a parent entity to deprive Bridas of a contractual remedy.  Intentionally bleeding a subsidiary to thwart creditors is a classic ground for piercing the corporate veil.

Id. at 420.

Nothing in this case has any factual similarity to *Bridas*.  Tank Punk: (1) has not alleged or shown that it has no remedy against Geden Holdings, Ltd. - the party against whom it has its substantive claims; (2) has not alleged or shown that the Geden Group Defendants sold its vessels

23

in order to thwart Tank Punk and its other creditors; and (3) has not alleged or shown that the Geden Group Defendants cannot satisfy an award if Tank Punk were to prevail on its substantive claims in the pending arbitration proceeding.[10]   Neither facts nor circumstances in *Bridas* provides any support for the fraud/wrong/injustice prong of Tank Punk's alter ego veil piercing theory in this case.

Here, because there are no allegations by Tank Punk that it has been defrauded, harmed, or suffered an injustice as a result of the Geden Group Defendants' sale of 11 oil tankers to the Advantage Defendants, and because Tank Punk's corporate representative admitted at her deposition that Tank Punk has not been disadvantaged by that sale given the full market value that was received by the Geden Group Defendants for those 11 tankers, Tank Punk has not, and cannot, meet its burden on the fraud/wrong/injustice prong of the alter ego test.   Consequently, the Rule B attachment cannot be sustained on the alleged alter ego veil piercing theory. [11]

---

[10] Tokgoz testified at his deposition that the money received by Geden Holdings, Ltd. for its equity value in the 11 tankers is "[b]eing used for general business purposes."  Tokgoz Deposition at 130 (Document No. 41-1 at 132).

[11] Argued as an additional and alternative reason for vacating the attachment and dismissing Tank Punk's claims, Defendants maintain that Defendant Geden Holdings, Ltd. could be "found " in this District both at the time Tank Punk, Inc.'s Original Complaint was filed on June 12, 2015, and at the time the Amended Complaint was filed on February 24, 2016, and therefore a Rule B attachment was unavailable to Plaintiff.  In support of that argument, the Advantage Defendants point to the uncontroverted evidence that Geden Holdings, Ltd., as of June 14, 2015, when Tank Punk's Original Complaint was filed, had a presence in this District, having registered to do business in Texas with the Texas Secretary of State and having maintained an office and telephone number in this District.   In addition, the Advantage Defendants point to the uncontroverted evidence that Geden Holdings, Ltd., as of November 3, 2015, before the Amended Complaint was filed, had designated with the Texas Secretary of State an agent for service of process.  Tank Punk counters that Geden Holdings,. Ltd. was not initially named as a Defendant and its office in this District was nothing more than a virtual office, with no employees.  In addition, Tank Punk maintains that Geden Holdings' designation of an agent for service of process in the State of Texas, an agent located in Dallas, is insufficient to show that Geden Holdings is amenable to service of process in this District.

Determining whether the Rule B attachment was proper at the time Tank Punk filed either

**IV.     Discussion - Dismissal of Tank Punk's claims against the Advantage Defendants**

The Advantage Defendants ask, without any substantive argument or citation to any legal authority, that the claims against them be dismissed if the attachment is vacated.  Based on the conclusion reached herein that the attachment of the Advantage Defendants' assets should be vacated, coupled with the fact that Tank Punk has no substantive claim against the Advantage Defendants, Tank Punk's Rule B security claims against the Advantage Defendants should be dismissed.  *See Olendorff Carriers*, No. C-12-074, 2013 WL 1628358 *7 (S.D. Tex. March 28, 2013, Memorandum and Recommendation), adopted, 2013 WL 3937450 (S.D. Tex. July 30, 2013).

**V.     Conclusion and Recommendation**

Based on the foregoing and the conclusion that the evidence preponderates against Plaintiff Tank Punk, Inc. having met its burden on the alter ego/piercing the corporate veil allegations in support of the Rule B the attachment in this case, the Magistrate Judge

RECOMMENDS that Defendants' Amended Motion to Vacate Attachment and Dismiss (Document No. 52) be GRANTED, that the attachment of the funds remaining in the registry of the Court be vacated, and Plaintiff Tank Punk, Inc.'s claim(s) against the Advantage Defendants be dismissed.  Based on this recommendation, it is

ORDERED that Plaintiff Tank Punk's "Ex Parte Motion for Order Authorizing Issuance of Supplemental Process of Maritime Attachment and Garnishment and Authorizing Special Process

---

its Original or Amended Complaint need not be decided on this record, particularly given the procedural history of this case and the determination herein that Tank Punk has not met its burden of establishing the propriety of a Rule B attachment on an alter ego theory of liability.

Server" (Document No. 34) is DENIED.

The Clerk shall file this instrument and provide a copy to all counsel and unrepresented parties of record.  Within fourteen (14) days after being served with a copy, any party may file written objections pursuant to 28 U.S.C. § 636(b)(1)(C), FED. R. CIV. P. 72(b), and General Order 80-5, S.D. Texas.  Failure to file objections within such period shall bar an aggrieved party from attacking factual findings on appeal.  *Thomas v. Arn*, 474 U.S. 140 (1985); *Ware v. King*, 694 F.2d 89 (5th Cir. 1982), *cert. denied*, 461 U.S. 930 (1983); *Nettles v. Wainwright*, 677 F.2d 404 (5th Cir. 1982) (en banc).  Moreover, absent plain error, failure to file objections within the fourteen day period bars an aggrieved party from attacking conclusions of law on appeal. *Douglass v. United Services Automobile Association,* 79 F.3d 1415, 1429 (5th Cir. 1996).  The original of any written objections shall be filed with the United States District Clerk.

Signed at Houston, Texas, this 6th  day of July, 2016.


Frances H. Stacy
United States Magistrate Judge

26