**IN THE UNITED STATES DISTRICT COURT**
**FOR THE SOUTHERN DISTRICT OF TEXAS**
**HOUSTON DIVISION**

| | | |
|---|---|---|
| **TANK PUNK, INC.,** | § | |
| **Plaintiff,** | § | |
| **v.** | § | **C.A. NO. 4:15-CV-01675** |
| | § | **C/W** |
| **SPIKE SHIPPING, LTD.; ADVANTAGE** | § | **C.A. NO. 4:15-CV-1645** |
| **ARROW SHIPPING, LLC; GEDEN** | § | |
| **HOLDINGS LTD; GENEL DENIZCILIK** | § | |
| **NAKLIYATI A.S. A/K/A GEDEN LINES;** | § | |
| **ADVANTAGE TANKERS, LLC;** | § | |
| **ADVANTAGE HOLDINGS, LLC;** | § | |
| **FORWARD HOLDINGS, LLC; MEHMET** | § | |
| **EMIN KARAMEHMENT and GULSUN** | § | |
| **NAZLI KARAMEHMET WILLIAMS** | § | |
| | § | |
| **Defendants.** | § | |

## PLAINTIFF'S OBJECTIONS TO THE MAGISTRATE JUDGE'S MEMORANDUM AND RECOMMENDATION TO GRANT MOTION TO VACATE AND DISMISS

**TO THE HONORABLE JUDGE OF SAID COURT**:

COMES NOW, Plaintiff TANK PUNK, INC., (hereinafter "Plaintiff"), by and through undersigned counsel, and files its Objections to Magistrate Judge Frances H. Stacy's Memorandum and Recommendation to Grant Defendants' Motion to vacate and dismiss. In support thereof, Plaintiff would respectfully show as follows:

### FACTS AND PROCEDURAL BACKGROUND

These consolidated suits in admiralty were commenced pursuant to Supplemental Rule B (hereinafter "Rule B") of the Supplemental Rules for Admiralty or Maritime Claims (hereinafter "Supplemental Rules"). Plaintiffs in the consolidated actions had bareboat chartered their respective vessels, the crude oil carriers AVOR and SPIKE, to subsidiaries 100% owned by Defendant Geden Holdings, Ltd. (hereinafter "bareboat charterers"). Geden Holdings, Ltd. (hereinafter "Geden Holdings") was also the bareboat charterers' performance guarantor. The bareboat charterers defaulted on their obligations to pay monthly hire. The respective bareboat

charter parties provide for resolution of disputes in London maritime arbitration. To obtain security for their claims in arbitration, Plaintiffs filed suit seeking an order of maritime attachment and garnishment against the bareboat charterers with a prayer for the attachment of the crude oil carrier Motor Tanker ADVANTAGE ARROW. "ADVANTAGE ARROW" was a new name for the tanker with IMO # 9419448 formerly named "TARGET."

Though the "TARGET" had changed registered owner and name approximately 3 months earlier, her commercial and administrative management had remained unchanged in the hands of Genel Denizcilik Nakliyati S.A., a Turkish company ultimately controlled 100% by the Karamehmet family, the patriarch of which is Mehmet Emin Karamehmet (hereinafter "Emin Karamehmet"). Emin Karamehmet indirectly owns and controls 100% of Geden Holdings. The respective complaints were originally framed on a theory based on the status of Advantage Tankers LLC and its affiliated companies as alter-egos of Emin Karamehmet, and the corporate entities he controlled based on information from the Marshal Islands ship mortgage records; information contained in a business restructuring plan-study commissioned by Geden Lines from AlixPartners entitled "Project Hermitage Restructuring" (hereinafter "Project Hermitage"); an earlier prospectus of an aborted initial public offering; and information from the respective Plaintiffs' experience with the bareboat charterers.

Following the original attachments in June 2015 Defendants provided cash substitute security of $2,200,000.00 deposited in the registry of the court, for the release of the ADVANTAGE ARROW. In the months that followed, a number of the original claims were settled (those of Plaintiff Eclipse Liquidity, Inc. and Plaintiff Psara Energy Ltd.) and portions of the security were released by agreement, leaving in the registry $1,517,200.00. On February 24, 2016, Tank Punk filed a First Amended Complaint (Doc. 47), adding, for the first time as

defendants, Geden Holdings, Ltd., Mehmet Emin Karamehmet and Gulsun Nazli Karamehmet-Williams.

The claims brought before the Court with Plaintiff's First Amended Complaint (hereinafter "Amended Complaint") are based on the failure of Spike Shipping, Ltd. (the bareboat charterer) to perform its contractual charter party obligation to Plaintiff Tank Punk, Inc. (the vessel owner) and include damages for: failure to pay earned charter hire of $232,796.82; the cost of hull and machinery repairs, dry-docking, and a the application of a 60-month coating that bareboat charterers should have provided, calculated to cost $1,070,000.00; off-hire damages for time spent completing repairs and dry-docking calculated in the amount of $1,225,000.00; interest $155,114.00; and attorneys' fees $200,000.00. (Amended Complaint, Doc. No. 47 at 6, 23).

Plaintiff's Amended Complaint seeks to maintain the attachment against the Defendants' funds on deposit with the Registry of the Court ($1,517,200.00) based on three distinct legal theories which have been applied by courts in sustaining Rule B attachments: (1) alter-ego/veil-piercing based on this traditional equitable remedy which is specifically available in admiralty. *See* e.g. *Talen's Landing, Inc. v. M/V Venture, II*, 656 F.2d 1157 (5th Cir. 1981); *Sabine Towing & Transp. Co. v. Merit Ventures, Inc*., 575 F. Supp. 1442 (E. D. Tex., 1983); *See* also (non-admiralty) *Bridas S.A.P.I.C. v. Government of Turkmenistan*, 447 F.3d 411 (5th Cir. 2006) (hereinafter "*Bridas II).* (2) setting aside of fraudulent conveyances of assets. *See Swift & Co. Packers v. Compania Colombiana Del Caribe, S.A*., 339 U.S. 684, 694 (U.S. 1950); *Flame S.A. v. Freight Bulk Pte. Ltd* 807 F.3d 572, 582 (4th Cir. 2015); *N. Tankers (Cyprus) v. Backstrom*, 967 F. Supp. 1391, 1395, 1415-1416 (D. CT. 1997); (3) corporate successor liability. *See* e.g. *Patin v. Thoroughbred Power Boats Inc*., 294 F.3d 640, 649 (5th Cir. 2002).

The allegations of the Amended Complaint addressing the alter-ego/veil piercing theory are set out in ¶¶ 41-61 and are summarized at ¶ 62. (Doc. 47). The allegations of the Amended Complaint addressing the corporate successor theory are contained in ¶¶ 32-39 and are summarized at ¶ 31. *Id.* The allegations of the Amended Complaint addressing the fraudulent transfer theory are contained in ¶¶ 32, 37; 41; 44; 46; 42; 53, 57; 61. *Id. See also* Plaintiff's Memorandum in Opposition to Amended Motion to Vacate and Dismiss Attachment Doc. 56 at pp. 18-20 (hereinafter referred to as "Opposition").

Limited discovery was granted to the respective parties pursuant to the Magistrate Judge's order of October 23, 2015. *See* Doc. 30. The parties conducted discovery on the alter-ego issue, and the Magistrate Judge conducted a hearing on February 9, 2016, pursuant to Rule E(4)(f) of the Supplemental Rules wherein the Court heard oral argument from counsel for both sides and considered deposition and documentary evidence submitted by the respective parties. Subsequently, the Magistrate Judge issued an order granting leave to Plaintiff to file an amended complaint, and to Defendants to file an amended motion in response. *See* Doc 46. After the amended complaint and amended motion were submitted, the Honorable Magistrate Judge Frances H. Stacy on July 6, 2016 issued her "Memorandum and Recommendations Granting Defendants' Amended Motion to Vacate Attachments and Dismiss." *See* Doc. 64 (hereinafter referred to as "Memorandum").

## ARGUMENT

## I. THE MAGISTRATE JUDGE'S RECOMMENDATION TO GRANT DEFENDANTS' MOTION TO DISMISS IS SUBJECT TO IMMEDIATE REVIEW BY THE COURT

Pursuant to 28 U.S.C. § 636(b)(1), a federal district judge may designate a magistrate judge to conduct dispositive hearings (including evidentiary hearings), and require said magistrate judge to file his proposed findings and recommended disposition with the Court. *See also* Article IV, General Order No. 2002-13, United States District Court for the Southern District of Texas. Within

fourteen (14) days after being served with a copy, any party may serve and file written objections to such proposed findings and recommendations made by the magistrate judge. 28 U.S.C. § 636(b)(1); Fed. R. Civ. P. 72(b)(2). "Under the plain language of 28 U.S.C. § 636(b)(1), Fed. R. Civ. P. 72(b), and all of the relevant cases, a district court must engage in *de novo* review where a party has objected to a magistrate's decision." *United States v. Wilson*, 864 F.2d 1219, 1221 (5th Cir. Tex. 1989); *Mendez v. FRB*, 2012 U.S. Dist. LEXIS 5801 (W.D. Tex. Jan. 18, 2012). The clearly erroneous, abuse of discretion, and contrary to law standard of review is appropriate only where there has been no objection to the magistrate's ruling. *See Wilson*, 864 F.2d at 1221. (*emphasis* added).

Accordingly, this Court must review *de novo* any part of Magistrate Judge Stacy's recommended disposition that has been properly objected to herein and may: accept, reject, or modify the recommended disposition; receive further evidence; or return the matter to the Magistrate Judge Owsley with instructions. See Fed. R. Civ. P. 72(b)(3).

## II.     PLAINTIFF'S SPECIFIC OBJECTIONS

### 1.  "Preponderance of the Evidence" is Not the Appropriate Standard of Proof that a Plaintiff is Required to Meet at a Supplemental Rule E(4)(f) Hearing to Avoid Vacatur

Supplemental Rule E(4)(f) provides:

> Whenever property is arrested or attached, any person claiming an interest in it shall be entitled to a prompt hearing at which the plaintiff shall be required to show why the arrest or attachment should not be vacated or other relief granted consistent with these rules.

In order to obtain, and maintain an attachment against a Rule E(4)(f) challenge seeking to vacate it, a Plaintiff must show: "1) the plaintiff "has a valid prima facie admiralty claim against the defendant; 2) the defendant cannot be found within the district; 3) the defendant's property may be found within the district; and 4) there is no statutory or maritime law bar to the attachment." *Aqua Stoli Shipping, Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 445 (2d Cir. 2006); *Naftomar Shipping*

*& Trading Co. v. KMA Int'l S.A.*,2011 U.S. Dist. LEXIS 24723 (S.D.Tex 2011) at *4.

Though the Rule puts the burden of proof on the Plaintiff, it does not define the level or standard of proof that a Plaintiff must meet in order to avoid vacatur at an E(4)(f) hearing. However, the jurisprudence over several decades has fashioned such a standard which in the overwhelming majority of decided cases is not preponderance of the evidence. In the practice that developed before the current supplemental Rules were adopted, the Supreme Court of the United States applied a test of whether there are "good reasons for the attachment" and "whether substantial questions of fact were raised" as a condition of upholding the attachment of a vessel against a motion to vacate. *Swift & Co. v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 695-696 (U.S. 1950). Other courts, in the context of a motion to vacate attachment, apply a "reasonable belief" standard of proof. *Vitol, S.A. v. Primerose Shipping Co.*, 708 F.3d 527,542-543 (4th Cir., 2013); *Flame S.A. v. Indus. Carriers, Inc.*, 24 F.Supp.3d 493, 509 (E.D. Va., 2014). Some courts apply a "reasonable grounds" standard, *Wajilam Exports (Singapore) v. Atl Shipping*, 475 F.Supp.2d 275,278 (S.D.N.Y., 2006); *Glory Wealth Shipping v. Five Ocean Corp.*, 571 F.Supp.2d 531,535 (S.D.N.Y., 2008); *Res. Marine Pte, Ltd. v. Solym Carriers* (London) Ltd.,2012 U.S. Dist. LEXIS 179820 (E.D.CA 2012) at * 6; while others apply a "probable cause" standard. *20TH Century Fox Film v. M.V. Ship Agencies,* 992 F.Supp. 1423, 1425 (M.D. Fla., 1997) *North of Eng. Protecting & Indem. Ass'n v. M/V Nara*, 1999 U.S. Dist. LEXIS 22375, 2000 AMC 681 (E.D. la 1999) at *5-6; *A. Coker & Co., LTD. v. Nat'l Shipping Agency Corp.*, et al., 1999 U.S. Dist. LEXIS 7442, 1999 WL 311941, *1 (E.D. La., May 17, 1999); *Naftomar Shipping & Trading Co. v. KMA Int'l S.A.*,2011 U.S. Dist. LEXIS 24723 | 2011 WL 888951 (S.D.Tex 2011) at *7.

The overwhelming majority of the courts adhere to a standard of proof which is quite less stringent than a "preponderance of the evidence." The plaintiff need not prove its case at a Rule

E(4)(f) hearing. *Kite Shipping LLC v. San Juan Navigation Corp*, 2012 U.S. Dist. LEXIS 96199 (S.D. Cal., 2012) at *14-15. "[I]n ruling on a motion for vacatur [of a maritime attachment], the district court should not conduct a full-fledged inquiry into the merits of the plaintiff's claim" *Shipping v. Estech Trading LLC,* 764 F.Supp.2d 632, 636 (S.D.N.Y., 2011). "[I]t would defeat the purpose of attachment...to require at this stage that [Glory Wealth] (the Plaintiff) prove that the facts in the complaint are true." *Glory Wealth Shipping v. Five Ocean Corp*., 571 F.Supp.2d 531,535 (S.D.N.Y., 2008); *Wajilam Exports (Singapore) v. Atl Shipping*, 475 F.Supp.2d 275, 279 (S.D.N.Y., 2006).

Notwithstanding the overwhelming weight of authority and at least one court decision from the Southern District of Texas which adopts the probable cause standard - *Naftomar Shipping & Trading Co. v. KMA Int'l S.A.,* 2011 U.S. Dist. LEXIS 24723 (S.D. Tex. 2011) - the Magistrate Judge's Memorandum adopts and applies a much more stringent standard of proof, *i.e.* that of preponderance of the evidence.

Relying heavily on a decision from the Corpus Christi Division of this Court - *Olendorff Carriers Gmbh & Co., KG v. Grand China Shipping (Hong Kong) Co., Ltd*., Civ. Case No. 2:12-CV-00074, 2013 WL 3937450 *2, 2013 U.S. Dist. LEXIS 106080 (S.D. Tex. July 30, 2013) - the Magistrate's Memorandum posits that "[w]hile a plaintiff initially need only make a prima facie showing that a defendant is amenable to suit, when a district court permits jurisdictional discovery and conducts a full evidentiary hearing on the issue of jurisdiction, the plaintiff must then prove its jurisdictional facts by a preponderance of the evidence." Judge Ramos, who decided *Oldendorff,* relied for supporting authority and adopted the reasoning of *Hawknet Ltd. v. Overseas Shipping Agencies,* 2009 U.S. Dist. LEXIS 44023 (S.D.N.Y. 2009), which is the only case that adopts and applies a preponderance of the evidence standard of proof in a Supplemental Rule

B(1)/Rule E(4)(f) context. See *Oldendorff* supra at LEXIS *5. Though *Oldendorff* speaks of "[s]everal district courts, including courts for the Southern District of Texas, [that] have applied a preponderance of the evidence standard to Rule E motions to vacate after providing the party asserting jurisdiction an opportunity for discovery and an evidentiary hearing" (*Oldendorff supra* at *4-5), only *Hawknet* adopts such a standard. The two Southern District of Texas cases cited in *Oldendorff* plainly do not support this statement. *Vinmar Int'l, Ltd. v. M/T Clipper Makishio*, 2009 U.S. Dist. LEXIS 127956 (S.D. TEX 2009) clearly states at *2, that "Plaintiff must show by a preponderance of the evidence that it is entitled <u>to a valid maritime lien</u>, *Seatrade Group N.V. v. 6,785.5 Tons of Cement*, No. Civ. A. H-05-2771, 2005 U.S. Dist. LEXIS 43060 at *2 (S.D. Tex. Dec. 6, 2005) (Rosenthal, J.), and is required to make a prima facie showing that it is entitled to the damages sought and secured by the arrest and attachment." (*emphase*s added). With regard to Rule B attachment in the *Vinmar* case, (which involved both Rule C enforcement and Rule B attachment claims), Werlein J noted: "Moreover, because Plaintiff has failed to make <u>a prima facie case</u> that Claimant is liable in personam, attachment of the Vessel under <u>Rule B</u> is also improper. See FED. R. CIV. P. SUPP. B(1); Seatrade Group, 2005 U.S. Dist. LEXIS 43060, 2005 WL 3878026, at *2." *Vinmar* supra at * 7." (*emphases* added). It appears that the "preponderance" standard in both Southern District of Texas decisions relied upon by Judge Ramos restrict it to proceedings in which the arresting (as opposed to "attaching") Plaintiff attempts to enforce an *in rem* lien against property, and distinguish this from cases of Rule B attachment.

Both the *Oldendorff* court and the *Hawknet* courts grounded their "preponderance of the evidence" reasoning on cases from their respective circuits dealing with Rule 12(b)(2) motions challenging personal jurisdiction. In such cases, the respective circuits ruled that when personal jurisdiction is challenged, the Plaintiff who has had an opportunity to do discovery must show with

a preponderance of the evidence that the defendants is subject to the court's jurisdiction. *See* cases cited in *Oldendorff* supra at Lexis *6, *Hawknet, Ltd*. at Lexis *85. However, the motion before the Magistrate Judge was not a motion under Rule 12(b)(2) challenging personal jurisdiction. The issues were rather more complex involving the interrelationship of corporate entities, their ownership, ownership interests, ownership of assets, corporate control, etc. incapable of being explored by means of limited discovery and resolved in a 5-hour long hearing. The Magistrate Judge also acknowledged there is diametrically opposite authority in the Southern District of Texas, involving alter-ego issues in a Rule B attachment case, where discovery was taken by Plaintiff, a Rule E(4)(f) hearings was held and the district court applied a "probable cause standard" of proof. *See* Memorandum, Doc. 64, at p. 7, fn. 5, noting *Naftomar*, supra at *6.

Requiring Plaintiff to prove its case with a preponderance of the evidence, a standard not spelled out in any of the orders that preceded the February 9, Rule E(4)(f) hearing, worked material prejudice for Plaintiff as the Magistrate Judge twice in her Memorandum has reasoned that Plaintiff "has not shown, by a preponderance of the evidence, that any discrepancy reflects a "sham" sale or continued control over the ADVANTAGE ARROW by the Geden Group Defendants following the sale" (Doc. 64 at p. 16, fn. 8), and that Plaintiff's evidence "is simply insufficient, under a preponderance of the evidence standard, to meet the dominion and control prong of the alter ego test." *See* Doc. 64 at p. 20.

**2. The Memorandum Entirely Omitted to Deal with The Alternative Basis of Plaintiff's Claims that the Advantage Group of Companies Are Successor Corporations of the Geden Group of Companies**

As noted in the foregoing, Plaintiff with great specificity pled in the Amended Complaint the nature of the relationship of the two groupings of Defendants as predecessor and successor corporations. *See* Amended Complaint, Doc. 47 at ¶¶ 30-39. It cited and provided copies of considerable documentary evidence in support of these allegations and offered supporting legal

arguments. *See* Doc. 56 at pp. 5-10. In its legal arguments Plaintiff noted the successor

corporation doctrine has been adopted in the admiralty jurisprudence of the Fifth Circuit in *In re*

*Louisiana Crawfish Producers*, 772 F.3d 1026, 1030 (5th Cir. 2014), which has adopted the rule

of *Golden State Bottling Co. v. NLRB*, 414 U.S. 168, 182 n. 5 (U.S. 1973). Plaintiff's claim of its right

to attach the ADVANTAGE ARROW as an asset of a successor corporation is quite distinct from

its right to attach the asset of an alter ego of its obligor.

The Memorandum does not deal at all with the successor corporation alternative basis of

the claim. Instead it treats the allegations of the Amended Complaint as allegations of Plaintiff's

alter-ego/veil piercing claim, and makes in this regard no recommendations or findings

whatsoever. *See* Doc. 64. P. 3. However, the jurisprudence clearly distinguishes between

successor corporation and corporate veil as distinct legal theories. *See* generally *e.g. Patin v.*

*Thoroughbred Power Boats Inc.*, 294 F.3d 640 (5th Cir., 2002).

### 3. The Memorandum Omitted to Deal with the Third Alternative Basis of Plaintiff's Claim, of Disregarding the Transfer of the ADVANTAGE ARRROW as a Fraudulent Conveyance

Plaintiff pled this Rule B attachment predicate in its Amended Complaint, Doc. 47 at ¶¶ 32,

37; 41; 44; 46; 42; 53, 57; 61 and provided arguments in support in its Opposition. *See* Doc 56. at

pp 18 -20.

The power of the admiralty to authorize pre-judgment attachment by way of Rule B(1) of

an asset of a 3rd party not a direct obligor of the Plaintiff, was originally articulated in term of

setting aside a fraudulent transfer; a conceptually distinct category of equitable relief available

from a court of admiralty, by no lesser authority than the Supreme Court of the United States in

*Swift & Co. v. Compania Colombiana del Caribe, S.A.*, 339 U.S. 684, 694-695 (1950). The same

authority clearly recognizes the conceptual distinction between granting the relief on the basis of

alter-ego liability and on the basis of setting aside a fraudulent transfer. *Id.* at p. 689, fn. 4. Plaintiff

in its Amended Complaint carefully pled this alternative basis for relief. It set out in great detail and with reference to documents of unquestioned authenticity: a sophisticated restructuring plan for the change of the ownership of the Geden business by transferring the corporate share ownership (Doc. 47 at ¶¶ 41-42, 55), the transfer of the property over the vessels to newly minted corporate entities controlled by the same interests (Doc. 47 at ¶ 58), and the "ring fencing" of the new ownership vehicles from the demands of existing creditors; and the changing of the vessels' names, flags, and corporate ownership (Doc. 47 ¶¶ 61, 63). This "fraudulent transfer" basis for relief was argued in Plaintiff's Opposition, supported by reference to court decisions and statutory law supportive of Plaintiff's requested relief. *See* Doc 56 at pp.18 - 20. Plaintiff specifically requested the Magistrate Judge to consider this basis for relief. *See* Doc. 56 at p. 25.

The Memorandum of the Magistrate Judge did not even acknowledge the fraudulent transfer basis of Plaintiff's claim, even though all of the earmarks of fraudulent transfer sustaining the claim were present, *e.g.*: (1) statutory basis under the Uniform Fraudulent Transfer Act, that the transfer between close relatives may be a "badge of fraud" (Doc 56, at pp. 19-20[1]); (2) an express admission in writing that notwithstanding the transfer of property the control by Geden Holdings, Ltd. remained unchanged, as spelled out in the "Consent Letter" of Geden Holdings, Ltd. to Shell Western Supply, Co (Doc. 56 at p. 18[2]); (3) an elaborate, professionally developed, restructuring plan that provides for transfer of ownership of a business and assets for the express

---

[1] Indeed, the Magistrate Judge's memorandum minimizes the significance of the transfer of assets valued at nearly half a billion dollars from a parent to an only child and states: "Such speculation is insufficient to support an alter ego theory of liability. Estate of Lisle v. Commissioner of Internal Revenue, 341 F.3d 364, 377 (5th Cir. 2003), mandate recalled, 431 F.3d 439 (2005); Settlement Funding, LLC v. RSL Funding, LLC, Civil Action No. H-12-2044, 2013 WL 5231475 *7 (S.D. Tex. Sept. 16, 2013)." Doc. 64 at p. 17.

[2] The Magistrate's memorandum contains a finding in this regard contrary to the facts evidenced on the face of this document, which Plaintiff argues in these Objections is a completely erroneous finding of fact in need of resolution by the District Judge.

purpose of evading creditors' remedies – "Project Hermitage" report of AlixPartners. *See* Doc. 47 at pp. 11: ¶ 37; 12: ¶ 41 and fn. 5; 13: ¶ 42; Doc. 56 at pp. 12, 17, 18.

**4. The Magistrate Judge in Conducting the Rule E(4)(f) Evidentiary Hearing on February 9, 2016 Erroneously Denied Plaintiff's request for a Subpoena to a Third Party, *i.e.* Geden Holdings, Ltd. for Production of Bank Money Transfer Records**

Geden Holdings has registered as a foreign corporation in Texas. The limited bank statements and transfer records made available at the E(4)(f) hearing, and relied upon by Defendants, were incomplete and critical information regarding the alleged transactions was missing. Plaintiff requested the Magistrate Judge for a subpoena directing Geden Holdings, Ltd. to produce complete records and to delay ruling until the banking and account records were produced. The Magistrate Judge denied the request. The transcript of the February 9, 2016 hearing filed herewith and attached hereto as "**EXHIBIT A**" at pp. 86:15-25; 87:1-25; 88:1-25; 89:1-8. Nonetheless, the Magistrate's decision is replete with references to the record of bank transfers evidencing payments. *See* e.g. Doc 64 at p 12: "the uncontroverted evidence – in the form of bank records – that Williams used her own funds (close to $200 million) to purchase certain of the Geden Group Defendants' assets" (Doc. 64 at p. 15); "… there is documentary evidence which shows that Williams, in 2015 (Doc. 64 at p. 15) paid the fair market value for the 11 tankers that were purchased by the Advantage Defendants, using nearly $200 million of her own funds, and securing hundreds of millions more in loans." It is respectfully submitted that the Magistrate Judge should have ordered the production of the complete banking records under subpoena.

**5. The Magistrate Judge, Erroneously Minimized the Significance of the "Alix Partners Project Hermitage Restructuring" Report and its Bearing on Plaintiff's Claims**

Project Hermitage is a document containing a business restructuring report. It is attached to the Amended Complaint as Exhibit 10, Doc. 47-2, pp. 35- 87. Plaintiff has argued that Project Hermitage is a blueprint for the restructuring of the asset-holding company - Geden Holdings - by

transferring all of its assets to "Newcos" for the express purpose of ring-fencing them from creditors. *See* Amended Complaint, Doc. 47 at ¶¶ 41-42, 55 and Fn. 5; and Amended Complaint Exhibit 10, Doc.47-2 at pp. 36-87. Plaintiff has not argued that the recommendations of Project Hermitage Report were implemented in the restructuring of ownership word-for-word. However, the basics of the report were implemented with the formation of the Advantage Group corporate holding structure and the transfer of all 11 of Geden Holding's crude oil tankers to it. Implementation included all of the classic debt-dodging trimmings of the shipping trade, *i.e.* renaming, reflagging, and remortgaging of the ships. *See* Opposition, Doc. 56 at p 11.

The Magistrate Judge in the Memorandum takes a different view finding that:

> [A]s explained by Tokgoz and Mat at their depositions, the proposals contained in the March 2013 "Hermitage Report" were not implemented because the banks providing financing to Geden Holdings, Ltd. would not, or could not, agree on the course of action proposed in the report. Tokgoz Deposition at 43-44 (Document No. 41-1 at 45-46); Mat Deposition at 37 (Document No. 41-3 at 39). As such, any language about "ring-fencing" in the March 2013 Hermitage Report has little relevance to the actual sale of the 11 tankers to the Advantage Defendants in 2015

Doc. 64 at pp. 16-17.

It is respectfully submitted that the Magistrate Judge's findings of fact, inferences and conclusions in this regard are erroneous as it is readily apparent from a comparison of the Project Hermitage recommendations with the subsequent events which bear out its substantial actual implementation as follows:

1. Project Hermitage Recommends the sale of the vessels from Oldco to Newco. *See* text and diagram at Amended Complaint Exhibit 10, Doc.47-2, at p.51. Compare to deposition evidence of Tugrul Tokgoz admitting the 11 tankers were sold to new companies, *i.e.* Advantage Tankers. *See* TOKG 45, 17-22[3].

---

[3] Copies of the following depositions are filed in the record as follows: Appendix 1, Doc. 41-1 - Deposition Transcript of Ali Tugrul Tokgoz; Appendix 2, Doc. 41-2 -Deposition of Transcript of Gulsun Nazli Karamehmet Williams;

2. Project Hermitage provides, on completion of the restructuring, Genel Denizcilik would continue to act as the Manager. ("20K per operating vessel per month. All existing management agreements are replicated in Newco"). *See* text and diagram at Amended Complaint Exhibit 10, Doc.47-2, at p.51. Compare with deposition evidence admitting a management agreement made for each vessel of Advantage Tankers. *See* TOKG 98:11-25; 99:1-25; 100:1-13.

3. Project Hermitage provides for "Rollover Financing of $784.0m." *See* text and diagram Amended Complaint Exhibit 10, Doc.47-2, at p.51. Compare with extract from negotiations correspondence between Geden Holdings, Ltd. and NDLB bank before Advantage Tankers had come into existence which states: "The Newco Advantage Tankers ("AT") will acquire 5 aframax and 4 suezmaxes as initially planned. All 9 vessels will continue with the existing Shell Charters but the charter rate will be based on a floor rate plus profit sharing whereby the floor rate would be sufficient to cover the debt service plus opex for the first three years (USD 17,500 pd). We are approaching each of the lenders to confirm their commitments with subject to several amendments to be made on the agreed term sheets." *See* Amended Complaint Exhibit 18, Doc. 47-3 at p.56.

4. Project Hermitage provides for the retention of the equity by Geden Holdings, Ltd. in the vessels sold over and above any amount of refinancing debt. *See* text and diagram at Amended Complaint Exhibit 10, Doc.47-2, at p.54. Compare this with the deposition testimony regarding the "shifting" of equity. TOKG 54:11-25; 55:2-25

5. Project Hermitage provides for the "...recategorization of exposure from 'Geden Holdings Ltd.' to Newco where equity is 'in-the-money' and shareholders are better incentivized to provide ongoing support." *See* Amended Complaint Exhibit 10, Doc.47-2, at p.75. Compare with the answer of Tokgoz's deposition when asked to explain the meaning of this statement: "I

---

Appendix 3, Doc. 41-3 - Deposition Transcript of Mehmet Mat), respectively abbreviated for reference as: TOKG; WILL; and MAT.

14

am not one hundred percent understanding, please correct me if I am wrong, in some assets or all assets there is a balance sheet of Geden Holdings, has equity -- plus equity, and this can be moved -- I don't understand exactly what that means." TOKG 53:21-25; 54:1-10.

6. Project Hermitage recommends "Ring-fence potential sources of disruption, holdout, or nuisance (such as arrests or sister-ship arrests)" (Amended Complaint Exhibit 10, Doc.47-2 at p. 42); "A long term plan involves grouping and ring-fencing assets according to their debt service capacity and sensitivity to a recovery in rates." *Id.* "There will be **some change in the ownership** in the go-forward entities Newco Alpha and Beta (in order to protect relevant lenders from sister ship arrests in South Africa-type jurisdictions)." *Id* at p. 50 (*emphasis* in the original). Compare the deposition testimony of the chief executive officer of Geden Holdings; Geden Lines; and Advantage Tankers who readily testified that the 11 tankers were sold to new companies, indeed to Advantage Tankers. *See* TOKG 45:17-22. He readily admitted it was Part of Geden's plan to find a structure that would protect the assets of the company from arrest. *See* TOKG 42:8-25; 43: 1-4.

7. The testimony and documentation generated by Geden following the issuance of the Project Hermitage Report reveals that the same concepts and even wording such as "newco" were used in the negotiations that brought about the re-financing of the 11 crude oil tankers fleet. *See* TOKG 69:19-22; 77:3-6; 133:25; 134:1-3; *See* also Doc. 47-3 at p.56.

The Magistrate Judge should have considered the contents of the AlixPartners authored report and the objectives it outlined and compared it with the end result of the restructuring of the ownership of Geden Holdings, Ltd. and its SPV's into Advantage Tankers, LLC and its associated SPV's.

**6. The Magistrate Judge Erroneously Determined that a Discrepancy of Approximately $8,500,000 in the Sale Documents Between Geden Holdings to Advantage Tankers**

**Concerning the Vessels ADVANTAGE ARROW and ADVANTAGE AVENUE and the Sale Prices Shown in the Respective Loan Agreements Does Not Call into Question the Genuineness of the Sale**

Plaintiff brought the discrepancy to the attention of the Magistrate Judge at the hearing (EXHIBIT A p. 91:8-25; 92:1-25; 93:1-25; 94:1-25; 95:1-22) and with its Surreply to Defendants reply to the Plaintiff's Opposition. Doc. 59-1 at pp 2-3.

The Magistrate Judge in her Memorandum, Doc. 64, FN 8 states:

> In its Sur-Reply (Document No. 59-1), Tank Punk points out certain discrepancies in the documents evidencing the sale of the M/T ADVANTAGE ARROW, discrepancies which do not consistently reflect or suggest that the M/T ADVANTAGE ARROW was not actually sold for $44 million. Despite the identified discrepancies between the sales and the loan documents for the ADVANTAGE ARROW as to the value of the ADVANTAGE ARROW, Tank Punk has not shown, by a preponderance of the evidence, that any discrepancy reflects a "sham" sale or continued control over the ADVANTAGE ARROW by the Geden Group Defendants following the sale. In addition, although Tokgoz testified at his deposition that he could not explain the dollar-number discrepancies between the sale and the loan documents, he believed that they may have been typographical errors, and was adamant that the entire $44 million for the sale of the M/T ADVANTAGE ARROW was "paid." Tokgoz Deposition at 114-119 (Document No. 41-1 at 116-121).

The "discrepancies" are a difference of $6,250,000 in the purchase price of the ADVANTAGE ARROW as reflected in the purported bill of sale and the loan agreement with NDLB bank. Compare the Bill of Sale for the "TARGET" (renamed ADVANTAGE ARROW) produced by Defendants in their Amended Motion to Vacate (Doc.52-1 at p. 41) with the Extract from the Loan Agreement attached to the Amended Complaint as Amended Complaint Exhibit 21, Doc. 47-4 at p 38. This is not the only discrepancy. It is likewise with the difference in the sale price of the vessel ADVANTAGE AVENUE (ex. TRUE), when comparing the bill of sale for the MT TRUE (renamed ADVANTAGE AVENUE) (Amended Motion to Vacate Doc. 52-1 at p. 36) with the price set out in the loan agreement. *See* Exhibit 23 to Plaintiff's Supplemental Memorandum of law in Advance of Evidentiary Hearing, Doc 42-7 at pp.107-109. Here the

discrepancy is $2,250,000. Both vessels were financed under the same loan facility of NDLB bank in the total amount of $64,000,000. A "discrepancy" in the total amount of $8,500,000 is not a minor matter. It is nearly 12% of the amount of the loan. A "discrepancy" of this magnitude should have raised a concern for the Magistrate Judge that the purported arm's length sale might not be genuine. Applying the probable cause standard of proof, which is the one appropriate for a Rule E(4)(f) hearing, should have led the Magistrate to a different outcome, *i.e.* a recommendation to uphold the attachment or, at least order further discovery.

**7. The Magistrate Judge erroneously Concluded (1) "…that there is documentary evidence which shows that Williams, in 2015, paid the fair market value for the 11 tankers that were purchased by the Advantage Defendants, using nearly $200 million of her own funds, and securing millions more in loans"** Doc. 63 at p.15.

In her deposition Ms. Karamehmet-Williams stated she paid from her own funds "just shy of $200 m US" (WILL: 52:3-5) referring to a bank statement from Turkish bank Garanti produced by the Advantage Tankers Defendants to support her contention that she had transferred these funds, $195,300,000. *See* Defendants' Amended Motion to Vacate Exhibit 1, Doc 52-1 at p. 4; WILL 54:23-25; 55:1-25; 56:1-25. She claimed the funds were transferred from a personal bank account with Garanti Bank to an account of Advantage Holdings with the same bank. *Id.* 57:1-25; 58:1-9. These funds, she testified, were for the purpose of purchasing the ships. *Id* at 58: 10-12. The same representations were made by Defendants in their briefing (Defendants' Amended Motion to Vacate Attachment and Dismiss, Doc. 51 at pp. 6-7; Quartaro Supp. Declaration ¶ 4 and Exhibit 2 thereto, Doc 52-1, p. 2; p. 6), in which they summarized as follows: the purported price for which Geden Holdings Ltd. sold each vessel to Advantage Tankers, LLC; the debt on each vessel financed by the respective lending banks; and the portion of the sale price paid by Ms. Karamehmet-Williams to acquire the Geden Holdings' equity of in each of the vessels. *See* Quartaro Supp. Declaration, Exhibit 2, Doc. 52-1 at p. 6.

<u>TABLE ONE</u>

| Vessel Name: | Sale Price: | Payment of Debt: | Equity: |
|---|---|---|---|
| ADVANTAGE SPRING | $54,000,000.00 | $43,612,706.00 | $10,387,249.00 |
| ADVANTAGE SOLAR | $46,500,000.00 | $34,500,000.00 | $12,845,000.00 |
| ADVANTAGE START | $54,000,000.00 | $28,512,245.00 | $25,487,755.00 |
| ADVANTAGE AWARD | $48,500,000.00 | $28,150,000.00 | $20,350,000.00 |
| ADVANTAGE AVENUE | $46,250,000.00 | $28,750,000.00 | $17,500,000.00 |
| ADVANTAGE ARROW | $44,000,000.00 | $23,515,000.00 | $20,485,000.00 |
| ADVANTAGE SUMMER | $54,000,000.00 | $43,702,119.00 | $10,297,881.00 |
| ADVANTAGE SUN | $57,750,000.00 | $42,997,750.00 | $14,752,250.00 |
| ADVANTAGE ATOM | $48,500,000.00 | $20,350,000.00 | $28,150,000.00 |
| ADVANTAGE ANTHEM | $48,500,000.00 | $27,550,000.00 | $20,950,000.00 |
| ADVANTAGE SKY | $50,250,000.00 | $35,387,500.00 | $14,862,500.00 |
| **TOTALS**: | $551,750,000.00 | $ 357,028,320.00 | $196,067,635.00 |

Plaintiff respectfully submits that the drawdown notices under the Loan Agreements that refinanced the purchase of the ADVANTAGE ARROW and the ADVANTAGE AVENUE (Surreply Exhibit 1, Doc 59-1 at pp. 10-16) substantially contradict the Defendants' representations tabulated above.

According to the Loan Agreement out of the $64,000,000 NDLB loan facility, a total amount of $31,000,000.00 was earmarked for the purchase of the M/T TARGET (renamed ADVANTAGE ARROW) (Amended Complaint Exhibit 21, Doc. 47-4 at p. 36-39). There was a drawdown of the full amount of this loan commitment. *See* Surreply Exhibit 1, Doc 59-1 at pp. 11-16. In accordance with the Utilization Request (drawdown notice) dated 1 April 2015, an amount of $27,700,000 was drawn and its proceeds were credited as follows: 1) $500,000 for payment into the Earnings Account with NDLB; 2) $23,515,000 towards repayment of the Seller's (Geden's) loan facility with NDLB; 3) $640,000 for payment of the lender's upfront fee; 4) $3,045,000 "to be credited to Account No. 1800000944 of Advantage Tankers LLC" with NDLB. *See* Surreply Exhibit 1, Doc.59-1 at pp. 13-14.

The next Utilization Request (drawdown notice) dated May 7, 2015, for the amount of $3,300,000, representing the balance of NDLB's loan commitment for the ADVANTAGE ARROW, on its face states: "[t]he purpose of this Advance is the payment of part of the acquisition cost of m.v. "TARGET" tbr "ADVANTAGE ARROW."" (Surreply Exhibit 1, Doc.59-1, at p. 15).

Summing up the figure of the two drawdowns for the purchase of the ADVANTAGE ARROW, of the $31,000,000 financing commitment, after payment of the bank's finance charges ($500,000 + $ 640,000) and the repayment of the Seller's (Geden Holding's) loan facility with the bank, it is shown in the drawdown notices that that a total amount of $6,345,000 ($3,045,000 + $3,300,000) was applied by Advantage Tankers to Geden Holdings to purchase part of its equity in the ADVANTAGE ARROW.  However, the Advantage Tankers Defendants have strenuously argued and represented to the Court that Ms. Karamehmet-Williams acquired the equity in the vessel from Geden Holdings <u>with her own funds</u>, not funds loaned to her by NDLB. *See* Defendants' Amended Motion to Dismiss, Doc. 52 at pp 6-7; Quartaro Decl. Doc. 52-1 at p. 2 ¶ 3, and associated Exhibit 1 at p. 5 and Exhibit 2 at p. 6. Indeed, this is the Magistrate's finding also. Doc. 64 at p. 15.  But the drawdown notices show that an additional $6,345,000 was used to buy Geden Holding's equity in the ADVANTAGE ARROW, *i.e.* a total of $26,830,000, not $20,485,000 as the Advantage Tankers Defendants contend and have represented.  All of this contradicts Defendants' representations tabulated in TABLE 1 above.

Undertaking the same exercise with reference to the purchase of the ADVANTAGE AVENUE, leads to the same kind of incongruities and contradictions.  The drawdown notices in respect of this vessel show the following facts: Two drawdowns of the full amount of the loan commitment of $33,000,000 with $28,750,000 applied to repayment of the Seller's outstanding loan; $3,800,000 to be applied toward purchase of the equity in the M/T ADVANTAGE

AVENUE, and approximately $250,000 for the payment of finance charges. *See* Surreply Exhibit 1, Doc. 59-1 at p 11, p. 15.

The Advantage Defendants' position has been that the amount paid for the equity in the ADVANTAGE AVENUE was $17,500,000.00 (Quartaro Declaration in support of Amended Motion to Vacate Exhibit 2, Doc. 52-1 at p. 6, 37) and that this amount was part of the funding provided by Karamehmet-Williams from her own funds. *See* Amended Motion to Dismiss, Doc. 52 at pp. 6-7. Again the Defendants' own figures, taken at face value show that the payment for Geden Lines' equity might have been $21,300,000 ($17,500,000.00 + $3,800,000) which is contrary to their own evidence. *See* TABLE ONE above.

Thus, it is mathematically demonstrable that the Turkish bank statements produced by the Advantage Defendants cannot be taken on face value to represent what said Defendants contend that they show, *i.e.* transfer of funds of Defendant Karamehmet -Williams paid from her own resources to purchase in good faith the equity share of Geden Holdings in the 11 tankers. There is a permissible inference from these facts that the transfers from bank account to bank account in Garanti Bank may be a passing through sham transfer of funds to legitimize the transfer of the assets.

**8. The Magistrate Judge Either Misread or Misunderstood the Contents of Consent Letter of Geden Holdings, Ltd. Acting By and Through its CEO and Director Tugrul Tokgoz addressed to Shell Western Supply and Trading Limited ("Shell Western") and Erroneously Concluded that the Said Document - Attached as Exhibit 5 to Amended Complaint (Document No. 47-1 at pp. 37-41) – Does Not Show a Retention of Geden Holdings' Ownership Over the One-ship-companies of the Geden Group, as Plaintiff had Pled in its Amended Complaint.** Doc. 47 at p. 9.

Contrary to the plain language of the Consent Letter the Magistrate Judge found that "*nothing* in that Consent Letter, particularly paragraph 2 referenced by Tank Punk in its Amended Complaint, can be read as such a representation by Geden Holdings", *i.e.* that Geden Holdings

would continue to own the corporate one-ship-companies that controlled the tankers. *See* Memorandum, Doc. 64 at p 18.

The Magistrate's Memorandum omits to completely quote or refer to relevant language from the Consent Letter which may be of critical importance in understanding its contents. Accordingly, it is quoted below from the Consent Letter's heading though its numbered paragraph 2.

"CONSENT LETTER"

From:   Geden Holdings Ltd. <u>(the "Shareholder")</u>
   85 St. John's Street, Valletta, Malta

To: Shell Western Supply and Trading Limited (the "Charterer")
   Barbados

6.02.2015

Dear Sirs

1  We refer to the time charter parties each dated 13 March 2012 (in the case of the vessel "Royal", dated 17 October 2012) (the "Existing Charter") and entered into between the companies listed in Annex 1 hereto as owners (the "Existing Owners") and the Charterer in respect of the vessels listed in Annex 1 hereto (the "Vessels").

2.  As part of certain reorganization efforts being conducted by the existing shareholders of each Existing Owner, it has been proposed that each Existing Owner will sell (the "Vessel Sales") all its title, interest to and right in its Vessel to the relevant companies listed in Annex 1 here to as new owners (<u>and each wholly owned by the Shareholder, the "New Owners").</u>" Doc. 47-1 at p. 37 (*emphases* added)."

In her interpretation of the Consent Letter, the Magistrate Judge might have missed that "Geden Holdings, Ltd" is defined as "Shareholder." She might have also missed the language underscored in the above quoted paragraph 2 of the consent letter, *i.e.* (<u>and each wholly owned by the Shareholder, the</u> <u>"New Owners")</u>. Clearly this wording refers to the New Owners whose names are set out in Annex I to the Consent letter, which are owned by the Shareholder, *i.e.* Geden Holdings, Ltd. It is respectfully submitted that these underscored words in the parentheses either mean that the Shareholder owns the "New Owners", or they mean nothing.

Nowhere in the Consent letter is there mention of Advantage Tankers, LLC as a new controlling shareholder of the New Owners. The consent letter is signed on behalf of Geden Holdings, Ltd. by Tugrul Tokgoz as its director. There can be no question from the face of the Consent Letter that Geden Holdings acted as the sole shareholder of each of the corporate owners set out in Annex 1 (both old and new) to bind them to new charter parties, with new terms, and its authority for doing so is spelled out on the face of the Consent Letter, *i.e.* it was their sole shareholder. The Magistrate Judge's reasoning that Geden Lines was contemplated as the manager of the tankers after their sale and that this was a requirements of Shell as a charterer, does not in the least detract from the plain meaning of the words on the face of the Consent Letter as she reasons. *See* Doc. 64 at p.18. The Magistrate Judge misreads the consent letter in another important respect. She states: "Neither the terms of the Consent Letter nor the Advantage Defendants' subsequent charter agreements with Shell Western in any way evidence that the Geden Group Defendants retained control over any of the tankers following their sale. In fact, the terms of the Consent Letter indicate to the contrary." *See* Doc. 64 at p. 18. Plaintiff respectfully disagrees. The consent letter is about who owns the shares to the new corporate owners of the vessels, not who manages chartering and operations of the vessels after their sale to "newcos."

There is yet another important element in the Consent Letter that the Memorandum does not address. The Consent Letter spells it out on its face. It describes the transfer of the assets as "part of certain reorganisation efforts being conducted by the existing owners", leaving no doubt that this is not an ordinary sale of the assets in the regular course of business. It is corporate restructuring. This was argued by Plaintiff at the hearing on February 9, 2016; (EXHIBIT A 58: 14-25; 59:1-25; 60:1-25; 61:1-25; 62:1-8) and in Plaintiff's Opposition. Doc 56 at pp. 12-13.

**9. The Magistrate Judge Erroneously Determined that Plaintiff Neither Alleged nor Proved the Fraud or Injustice Test in its Complaint for Purposes of Showing the Alter-Ego Relationship Between the Geden Defendants and the Advantage Defendants.** Doc 64 at pp. 20-24.

Contrary to the Magistrate's findings, Plaintiff quite specifically pled in the Amended Complaint that its asset the M/T SPIKE was singled out by name in the reorganization plans of Geden Holdings, Ltd./Geden Lines as one of the vessels under bareboat charter to Geden's affiliate Spike Shipping Ltd. that belongs to the "residual fleet" which is "not part of the company's future" *See* Amended Complaint, Doc. 47 at ¶43. Plaintiff notes the Magistrate's remarks with reference to ¶66 of the Amended Complaint that the Memorandum characterizes "conclusory" (Doc. 64 at p. 21, ¶66) is indeed the conclusion from the numerous factual allegations (premises) of the Amended Complaint (¶¶ 37, 41-43, 55, 60-61) that set out in detail Defendants' fraudulent corporate restructuring and asset reshuffling.

Another reason that the Magistrate Judge cites in support for her conclusion that Plaintiff has not met the fraud or injustice prong of the alter ego test is that "The evidence also shows that Tank Punk could not have been disadvantaged by the sale of the 11 tankers to the Advantage Defendants because Geden Holdings, Ltd. received its full equity value in the vessels." Doc. 64 at pp. 21, 24. An enquiry as to whether Plaintiff was "disadvantaged" is beyond the scope of a Rule E(4)(f) motion to vacate. In rejecting a broader equitable enquiry and a "needs-plus-balancing test" as a standard for E(4)(f) vacatur the Second Circuit Court of Appeals in *Aqua Stoli Shipping Ltd. v. Gardner Smith Pty Ltd.*, 460 F.3d 434, 439, 445, 446 (2nd Cir., 2006) noted:

> The fact that Gardner Smith [the Rule B defendant] has substantial assets in another country is of no moment. Federal admiralty law allows a plaintiff to seize assets and bring suit wherever such assets may be found precisely because, while other assets may be available, plaintiffs may encounter difficulties in tracking them down. Should it wish, Gardner Smith has the option of relieving itself of this particular attachment by posting other security. Rule E does not require Aqua Stoli to go to Australia or any other country to sue Gardner Smith or to

obtain security as long as Gardner Smith's assets are available to Aqua Stoli [the Rule B Plaintiff] here.

*Id* at p. 444.

It is precisely this needs-plus-balancing test rejected by *Aqua Stoli* that the Magistrate Adopted and imposed on Plaintiff, *i.e.* prove with a preponderance of the evidence that it was "disadvantaged" by Geden Holdings' asset-stripping.

**10. The Magistrate Judge Erroneously Concluded: "In all, Tank Punk's Evidence of Control, which is Predicated Primarily on the Familial Relationship Between Karamehmet and Williams, and Secondarily on the Charter Business with Shell Western the Advantage Defendants Retained Following their Purchase of the 11 Tankers, is Simply Insufficient, under a Preponderance of the Evidence Standard, to Meet the Dominion and Control Prong of the Alter Ego Test."** Doc. 64 at p. 19.

The Magistrate Judge's conclusion is erroneous first because it adopts a "preponderance of the evidence standard", inapplicable in Rule B provisional attachment cases. In applying the multifactor "dominion and control" alter-ego/veil piercing test (*Bridas S.A.P.I.C. v. Government of Turkmenistan*, 447 F.3d 411, 418 (5th Cir., 2006), the Magistrate Judge did not specifically consider/deal with the following factors: **(1)** common stock ownership, discussed in detail in the foregoing objection No. 8; **(2)** shared business premises, telephones and faxes. Amended Complaint, Doc. 47 at ¶ 49; Opposition, Doc.56 at pp. 14-15. *See* e.g. *Sabine Towing & Transp. Co. v. Merit Ventures, Inc*., 575 F. Supp. 1442, 1446-1447 (E. D. Tex., 1983); **(3)** That Geden Holdings caused the incorporation of Advantage Tankers. *See* Amended Complaint, Doc. 47 at ¶50; Opposition, Doc.56 at pp. 16-17; TOKGOZ 74:1-25, 75:1-3; **(4)** that Geden Holdings entirely arranged the financing of Advantage Tankers. Amended Complaint, Doc. 47 at ¶¶ 50-55, and Exhibits attached thereto, Exhibit 19, Doc. 47-4 at pp. 2-32; MAT 59:14-25, 60:1-25, 61:1-25, 62:1-12. *See* also Amended Complaint Exhibit 17, Doc. 47-3, pp. 49-53; Exhibit 19, Doc 47-3 at pp. 55-56; **(5)** Common business departments provided by Geden Lines. *Bridas S.A.P.I.C. v.*

*Government of Turkmenistan*, 447 F.3d 411, 418 (5th Cir., 2006); **(6)** failure to observe corporate formalities. Amended Complaint, Doc 47 at ¶¶ 54, 62; Plaintiff's Opposition, Doc. 56 at p. 21; TOKG 74:4-25; MAT 48:16-22, 49:7-23; Amended Complaint Exhibit 19, Doc. 47-4 at pp. 2-32, particularly pp. 10, 32; Amended Complaint Exhibit 17, Doc. 47-3 at pp 49-52.

## <u>CONCLUSION</u>

Based upon the foregoing Objections, and what might be added in oral argument, Plaintiff respectfully requests the Court to make an order that the recommendations of the Magistrate judge in the Memorandum will not be adopted; that Defendants' motion to vacate should be denied; that the above captioned and styled consolidated suits in Admiralty should proceed to trial on the merits; or, in the alternative that Plaintiff be allowed to proceed with full discovery and following completion of same the matter should be referred to the Magistrate Judge for reconsideration based on a "probable cause" standard of proof.

Respectfully Submitted,

Chalos & Co, P.C.

<u>/s/George A. Gaitas</u>
George A. Gaitas
State Bar No. 2405885
Federal Bar No. 705176
7210 Tickner Street
Houston, Texas 77055
Tel: (713) 936-2427
Fax: (866) 702-4577

**<u>CERTIFICATE OF SERVICE</u>**

This is to certify that a copy of the foregoing was filed on this 20th day of July, 2016

with the Clerk of Court by using the CM/ECF system, which will send a notice of electronic

filing to all participating counsel of record.


/s/ George A. Gaitas
George A. Gaitas