# EXHIBIT A

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF TEXAS
HOUSTON DIVISION


ECLIPSE LIQUIDITY, INC.,    )    CASE NO:  4:15-CV-01645
                      )
          Plaintiff,    )        CIVIL
                      )
    vs.              )      Houston, Texas
                      )
AVOR NAVIGATION LTD., ET AL., )  Tuesday, February 9, 2016
                      )    (1:44 p.m. to 4:10 p.m.)
           Defendants.    )


EVIDENTIARY HEARING


BEFORE THE HONORABLE FRANCES H. STACY,
UNITED STATES MAGISTRATE JUDGE


<u>APPEARANCES</u>:


For Plaintiff:          GEORGE A. GAITAS, ESQ.
                    Chalos and Co, PC
                    7210 Tickner Street
                    Houston, TX 77055


For Defendants:        NEIL QUARTARO, ESQ.
                    Watson Farley & Williams, LLP
                    250 West Fifty-Fifth Street
                    New York, NY 10019


Court Recorder:        Paul Yebernetsky

Clerk:                 Beverly White

Transcriber:           Exceptional Reporting Services, Inc.
                    P.O. Box 18668
                    Corpus Christi, TX 78480-8668
                    361 949-2988


Proceedings recorded by electronic sound recording;
transcript produced by transcription service.

**Houston, Texas; Tuesday, February 9, 2016; 1:44 p.m.**

2    **Call to Order**

3    **THE COURT:**  Good afternoon, please be seated.

4    **MR. GAITAS:**  Good afternoon, your Honor.

5    **THE COURT:**  How are you?  All right, we have a new

6  hearing in Case Number 2015-01645, *Eclipse Liquidity, Inc.*

7  *versus Avor Navigation, Ltd, et al* and we just set oral

8  arguments on a Motion to -- this is Document Number 16, a

9  Motion to Dismiss Complaint and Vacate Attachments filed by

10  *Advantage Arrow Shipping, LLC, Advantage Holdings, LLC,*

11  *Advantage Tankers, LLC and Forward Holdings, LLC.*

12    A Response was filed on August the 20th, and so the

13  -- the plan is for each side to have an hour and a half to

14  present argument, and you've told me you're not going to

15  present any evidence?

16    **MR. SPEAKER:**  Correct, your Honor.

17    **THE COURT:**  Okay, so will each side announce

18  everybody's name at your table, please?

19    **MR. GAITAS:**  I am George Gaitas.  I appear for the

20  Plaintiffs and with me is my learned associate, Mr. Jonathan

21  Chalos.

22    **THE COURT:**  Hi.  How are you?

23    **MR. CHALOS:**  I'm good.

24    **MR. QUARTARO:**  Good afternoon, your Honor.  Neil

25  Quartaro, Watson, Farley & Williams, New York, for Defendants

1   Advantage Arrow Shipping, Advantage Tankers, LLC, Advantage

2   Holdings, LLC and Forward Holdings, LLC.

3          I am joined today by two colleagues from Phelps

4   Dunbar directly across the square from the Court, your Honor,

5   Marc Matthews and Brian Wallace.

6          **THE COURT:**  All right, thank you for appearing.

7          So the Motion, because it was filed by the Defendant,

8   I will hear your argument first.

9          **MR. QUARTARO:**  Thank you, your Honor.

10          **THE COURT:**  And you can stand or sit, whatever makes

11   you happy, as long as you're near a microphone and the

12   microphone is pointing at you.

13          **MR. QUARTARO:**  How's that, does that seem good?  I've

14   never been accused of not being able to be heard even in a

15   courtroom this size --

16          **THE COURT:**  Good.

17          **MR. QUARTARO:**  -- so I'm hoping everyone can hear me,

18   but I'm conscious of the fact that there's probably a court

19   reporter maybe somewhere who is taking notes.

20          **THE COURT:**  He's right here.  How does it sound,

21   Paul?

22          **MR. QUARTARO:**  So you think you can hear me fine?

23   Excellent.  Okay, well, thank you.  Thank you, your Honor.

24          I think before we go a whole lot further here I think

25   a procedural posture in this case should be clarified to your

1   Honor, and I think that would probably be helpful.

2          What we have are a number of complaints that the

3   Advantage Defendants, which are our clients, move to dismiss.

4          **THE COURT:**  Okay.

5          **MR. QUARTARO:**  However, intervening events, largely

6   the posting of security in those cases and the underlying

7   arbitrations in England has resulted in what we've termed the

8   "initial Complaint" as being largely moot.

9          However, before your Honor -- with one exception

10  which has not yet been withdrawn --

11         **THE COURT:**  Security has been posted or is going to

12  be posted?

13         **MR. QUARTARO:**  Has, your Honor.

14         **THE COURT:**  Thank you.

15         **MR. QUARTARO:**  Thank you.  So there is, I believe, a

16  live Complaint before your Honor, that's the Psara, spelled

17  with a P, P-S-A-R-A Energy, Ltd Complaint which I understand

18  will be dismissed due to the provision of security in that

19  case, and the proposed Supplemental and Amended Verified

20  Complaint by Tank Punk, Inc. which ostensibly would amend their

21  initial Complaint going back to June or July of this year -- of

22  last year, I forget exactly when that one was filed.

23         So procedurally we're a little bit awkward, your

24  Honor.  We have a Motion to Dismiss three Complaints, two of

25  which are already gone, the third one of which remains live

1  before your Honor.

2          We have another pending Amended Complaint before your

3  Honor.

4          That said, I don't think the lack of procedural

5  niceties here, if you will, is a challenge to resolving any

6  issues today.  The reason I believe that is as follows:

7          The allegations, particularly with respect to alter

8  ego in the proposed Amended Complaint are identical to the

9  initial Complaints, the alter ego argument is the same.

10         Counsel for the Plaintiffs, whom we know, I have

11 worked across from many times, and ourselves, conducted

12 discovery in accordance with the Court's Order realizing that

13 these initial Complaints are being resolved by the parties by

14 the provision of security in England and the prosecution of the

15 arbitrations there.

16         That said, we didn't want to lose the hearing date,

17 these are very important issues.  My client has several million

18 dollars tied up in this Court, your Honor, and some other funds

19 tied up in the Eastern District of Texas, all of which are

20 wrapped up into the same set of allegations which functionally

21 are the Geden Defendants, and if we look at the caption we

22 really appear to have two, in this case Spike Shipping, looking

23 at the Tank Punk Complaint, your Honor, and Genel Denizcilik

24 Nakliyati, A.S. which Plaintiff's have a a.k.a of Geden Lines,

25 and which we have referred to in our papers as Genel in order

1 to separate them.

2 So we've got -- we've got this pending -- this

3 pending Complaint that's got the same alter ego allegations,

4 and we went ahead and we did discovery on it, your Honor.  We

5 conducted four depositions, several thousand pages of documents

6 have been produced, three Defendants were deposed in London,

7 England several weeks ago and the attorney -- an in-house

8 attorney for Plaintiffs, Ms. Desbalita Baca (phonetic), who

9 verified the Complaints before your Honor, was deposed by a

10 video with myself in New York and her presence here in Houston

11 that is, of course, ably assisted by the folks at Phelps Dunbar

12 in conducting that deposition.

13 So technically one way to look at this case is that

14 on the underlying Complaint here, the Psara Energy Complaint,

15 the Plaintiffs are technically over-secured because they're

16 proceeding in a limited secured, but they want the security, as

17 I understand it, that's been posted in this case here before

18 your Honor to be applied to the proposed Supplemental and

19 Amended Verified Complaint.

20 **THE COURT:**  And one of the claims was already paid

21 out of the funds?

22 **MR. QUARTARO:**  I believe actually what happened was

23 money was -- was provided as security before those -- before

24 those arbitrations started.

25 **THE COURT:**  All right.  I'm sorry, I interrupted you.

1          **MR. QUARTARO:**  No, no, no, of course, not at all.

2          And I assume that as I spoke, you know, Counsel is

3   always hopeful that the game plan that they had developed will

4   be listened to completely during oral argument.  That's never

5   actually happened to me so I assume that your Honor will have

6   some questions as we go along and to the extent I'm able, of

7   course, I'm prepared to answer them.

8          **THE COURT:**  Thank you.

9          **MR. QUARTARO:**  So, procedurally, I think we can

10  address the Psara Energy Complaint because the relevant alter

11  ego allegations are the same.

12          Alternatively and, of course, the Court may have

13  other ways that it wishes to view these, these are all the

14  Counsels' thoughts, alternatively the Court may wish to review

15  the proposed Amended Complaint and the evidence presented there

16  and determine whether there is a basis to allow that.

17          **THE COURT:**  Okay.

18          **MR. QUARTARO:**  But we submit, of course, your Honor,

19  that there is not our (indiscernible) opponents submit, of

20  course, that there is.

21          So it's not 100 percent clear how we handle this.  We

22  could address the alter ego allegations on the Complaint that's

23  still before your Honor, and should be there a ruling on those

24  issues that would be res judicata in respect to the proposed

25  Amended Complaint.

1        Alternatively your Honor could convert that to be a

2   Motion for Summary Judgment which I think procedurally is

3   actually probably where we are with respect to that underlying

4   Complaint.

5        In the alternative to that your Honor could determine

6   whether there is, in fact, an appropriate Factual Basis to

7   allow the Plaintiffs to file this proposed Amended Complaint

8   and to obtain their Rule B action papers that they seek in that

9   matter.

10        The sum and substance, though, I think, is that since

11   the initial Complaints are or will be dismissed the resolution

12   of the allegations in the proposed Amended Complaint determines

13   whether or not this matter will stay before this Court.  I

14   think that's -- at the end of the day that's where we wind up.

15   If your Honor determines that there are, indeed -- there is,

16   indeed, a prima facie case and that the evidence supports the

17   alter ego allegations, maybe we (indiscernible).  If your Honor

18   determines that that's not the case I think the two Complaints

19   go away and we're off your Honor's docket.

20        Except, of course, if the underlying claims move to

21   England pursuant to the relative arbitration clauses, I believe

22   arbitrations are ongoing in certain all of the underlying

23   Complaints.  I'm not clear whether the issues that have been

24   alleged in the proposed Amended Complaint have been brought to

25   arbitration yet in England.  I believe that that has commenced,

1   but it hasn't gotten very far, it's only -- this Complaint

2   was filed November 20, so it's still the early days.

3           So before I move to kind of the meat, I think, of

4   today's hearing, and I do really think that the meat of today's

5   hearing is the evidence, right?  I mean, we've got the law, we

6   briefed that to your Honor.  You've got the papers in front of

7   you.  I don't think there's even very much disagreement on the

8   standard.  I mean, this is -- will be attachment in all three

9   of those cases.  Suffice it to say not the first time these

10  matters have been before the Southern District of Texas,

11  probably not the first time it's been before your Honor.  So I

12  think, you know, in terms of the law I don't think there's a

13  whole lot of dispute there.  I think on the facts, of course,

14  there is.

15          **THE COURT:**  Oh, my -- I'm also going to consider, how

16  are you going to dismiss the original Complaints?

17          **MR. QUARTARO:**  I'm sorry, how am I?

18          **THE COURT:**  How?  Yes.

19          **MR. QUARTARO:**  I would have to rely on the Plaintiffs

20  to do that and that's probably a question and that's more

21  appropriately directed to them.

22          **THE COURT:**  Do you intend to dismiss them?  The

23  original Complaints?

24          **MR. GAITAS:**  Your Honor, in these instances where

25  there's no claim, no underlying claim, there's no need for

1  securing.  Yes -- but understand.  We will sign the

2  dismissal -- (indiscernible) parties will sign the dismissal

3  (indiscernible).  But those that are live and there is a need

4  for securing, we're not.

5          **THE COURT:**  Of course.  You don't agree.

6          **MR. QUARTARO:**  And, perhaps, your Honor, we can just

7  clarify that in this case that would be the dismissal of the

8  Psara Energy, Ltd Complaint, 15-cv-01673, which would leave

9  before your Honor the proposed Amended Complaint in 15-cv-

10 01675, do I have that correct, Mr. Gaitas?

11         **MR. GAITAS:**  I think and I think also the Eclipse

12 Complaint and the Psara Energy.  I don't see any live claims on

13 these, as I recall, and that's -- I'm just relying on my

14 memory, and I'd have to go and look in the files, but these

15 concern unpaid hire.  And the hire --

16         **THE COURT:**  Unpaid what?

17         **MR. GAITAS:**  They're both charter hire.

18         **THE COURT:**  Hire.  Eclipse and which other one?

19         **MR. GAITAS:**  It is the Eclipse, your Honor, and the

20 Psara Energy, Ltd, the second one in order from the top.

21         **THE COURT:**  Thank you.

22         **MR. GAITAS:**  So the one that is left that has

23 substantive issues and needs security is the one of Tank Punk,

24 Inc., the Spike Shipping, et cetera, but the arguments and the

25 issues are identical as to all three so it's not material

1  whether we dismiss them or we don't dismiss them for purposes

2  of the hearing today.

3          **THE COURT:**  Right.

4          **MR. QUARTARO:**  I'll get into that a little more, your

5  Honor.  I'm not 100 percent sure that -- I'm not 100 percent

6  sure I agree with the importance, but I would certainly state

7  as a general matter we're basically satisfied and have no

8  problem working with opposing Counsel.  I believe there's two

9  stipulations of dismissal already have gone through and those

10 cases are gone, and I'm sure we can work out the other one.

11         With the Motion to allow the filing of the proposed

12 Amended Complaint it didn't make sense to try and move to force

13 that Complaint to be dismissed while the proposed Amended

14 Complaint is pending, that's the purpose of it and we

15 understand and respect that.  We need a ruling in order to

16 proceed.

17         **THE COURT:**  Okay.

18         **MR. QUARTARO:**  Does that -- does that put us in a

19 comfortable place procedurally to have a commitment from the

20 Bench obviously, but I think I've explained it so that the

21 relevant -- the relevant thing that's before the Court is the

22 proposed Supplemental and Amended Complaint?

23         **THE COURT:**  Right.

24         **MR. QUARTARO:**  Right.  Now, Mr. Gaitas did mention

25 that there is no difference.

1       There is actually one difference and I'd like to

2  point that out in a moment, but I'll circle around so that I

3  think you have it -- you have it in the papers.  But perhaps I

4  might say a word on the legal standards before -- before we go

5  further without inflicting any lengthy citations on the court

6  or on our court reporter.

7       Our view is straightforward.  The Plaintiffs have an

8  uphill climb, your Honor, and they have an uphill climb for two

9  reasons.

10       First of all, they have alleged an alter ego

11  structure.  The case law is very clear, piercing the corporate

12  veil is an extraordinary remedy reserved for special

13  circumstances, and we would argue, your Honor, there are, in

14  fact, no special circumstances here.  But in any event the

15  requirements to pierce the corporate veil are -- so that would

16  be our first goal.

17       Our second point, which sort of folds into the first,

18  is that in order to obtain the Rule B attachment Plaintiffs

19  have to show reasonable grounds, and if they neither make out a

20  prima facie complaint, which we argue they do not, or if the

21  evidence that we've developed fails to support the proposed

22  Amended Complaint then we have a reasonable basis for an

23  attachment.

24       The underlying Complaint we'll consent to the

25  dismissal of that today or whenever your Honor rules on the

1   proposed Amended Complaint and that would be the end of it from

2   our perspective, obviously.  I expect the opponents have a

3   different view.

4        So that's -- that's where we see the standard and we

5   think it's very, very important at this juncture, and I'm going

6   to come back to it a couple of times because we think it's

7   very, very important to identify for your Honor the fact that

8   there is a missing party in the caption and, of course, this is

9   laced throughout our papers, but that party is Geden Holdings,

10  your Honor.

11       Geden Holdings is not named as a Defendant here and

12  that's for a very simple reason, that reason is Geden Holdings

13  is present in the Southern District of Texas.  If Geden

14  Holdings was named as a Defendant the Plaintiffs would have to

15  swear a Rule B affidavit that says "None of the Defendants

16  against whom we seek security here in the Southern District are

17  present."  They can't do that if they name Geden Holdings.

18       That's a very serious omission, your Honor, and it's

19  the only fact that leaves this case before your Honor.  There

20  are other reasons to dismiss, but that's a pretty -- that's a

21  pretty important one, that's a pretty major one you're missing

22  from the caption.

23       But I'm going to show your Honor a graphic in a

24  couple of minutes that's repeated in a number of the papers

25  that the parties have produced, and you can see Geden Holdings

1    is a key link in the chain.  Once we pull that company out of

2    the chain of alleged alter egos the alter ego argument falls

3    apart.

4          So what facts did we develop?

5          Well, Plaintiffs had characterized Geden Holdings

6    and, again, this is key, and your Honor is going to see during

7    the presentation and as your Honor reads the papers there's an

8    effort to blur the lines between Genel and between Geden

9    Holdings.  They are completely separate companies and we're

10   going to show your Honor the organization chart, the effort to

11   blend those two companies is obvious because if the perception

12   that Genel owned the vessels of which Plaintiffs complained is

13   accepted then it's sort of gone away without naming the actual

14   owner, and actually their contract counterparty, so it's very

15   important, I think, to sort of keep those two things front and

16   center.

17         So, you know, the basic allegations here are pretty

18   straightforward.  Plaintiffs allege that the Geden Defendants,

19   principally Geden Holdings, sold a number of vessels that it

20   owned over a period of time including 11 oil tankers, and for

21   the purposes of today let's just call those the "vessels"

22   because I don't think any of us care about the other 49-odd

23   ships, it's 11 oil tankers that Plaintiffs complain were sold

24   by Geden Holdings, more specifically special purpose companies

25   owned by Geden Holdings, each one of which owned a ship, to the

1  Advantage Defendants.

2       And Plaintiffs contend that that sale allows them to

3  pierce the corporate veil because they were disadvantaged by

4  it, and because they have their various alter ego allegations.

5  You need both in order to -- in order to proceed.  You have to

6  show that on the one hand there was a domination and control of

7  the subsidiary by a parent and on the other hand that that

8  domination and control was used to disadvantage the complaining

9  party, so that's kind of our standard, right, first is there

10 domination and control; second, we can go down the road of is

11 there a disadvantage.

12      Now, in fact, when we went and deposed the -- the

13 principals of Advantage, and it should be noted they -- two of

14 them, Mr. Mehmet Mat, Mr. Tugrul Tokgoz, are also CFO and CEO

15 respectively of Genel and Geden Holdings.  So we deposed these

16 two and we deposed the 85 percent equity owner of the Advantage

17 Defendants, Ms. Nazli Williams, and what -- what came out of

18 that deposition is simply a straightforward story of Geden

19 Holdings trying and failing to restructure its business

20 whereupon it sold its assets, fairly straightforward.

21      Plaintiffs are trying to contend or trying to argue

22 that this attempted restructuring by Geden had been the sale of

23 the vessels to Advantage are all part and parcel of the same

24 restructuring, but they're not.

25      The evidence shows very clearly that Geden Holdings,

1   like a lot of shipping companies, had problems post-

2   (indiscernible).  Charter rates collapsed, they're having

3   trouble making ends meet.

4           So what did they do?

5           They did what any business would do, first thing went

6   out and tried to raise some money.

7           Attached to the proposed Verified Complaint at

8   Exhibit 3 is a Prospectus by a company called "Universal

9   Maritime."

10          Universal Maritime and, you know, the prospective

11  makes for -- Prospectus makes, frankly, for kind of boring

12  reading, but the upshot of it is they want to go out to the

13  Norwegian bond market, which is hot for shipping -- was hot for

14  shipping, and issue a bunch of Norwegian Kroner denominated

15  bonds, raise some money for Universal, get the vessels sold to

16  Universal and, thus, be leveraged again a balance sheet.

17          Unfortunately, that didn't come to fruition, they

18  weren't able to get sufficient underwriting, they weren't able

19  to have the bond issue that's come to fruition.  They tried and

20  it didn't work.

21          So next what did they do?

22          They go and they talk to their lenders.  Exhibit 4 is

23  a document called "Project Hermitage Restructuring."

24          So what happened in there?

25          Again, the testimony is very clear, it's all cited to

1   your Honor in the papers.  The testimony is very clear.  The

2   parties went to their banks, said, "Okay, we couldn't spin off

3   some of these assets, refinance them, inject some more money

4   into another company and deleverage our balance sheet, that's

5   not going to work.  Can you guys make a deal?  You know, we've

6   got to reduce our loan repayments, we need to extend

7   amortization, we've got to do something else, you know, we're

8   going broke."

9           The lender said fairly straightforward "You need an

10  independent business" or "you've got to go out and get a FA, a

11  financial advisor and propose some restructuring, take a look

12  at it, but that's how you -- you're going to have to go do

13  that."

14          That's exactly what they did.  They went out, they

15  retained AlixPartners, AlixPartners produces this independent

16  business review really for the benefit of the banks.  The banks

17  look at it and, frankly, there's no monthly restructuring

18  proposal.  There was a half a dozen banks involved in that

19  facility.  Apparently a couple of them were prepared to go

20  along with the restructuring, a couple of them wanted to get

21  paid out, they didn't want to extend, they didn't want to even

22  take interest only payments for a period of time, they weren't

23  interested in doing that.

24          So what did that leave as an option for Geden?

25          One thing, you've got to sell your assets, and that's

1  what they started to do.  In fact, over five or six years they

2  sold almost 60 ships, they're down to one which is a

3  nonfunctioning bulker that's apparently wrecked on the coast of

4  Tunisia, your Honor.  So they -- they've sold off almost all of

5  their shipping assets, although they still have some vessels

6  chartered, again, that they've chartered out at favorable

7  rates, they make a little of money, but they're not a ship

8  owning company, really, for all intents and purposes anymore.

9         So, interestingly, although my opponents characterize

10  this as a sinister restructuring plan, the Universal Prospectus

11  is publicly available, it's shopped all over the country and in

12  other places in order to obtain underwritings (indiscernible)

13  interest in the bond issuance, which doesn't work.

14         The Alix plan is circulated widely among the five

15  banks or six banks that were financing Geden at the time, this

16  is hardly a sinister secret plan when we've got publicly issued

17  bond prospectus on one hand, and a third party restructuring

18  proposal circulated among numerous parties on the other hand,

19  so we're not talking about some sort of behind the scenes,

20  shuffle assets around type of situation, but we've got a series

21  of legitimate restructuring attempts, none of which really

22  worked and which resulted in the ships ultimately being sold.

23  I don't think any of these factors are seriously in contention,

24  your Honor.

25         So I think at this point it's clear that the entity

1   that's central here is Geden Holdings, right?  That's the

2   company that owns these ships, that's the company that sells

3   these ships and that's the company that my opponents allege is

4   the one that cost their -- or that didn't pay their claims.

5           And it probably helps just for a minute to take a

6   look at the corporate structure.  I circled Geden Holdings in

7   red because they're such an essential link in this chain,

8   although we have to draw another theoretical link which I'll

9   fill in in a moment for your Honor, so there's actually two

10  missing links here, but we probably only need to focus on the

11  one for now.

12          So the Geden SPVs are the companies that own these 11

13  oil tankers, right, there's 11 of them hanging underneath;

14  factually, initially, about 60, but the ones we care about are

15  only the 11 oil tankers SPVs.  They're owned by Geden Holdings.

16  That's alleged, by the way, in the proposed Complaint, your

17  Honor, right there, right here at Paragraph 26 I believe it is,

18  Defendants -- 24, I'm sorry, Paragraph 24:

19          "The company holding the shares of the Geden fleet of

20          tankers was the Maltese holding company Geden

21          Holdings, Ltd.," right?

22          It's easy, by the way, to get this confused, my

23  opponents did it themselves.  If you look at Page 9 of their

24  Evidentiary Brief, Geden Holdings is the successor entity, or

25  Advantage Tankers, I'm sorry, is the successor entity to Geden

1   Holdings, but they're not on the caption.

2          Again, why?  Because it destroys Rule B jurisdiction

3   here, that's why they're omitted, your Honor.

4          So when we look at this chain this is what the

5   Plaintiffs are alleging.  The Geden SPV sold their ships to

6   really the Advantage SPVs, right?  That's very common, not just

7   in real estate, but in shipping, the holding company opens a

8   series of limited liability companies, each one holds an asset.

9   It's a very common corporate structure.  In fact, it's not just

10  real estate, there's all sorts of assets that are held that

11  way.

12         So these SPVs are sold over to the -- or these ships

13  are sold over to the Advantage SPVs.  Geden Holdings, the

14  proposed Amended Complaint alleges, owes the Plaintiffs money,

15  that's their claim.  They returned a ship on August 9th, and

16  that date is important, and I'll come back to it, your Honor,

17  August 9th, 2015.  Apparently there was some dispute over the

18  condition of the ship and whether a coating was put on the

19  bottom of it of sufficient length, and whether Geden Holdings

20  is liable for the theory the ship had to be properly coated,

21  that's the sum and substance which, by the way, is one of the

22  reasons why I disagree that those initial Complaints and the

23  proposed Amended Complaints have the same facts.  They do not.

24         The proposed Amended Complaint has a cause of action

25  that accrued on August 9th, 2015 when that vessel was returned

1  to the Plaintiffs.  All of the other Complaints were filed

2  before and involved a charter hire.  Accordingly, that proposed

3  Amended Complaint has a different cause of action than the

4  initial Complaints, and what Plaintiffs are really trying to

5  do, and we have this in our papers as well, of course, your

6  Honor, is relation fact.  They're basically saying "Well, your

7  Honor, we filed in June or July, we've dismissed that

8  Complaint.  I want to amend it -- or we're going to dismiss

9  that complaint, I want to amend it and I want to amend it with

10 a cause of action that accrued on August 9th, but I want my

11 security that I got back in June."  And, obviously, we have a

12 problem with that, your Honor.  We don't think that that

13 relation fact is appropriate.  We have a separate issue with

14 it, as well, which I'll highlight for the Court in just a

15 moment.

16         So to continue with Plaintiffs' seeming allegations,

17 Geden Holdings is then owned by a fellow named Emin Karamehmet.

18         Mr. Karamehmet is a well-known Turkish industrialist.

19 Unfortunately for him he happens to be at odds with the current

20 Turkish leadership; let's just say Turkey has something that

21 could happen these days.  Among other things he owns a large

22 media company.

23         His daughter, different last name, she's married,

24 Nazli Williams, is approached by Mr. Tabruz (phonetic) when it

25 becomes apparent that the banks will not restructure the debt,

1   and Mr. Tabruz knows that the tankers, the 11 tankers that are

2   owned by the respective Geden SPVs are worth just a little bit

3   more than what we might call book value, and the reason for

4   that is that they are chartered by Shell, a long term charter

5   with Shell and it's self-evident that an asset that is being

6   utilized by a company like Shell, what we would call in the

7   industry a gold standard charter, no matter what happens,

8   right?  Checks from Shell are going to clear, you know, they're

9   not going to stiff their charters.  And, in fact, they have a

10  reputation as such and they're not the only one, you can go to

11  a bank with that charter and you can obtain financing because

12  you can say to the bank "Hey, this ship isn't going to trade on

13  the market, Shell is taking it so we're guaranteed whatever the

14  hire is, $20,000, hey, your debt payments are assured, it's

15  getting a better rate," so it actually even functions as

16  security having a charter like that.

17          In any event, Mr. Tabruz approaches Ms. Williams

18  about creating a new company to buy these 11 oil tankers and

19  Ms. Williams testified -- she's got actually a fair amount of

20  experience.  She's got a communications degree, she started at

21  a communications company, worked her way up, eventually got a

22  executive role.  Because of her great wealth, and she is, you

23  know, unlike me, born into a very wealthy family, and I'm sorry

24  to say my trust fund has like $9 in it, Ms. Williams, perhaps,

25  has significantly more.  But my point is when you -- when you

1  look at her testimony this is not -- and she, frankly, had the

2  best quote probably in the entire case, this isn't

3  (indiscernible) the board room, right, there's a career

4  progression where Ms. Williams is on very serious boards of

5  directors including Turk Cell which is a very major cell phone

6  company in Turkey, so an experienced woman and a woman of

7  significant means, significant wealth.

8        And so Mr. Tabruz says "You know, gees, we have these

9  ships.  There could be an opportunity.  We'll have to set up a

10 new company, we're going to have to buy, though.  But if you're

11 interested in investing there could be a real opportunity

12 here."  And Ms. Williams is interested, but she doesn't want to

13 take the full risk and that's understandable because the

14 charters with Shell at that time were actually at a very low

15 rate, so if the market went up you were good; if the market

16 went down they'd have problems meeting their debt obligations

17 and eventually you would reach a point where maybe a lender

18 would foreclose and you could have your investment like that.

19        So what she initially said, it's pretty clear, "Let's

20 do a joint venture, I don't know if I want to take this risk on

21 myself, this is a lot of risk, it's a 200 million dollar equity

22 investment."

23        Mr. Mat, the CFO of both Geden Holdings and Genel,

24 and eventually hired by Ms. Williams for her companies, says

25 "Well, I do have some private equity branches in New York.

1  Let's go to New York, we'll meet with a couple of funds, maybe

2  we could get a joint venture going."

3         So they go and they meet with Northern Shipping Funds

4  and (indiscernible) and they start to have talks.  They get as

5  far, actually, as creating a possible joint venture vehicle,

6  Future Holdings, LLC.  These names are always sort of

7  optimistic -- you know, you should speak to the future in some

8  sort of way, and this one does exactly that.  So they form

9  Future Holdings, but really they don't want to have anything

10  that deal with the hedge funds.  It's not entirely clear what

11  the reason was, it seemed to come out in the deposition that

12  they felt perhaps the hedge funds were overreaching in terms of

13  what they wanted for their return.  So the deal with the hedge

14  funds falls apart.

15         At the same time it should be recognized it will take

16  a lot more than 200 million dollars to buy these ships, it

17  takes a little bit more like 600 million dollars to buy these

18  ships.  The reason that we're talking about an equity injection

19  of 200 million is they're simply going to finance the rest of

20  it and, again, pretty common, right?  You have an equity

21  injection, you have a debt component, it's a rather common

22  structure for many asset acquisitions.  That's exactly what

23  they were doing here.

24         So they're talking with Centerbridge and

25  INSUFFICIENT, let's do a joint venture, they're talking with

1  some lenders.  Critically, though, your Honor, not all the same

2  lenders as with Geden.  There were a couple, but there is not

3  that many shipping banks in the world, but there is new lenders

4  that they're talking to.

5          So, unfortunately, the private equity joint venture

6  goes away and Mr. Tabruz knowing that Ms. Williams has

7  expressed reluctance to take on sort of the entire risk of this

8  venture and the variable charter goes to Shell.  He says "Look,

9  can we negotiate a different charter if I get new owners?  If

10 these ships are sold will you do a charter with the new owners,

11 but it can't have much risk in it.  So here's what -- here's

12 the offer, we'll do a floor rate on the charter and any market

13 upside we'll split.  So I can go back, I can say to the

14 lenders, I can say to Ms. Williams, look, we have five-year

15 deals with Shell, we've got a base, we know what the floor is.

16 That's enough to pay the debt, service and to operate the

17 company.  We're assured of that.  If the market improves,

18 great, we have what they call just a little bit

19 (indiscernible), you know, a little extra because we'll be able

20 to -- we won't get it all because we have to share with Shell

21 in order to get a base rate but, you know, we have an upside

22 here and we have very little downside for the next five years."

23         On the basis of that Ms. Williams agrees to inject

24 the entire equity portion into Advantage tankers, and that's

25 just what happens.

1          Now I would ask -- I would ask your Honor if -- if

2     the -- if you would have the Quartaro declaration handy, and --

3          **THE COURT:**  No, I didn't bring all of those documents

4     here.

5          **MR. QUARTARO:**  I can't blame you, we didn't bring all

6     of our documents either and there was rather a lot of them.

7          **THE COURT:**  Right.  They're in my office, so --

8          **MR. QUARTARO:**  Okay, well --

9          **THE COURT:**  And all the binders, but is there an

10    identifying number?

11         **MR. QUARTARO:**  Yeah, let me just steer you right to

12    the exhibit and it probably makes more sense to perhaps even

13    delegate it, it's just similar accounts what I'm about to

14    suggest.

15         What I have is Exhibit 1, actually, has a cover page,

16    and this will probably help to summarize it, this shows, and

17    this is the cover page, the Quartaro Dep Exhibit 1, and if you

18    go through Quartaro Dep Exhibit 1 what you'll see is, first,

19    this chart that I've shown your Honor here.

20         Second, you'll see a series of documents for each

21    vessel.  And those documents largely consist of a Bill of Sale

22    for the ship and two payments, payment records totaling the

23    price of the ship.

24         And what could be done, and what I quite honestly

25    tasked somebody else with doing for me, is you could see from

1    those wire records two dates.  Remember I showed that the Geden

2    SPV, the ships are actually owned by SPVs.  The structure,

3    actually, is that each SPV has a bank account and the lending

4    bank has a security interest in that bank account, so the

5    payment of the sale price for each vessel is actually

6    bifurcated.  The debt component goes to the bank so that they

7    can clear off the mortgage.  This all happens, by the way,

8    contemporaneously, it's -- it's the equivalent of trading a

9    marble to a kid you didn't really trust, so you kind of want to

10   each snatch the marble at the same time except you've got a

11   crude oil tanker in one hand and $50 million dollars in the

12   other but the concept actually is exactly the same.

13        So the banks get the money, they release the

14   mortgage.  The new bank, which has financed at least a good

15   portion of that, then puts its mortgage on, everybody is

16   protected, the marbles are exchanged contemporaneously.

17        At the same time, though, these vessels were not

18   completely under water with that.  An equity component,

19   significant equity components totaling almost 200 million

20   dollars actually, those payments are also made to Geden

21   Holdings.

22        So what you can see, in sum and substance, from

23   Exhibit 1 is all 11 vessels are paid for in full, in cash, with

24   the debt component going to the lenders and an equity component

25   going to, unsurprisingly, our good friends at Geden Holdings.

1  This functionally is what Plaintiffs complained of, your Honor.

2          That really brings us, I think -- and I'm sorry, just

3  let me keep my Declaration together here, that really brings

4  us, I think, your Honor, to the only remaining question on the

5  money, and I apologize, Quartaro Exhibit 3 should have had this

6  on the cover, and perhaps, Ms. White, if I could -- thank you.

7  Gentlemen, I know you have many copies of this.

8          **THE COURT:**  Thank you.

9          **MR. QUARTARO:**  This is Exhibit 8 to the Nazli

10 Williams deposition, your Honor, and it's also marked

11 Defendant's 05192 as produced by the Defendants during the

12 course of discovery in this action.  You can see from the

13 number there was significant discovery, we did start at zero,

14 so lots of documents, your Honor.

15         And as you go through this you can see, and I'm

16 informed, although like my trust fund, my Turkish is weak, but

17 I am informed (indiscernible).  And if your Honor just looks at

18 this summary you can see very, very significant sums of money

19 moving into, and if you look at the upper right hand portion of

20 the statement, your Honor, where I'm pointing the account is

21 Forward Holdings, right?

22         **THE COURT:**  Right.

23         **MR. QUARTARO:**  And when we turn our attention to the

24 Advantage structure we have Forward Holdings, holding --

25 Advantage Holdings which then runs the tanker fundings, so

1  she's injecting her capital into Forward Holdings, and if we

2  total all of this up we get 195 million dollars 350,000 --

3  yeah, 195,350,000, your Honor.

4          This record is uncontroverted, there was no

5  countervailing evidence.  There may be supposition, but there

6  is no actual evidence.

7          So the evidence proves Ms. Williams injected the

8  money into the companies.  The evidence proves that the

9  Advantage Defendants paid Geden.  They covered all the debt,

10  they covered all the equity, they were paid in full.

11          The only piece that might be attacked in here, which

12  Plaintiffs have not challenged in any way, shape or form, the

13  sale price of the vessels.  The sale price of the vessels is

14  all established by a third party valuation service, well-known

15  in the industry called Clarksons.

16          Again, there is no evidence on the record before your

17  Honor or anywhere in the case that any of these sale prices did

18  not, in fact, reflect a then current market value of the

19  vessels, not a scintilla of evidence there.

20          I would like to point out, though, there is one

21  discrepancy, I believe it's Advantage Solar, the sale price

22  listed on the Bill of Sale appears to be incorrect, they

23  received slightly more, about a million dollars more.  I

24  understand that had to do with the actual condition of the

25  vessel although we're talking about more money going to Geden

1  Holdings, not less, it's difficult to see how the Plaintiffs

2  could possibly be disadvantaged by that.

3        So -- so we've got no doubt the money went in the

4  company, we have no doubt that the Advantage companies paid

5  fair market value over to the Geden -- over to Geden Holdings,

6  our missing Defendant, right?  I mean, it's almost appropriate

7  they'd have a missing chair.  You're (indiscernible) because

8  Geden Holdings is the party that should be in the room, but

9  they're not, so there's no doubt about that.  The -- the

10  investment went in, Geden Holdings received the full market

11  value of its vessels, it paid off its lenders and it retained a

12  chunk of the equity.

13        I'm sure Plaintiffs will have some comments about

14  that but, of course, their comments about Geden Holdings again.

15        Kind of baked into all of this again is the blurring

16  of those lines between Genel Denizcilik and between Geden

17  Holdings.  And I think it's important, your Honor, you will

18  have noticed through our evidentiary brief in Exhibit 1, which

19  is -- one or A.  It's a Declaration of Mr. Tokgoz and it just

20  plays out what a technical manager does.  The irony, of course,

21  of this entire case, your Honor, is what the Plaintiffs do.

22  They're also technical managers.  These are third party

23  companies that manage ships for ship owners and their real --

24  their reason for being is simply that they can take advantage

25  of experience in an economy of scale that you can run 60, 80,

1   100, 150 ships much more efficiently than you can two, three,

2   five, eight ships.  Their (indiscernible) costs are a lot lower

3   and it's straightforward.  Numerous companies in the industry

4   are doing this.  Stealth Maritime is one, (indiscernible) is

5   one, VShips is one, Wallem is one, I mean, there's an industry

6   that does this.  There's nothing nefarious about it in any way.

7         And there's no allegation, by the way, that Genel

8   performed this anything other than a (indiscernible) venture.

9   There doesn't seem to be anything on the record that points in

10  a different direction.  But, again, much of the case depends on

11  blurring the lines between Genel and Geden.

12        Also, your Honor, you'll see in Exhibit 1 that the

13  registered owners, and I don't think this is in contention in

14  any way, of all of the vessels, Geden SPVs, not Genel

15  Denizcilik, Geden SPVs, again, our missing chair, our missing

16  link in the prima facie -- in the alter ego chain.

17        All right, so -- so we've seen the structure.  We

18  seem to have a missing link.  It's pretty clear Geden Holdings

19  is -- is an essential link.

20        By the way, your Honor, you have -- here, in the

21  Southern District of Texas they have registered with the Texas

22  Secretary of State as a foreign corporation registered to the

23  business.  They have a telephone number that if you call it it

24  will be answered "Geden Holdings," and they've appointed an

25  agent in the Southern District of Texas, but I guess now is as

1    good a time as any to raise that issue.

2          The proposed Amended Complaint, which I had earlier

3    characterized as functionally seeking a relation fact to the

4    July Complaints, even though the cause of action accrued after

5    those Complaints were filed, was filed on November 20th, 2015.

6    That's very important actually because if Geden Holdings is a

7    necessary party in this case the Plaintiffs could not swear out

8    a Rule B affidavit that none of the alter egos are present in

9    the Southern District of Texas on November 20th.

10          I know there is arguments about whether their office

11   is sufficient for service of process, but we don't have to get

12   to any of that because there is no doubt that by November 3rd,

13   2015, and I believe that this is Quartaro Exhibit 4, by

14   November 3rd, 2015 Geden Holdings, not conceding that their

15   office wasn't appropriate for the receipt of service, but

16   making absolutely sure that there was no argument that they are

17   not subject to the service of process in the Southern District

18   of Texas, they go ahead and they appoint an agent here.  So

19   November 20, that proposed Amended Complaint cannot be

20   accompanied by -- as long as Geden Holdings is a necessary

21   party, cannot be accompanied by an affidavit saying none of

22   these alter egos are present in the Southern District of Texas,

23   the Rule B goes away.  Again, that's why we have a missing link

24   in this chain.

25          So we've got the relation fact argument.  We don't

1    think that that -- that that works.  We don't think it works

2    because the cause of action proves after; we don't think it

3    works because when the thing was filed they can't swear out a

4    Rule B affidavit.

5            We've got the Geden Holdings, the failure to join

6    Geden Holdings.  Again, we think that that -- that's a

7    fundamental failure that eviscerates the Plaintiffs' entire

8    case.  As long as Geden Holdings is not named in the caption

9    then they can't be, again, because of the Rule B arguments off

10   of the Plaintiffs' Complaint that Geden Holdings took actions

11   that, in sum and substance, are -- create an alter ego

12   argument.  They're not here, so how could that occur?  It

13   couldn't have.

14           And again look at Page 9 of their brief, they

15   actually allege the Advantage companies are the successors to

16   Geden Holdings.  That probably tells the Court all you need to

17   know and, frankly, I think you can rule on that basis alone.

18           So -- so if we look now at Ms. Baca when we look at

19   the -- which is the Plaintiffs dep -- the Plaintiffs'

20   representative, and we look at her understanding of the

21   corporate structure of the Defendants you'll see she's got a

22   fundamental misimpression.  Her testimony is that it's not Emin

23   Karamehmet that owns these companies, it's Ms. Williams, but

24   other than Ms. Baca's speculation, zero evidence on the record

25   that that's the case.  And, in fact, all of the documents

1  produced by the Plaintiff show that it's Mr. Karamehmet that

2  owns the Geden Holdings groups of companies.

3         In any event, that's their allegation in the proposed

4  Amended Complaint.  But it's very curious that the --

5         **THE COURT:**  That he has -- that's the allegation?

6         **MR. QUARTARO:**  Yes.  Yes, your Honor.  In fact --

7         **THE COURT:**  Okay.

8         **MR. QUARTARO:**  In fact, I'd be happy to direct you to

9  the paragraph if that would be helpful?

10        **(Counsel confers)**

11        **MR. QUARTARO:**  That, by the way, is the other link in

12  the chain that's missing here.  Plaintiffs are functionally

13  alleging that Emin Karamehmet, the father of Nazli Williams,

14  they should be treated as a single person, that notwithstanding

15  the evidence of Ms. Nazli's wealth and her ability to inject

16  money into the company and her business sophistication, and all

17  of those other facts, that the mere fact that his daughter

18  bought these ships is enough to pierce the corporate veil.

19  That's basically, at the end of the day, what they're alleging.

20        And, I mean, we have to figure out how you get past

21  Geden Holdings in that argument because that's another problem

22  with their chain.  Unsurprisingly I haven't seen a single case

23  cited that says that shares owned by a daughter can be imputed

24  her father, that's probably not surprising that there's no case

25  law on that point, your Honor.

1     **(Counsel confer)**

2          **MR. QUARTARO:** Okay. So let's -- let's just spend a

3     few more minutes on the -- on the alleged corporate structure

4     because I think we really have to come back here to, I believe,

5     it's (indiscernible) 1, and that's got, how do we get to an

6     alter ego?

7          Domination and control perpetrated a disadvantage,

8     the fraud-like wrong (indiscernible) so domination and control.

9     We have a real problem here. The case *Oxford Capital*, I

10    believe, which is cited in our Motion to Dismiss, has the 12

11    nonexclusive factors relied on by the Fifth Circuit in trying

12    to determine what an alter ego entity is.

13         The problem we have here, your Honor, this one does

14    not fit that case. In fact, Plaintiffs haven't cited a single

15    case where there is a corporate structure like this.

16         What are we normally looking at?

17         We're normally looking at say Advantage Tankers and

18    Advantage Holdings in piercing the corporate veil because the

19    parents have dominated the subsidiary, that's a -- that's a

20    normal veil piercing argument. That's not what we have here.

21    We have a daughter who bought ships from father so that --

22    there must be something wrong with that.

23         We have both the Geden SPVs sold these ships and they

24    owed us money, so there must be something wrong with that

25    transaction.

1          We don't have our normal parent to subsidiary

2    domination and control.  Accordingly, it's really -- would

3    really be hard to fit the *Oxford Capital* factors into the facts

4    of this case because we don't have that parent subsidiary, but

5    I tried, your Honor, I did try.

6          And if you look at our papers you'll see that I cite

7    for the Baca deposition only two of those factors.  I asked:

8    "Do you have any evidence that Geden Holdings caused the

9    formation of the Advantage companies?"  "No."  "Do you have any

10   evidence that they financed them?"  "No."

11         And you can see, I went through almost every

12   allegation that would be in the *Oxford Capital* list recognizing

13   it's nonexclusive, but there are 12 pretty persuasive factors

14   very, very well.  What do we have?

15         The same CEO and the same CFO from a holding company

16   to the manager to Advantage.  But that's not surprising, we're

17   talking about 11 sophisticated oil tankers and the two people

18   who have been running them for the last however many years.

19   Not surprising that when you looked to pick up those assets you

20   want to try and hire the people who know how to run them, I

21   mean, that's not unreasonable.

22         Okay, so we got domination and control.  We really,

23   other than the common CFO and CEO we've got nothing.  We don't

24   have any evidence, for example, of Mr. Karamehmet instructing

25   his daughter.  We have no records of him in board meetings.  We

1   have no record of his ownership of the company.  There is

2   nothing there.  There's just no evidence to support that

3   domination and control other, of course, than the innuendo that

4   a daughter could not possibly be separate from her father.

5           So what's the next problem?

6           Well, going -- by the way, your Honor, I would submit

7   failure to allege, let alone show prominent ownership is fatal,

8   fatal to the alter ego allegations.  I submit there are very

9   few, if any, Maritime cases, let alone any other case, where

10  you have a structure similar to this, or a structure that is

11  not a parent subsidiary where we're piercing the corporate

12  veil.  So, you know, we're -- legally we're way off seeing the

13  wilderness here in terms of trying to fit the equivocal case

14  law factors with the facts alleged by the Plaintiffs.

15          How am I doing on time?

16          **MR. SPEAKER:**  (indiscernible)

17          **MR. QUARTARO:**  Okay, thank you.  And I'm trying to

18  think I have maybe 10 minutes left, but I'm paid by the words

19  so I --

20          **THE COURT:**  How many minutes?

21          **MR. QUARTARO:**  I said I think I have about 10, maybe

22  15.  I'll reserve my time for rebuttal.

23          **THE COURT:**  How much time are you reserving for

24  rebuttal?

25          **MR. QUARTARO:**  Whatever's left, if that would be

1  okay, your Honor?

2          **THE COURT:**  How much --

3          **MR. QUARTARO:**  I'm thinking maybe 30 minutes.

4          **THE COURT:**  Yeah, yeah, yeah.  I think that's fine.

5          **MR. QUARTARO:**  (Indiscernible)

6          **THE COURT:**  I think that's about right.  I clocked

7  you finishing at 20 after 3:00.

8          **MR. QUARTARO:**  Yes.  To be perfectly honest,

9  your Honor, I don't think there's all that much left.  I think

10 I won't even use my hour and a half.

11         **THE COURT:**  Okay.

12         **MR. QUARTARO:**  And in full disclosure, I do have a

13 7:30 flight and a 5-year-old who's waiting for me, so --

14     **(Laughter)**

15         -- you know (indiscernible)

16         **THE COURT:**  You mean you have another place you'd

17 rather be.  Okay.

18         **MR. QUARTARO:**  Well, I don't know that I would go

19 that far, your Honor.

20         **THE COURT:**  That's quite all right.

21         **MR. QUARTARO:**  But -- because this is an interesting

22 case and --

23         **THE COURT:**  Yes.

24         **MR. QUARTARO:**  -- and again, I've been across from my

25 opponents for a while and suffice it to say that we never agree

1  on the same facts and they have a kind of interesting, whatever

2  the merits of it, it's an interesting point.  And shall we say

3  you have, as I do in this case, we have opponents who respect

4  you, who know the industry, who know there's a certain

5  collegiality among maritime professionals and I think that

6  extends to the Maritime Bar in New York.  It certainly does in

7  Texas. To shorten, it's not an onerous case to deal with.  We

8  know each other and we've been able to get things done.

9         But I don't think that changes the facts and the law

10 and I think it is overwhelmingly in favor of my client,

11 your Honor.

12        The second piece that we need to show here, we've got

13 domination and control, and again we submit that we're just not

14 there.

15        Oh, I'm sorry, your Honor, I just refer you to

16 Paragraph 25 in the Plaintiffs' Complaint.

17        Thank you, Mr. Matthews.  Appreciate that.

18        And I believe that has got the -- (indiscernible) at

19 the top of Page 7, controlled by -- the vessels are controlled

20 -- first the Geden fleet, they're talking about Genel

21 Denizcilik, not Geden Holdings, as the (indiscernible), in

22 terms controlled by the Cukurova Group, ultimately and

23 beneficially owned by members of the Karamehmet family.

24        In the testimony the only person in the Karamehmet

25 family that's identified as owning Geden Holdings, Emin

1   Karamehmet.  Again, zero evidence other than Ms. Bacha's

2   (phonetic) speculation, which fascinatingly (indiscernible)

3   Verified Complaint that Ms. Nazli Williams owns it.

4          There's also a reference on Paragraph 30, I believe,

5   your Honor.

6          **THE COURT:**  Paragraph 25 and Paragraph 30.

7          **MR. QUARTARO:**  Yes.

8          **THE COURT:**  Okay.

9          **MR. QUARTARO:**  These lay out their theory of the

10  ownership of things.  And, you know, put it on a graph or

11  charts, you can see the missing link.  It's very, very clear.

12  Again, Plaintiffs' own papers say that.

13         So we've got the domination and control.  What's the

14  other thing?  And I think this is the part, by the way, that's

15  just fatal.  We've got a lot of problems already, but I think

16  this one is just the end.  We've produced the wire transfer

17  records.  We've shown that Geden Holdings has paid for the

18  ships.  We've shown that Geden Holdings (indiscernible).  Geden

19  Holdings comes out to about 200 odd million dollars in equity

20  when it sells these ships.

21         Now, first of all, as a matter of pleading,

22  Plaintiffs don't allege a security interest in the vessels.

23  They don't hold a lien, they're not mortgagees, they don't have

24  any of that.  Right?  Which is neither Rule B nor Rule C, of

25  course, your Honor.  If they had a maritime lien, they would

1  try to arrest the ships under Rule C, not attach them under

2  Rule B.  So there's no doubt they don't have a security

3  interest and Ms. Bacha admitted that during her testimony.

4         Geden Holdings never represented that it wouldn't

5  sell any of its vessels.  (Indiscernible) think about the Rule

6  that they're actually asking for.  They're saying, oh, if a

7  company has an open contract with another company, they're

8  counterpart can never sell an asset while that contract is

9  open; because if I have damages under my contract, that must

10  have been a fraudulent transfer to my disadvantage.  It doesn't

11  make sense.  The theory doesn't make sense.  It just

12  intuitively doesn't work.

13         But even if somehow it did, they don't actually

14  allege that the sale of those vessels were on anything other

15  than an arm's length basis.  Tellingly, I asked Ms. Bacha that,

16  I said Ms. Bacha, if Geden Holdings, again a non-party, which

17  it's not even clear why we're addressing in the deposition, but

18  we have to get to the owner, I said:

19         "QUESTION:  Ms. Bacha, if Geden Holdings received the

20         full value of those ships, it received its equity

21         interest, how could the Plaintiffs have been

22         disadvantaged by that sale?

23         "ANSWER:  They couldn't."

24         They couldn't.  And that's critical.  The Plaintiffs

25  know if Geden Holdings got all of the money from those ships,

1  they couldn't be disadvantaged by the sale of them.

2        They have no evidence that Geden Holdings wasn't

3  paid.  Quite the contrary.  Your Honor's got dozens and dozens

4  of pages of wire transfer records in the record.  They've got

5  no challenge to the arm's length market sale price of the

6  vessels.  None at all.  And we have no doubt that new money was

7  injected into Forward Holdings that then trickled down into the

8  various SPVs to buy the ships.  Again, those records are all

9  with your Honor, Quartaro Exhibits 1, 3, and the Karamehmet --

10 or, I'm sorry, the Ms. Williams exhibit that I handed up to

11 your Honor a few moments ago.

12       So they have no evidence that these vessels were sold

13 for anything other than market terms.  They have no evidence

14 that the prices don't reflect market terms.  They've admitted

15 that that's fatal to their case.

16       Two other factors I think really point to the arm's

17 length nature of the transactions.  Firstly, five major

18 international shipping banks financing the acquisition by

19 Advantage.  And this isn't, you know, the ABC Bank of

20 Kazakhstan, this is CIT Finance, EVB (phonetic), Nord LP

21 (phonetic), Unicorn (phonetic), there are huge, huge

22 multibillion dollar international shipping banks who extended

23 new credit, new money to help finance the acquisition of these

24 ships.  Again, there is simply no argument to that.  This isn't

25 a rollover of the Geden loan, you've got new lenders.  Again,

1  Geden tried to restructure with its lenders, couldn't do it.

2  So new loan facility.

3      The cover page of that and the list of lenders is

4  also in the Quartaro Dec. I believe it's Exhibit 3. Yes. Oh,

5  I'm sorry, Exhibit 2. Series of pages showing the new lenders

6  and the new loan agreement in favor of Advantage.

7      And if I didn't verge on it to your Honor earlier,

8  Exhibit 4 is the Texas Secretary of State records showing that

9  Geden Holdings had an agent in the SD of Texas by November 3rd,

10 2015.

11     So they get paid full price, there is new money,

12 there is, I don't want to call it a third party vetting, but

13 there are some pretty major serious shipping banks that see

14 this as an arm's length transaction and finance it. On top of

15 that, and this is the part that just torpedoes the case

16 altogether, obviously my opponents asked the CFO to see if he

17 had the $200 million in Geden Holdings, what did you do with

18 it? Now, we don't know (indiscernible) wire it over to

19 Ms. Williams to buy the tankers or we kicked it all up to Emin

20 Karamehmet. That's not what they did. They testified they

21 used it for ordinary business purposes. When pressed, one of

22 those ordinary business purposes, your Honor, to pay the

23 Plaintiffs. If your Honor refers to the final exhibit in the

24 Quartaro Declaration, and again I apologize that it's a series

25 of wire transfers, but you can see, for example, the very last

1  page of the Quartaro Declaration, which is the very last page

2  of the response to the subpoena served on Geden Holdings -- by

3  the way, where do you think they served that subpoena?  Right

4  here in the Southern District of Texas on Geden Holdings'

5  registered agent, by the way.  No doubt there could be service

6  of process in the Southern District of Texas, Plaintiffs did

7  it.  So there's no question this is subject to jurisdiction

8  here, at least for Rule B purposes.

9           If you look at the very last wire transfer, there's a

10  whole bunch of them, but the last one's a beauty and that's why

11  I look at the last one.  What is Geden doing?  Well, let's take

12  a look.  It looks to me like they're wiring a rather

13  significant sum of money, this appears to be $426,888, to who?

14  Tank Punk Inc., your Honor.  So not only is Geden Holdings paid

15  the full market value of its ships, not only does it receive

16  its equity and then use it for general business purposes, one

17  of those general business purposes is paying the Plaintiffs.

18  So how on earth could they be disadvantaged by the sale of

19  these vessels by Geden Holdings (indiscernible)?  The short

20  answer, your Honor, and the long answer is they weren't.

21           A couple of quick final observations, your Honor,

22  before I cede the floor.  First, we owe the Court an apology.

23  We owe the Court an apology, I owe the Court an apology.  I

24  filed my papers late yesterday.  The reason I filed them late,

25  quite frankly, I wrote noon Tuesday in my calendar, instead of

1 noon Monday. That's, unfortunately, what happened. I tried to

2 rectify it as quickly as I could. Unfortunately, both for my

3 stomach and for my back, I was flying out of Newark yesterday,

4 I wound up traveling, instead of four hours, I spent nine

5 hours, because a weather system moved through the East Coast

6 and so I was delayed. As soon as I got to Houston we rectified

7 that, we got the papers filed right away. As soon as we

8 realized, it was actually during a conversation with

9 Mr. Gaitas, that the papers were due noon yesterday, I, you

10 know, immediately thought, geez, I didn't realize, I'm sorry,

11 we'll have it in as soon as we can, but I'm leaving for the

12 airport in 20 minutes, so, you know, as soon as I get down to

13 Houston we'll get them filed. Which is what we did.

14        Nothing intentional about that, your Honor, and I

15 truly hope that that won't be read as any sort of error or

16 omission on behalf of my client. The error was mine. I wrote

17 Tuesday instead of Monday, we only had a week to prepare the

18 brief, and so that's what happened. I apologize to the Court

19 for that tardy submission.

20        The other thing is that our opponents have asked for

21 a adverse inference of some kind because term sheets from NSF

22 and from Centerbridge (phonetic) were not produced. First,

23 it's not clear what adverse inference could possibly be taken

24 in respect to the transaction if all parties know it didn't

25 actually occur. But second, during the deposition, when that

1   item came up and that issue came up, the testimony is quite

2   clear I said send me a written request.  Send me an email or

3   something.  It doesn't have to be formal with these guys.  They

4   don't have to send me a formal request for documents, just send

5   an email telling me what they want.  No such email, your Honor.

6          That said, we have to go back and say that, no,

7   there's nothing to hide there.  It's a transaction that was

8   never consummated.  It never happened.  So, you know, if there

9   is a great demand for it, if there is some theory that the

10  Plaintiffs can articulate that it's somehow relevant to their

11  case, we're certainly happy to oblige, your Honor.  As you've

12  seen, we've produced over 5,000 pages of documents, we've

13  produced three witnesses, we traveled to England, we've

14  cooperated in every way, shape, and form for this veil piercing

15  argument, which, frankly, has very little merit, your Honor,

16  really.

17         I thank the Court for your time.  I would reserve the

18  remainder of my time and hope that I do not have to use

19  anywhere near the majority of it for rebuttal.  And to the

20  extent your Honor has any questions, I am certainly happy to

21  answer them.  Or to answer them at the conclusion of the

22  hearing, if your Honor believes that would be more appropriate.

23         Thank you.

24         **THE COURT:**  Are you opposing the Document 32, Motion

25  to File Supplemental Complaint by Tank Punk, Inc.?

1          **MR. QUARTARO:**  Yes, ma'am.

2          **THE COURT:**  You are.  Okay.

3          How about a response?

4          **MR. QUARTARO:**  Thank you.

5          **THE COURT:**  Thank you.

6          **MR. GAITAS:**  Your Honor, is it okay if I can sit down

7    while I speak?

8          **THE COURT:**  Yes, you may.  Whatever you're most

9    comfortable doing.

10         **MR. GAITAS:**  I very much appreciate it.  Thank you.

11         **THE COURT:**  It's absolutely fine.  What we really

12   care about is having a good record, so --

13         **MR. GAITAS:**  Then am I -- can you hear me?

14         **THE COURT:**  Can we hear you?  Yes.

15         **MR. GAITAS:**  Okay.  I will briefly respond to my

16   learned friend on the arguments he made before I go on my

17   argument.

18         I thought I didn't hear him correctly, but I think I

19   did.  I thought Mr. Quartaro admitted that Geden Holdings is

20   now essentially a nonfunctioning company and it basically has

21   one ship and it is not engaged in business.

22         **THE COURT:**  A shipwrecked ship, right?

23         **MR. QUARTARO:**  Not -- yes, Geden Holdings, my

24   understanding, I may -- again, they're neither a party nor

25   represented here.  But my understanding is they do own one

1  carrier, but -- one bulk carrier, but she's wrecked on the

2  coast of Tunisia.  However, what I actually said, and it may be

3  helpful, although onerous, and I apologize to go back

4  (indiscernible) what I said, and what I said was they remain in

5  business and they do have ships chartered in and chartered out

6  at an advantageous rate.  So in fact, they do remain in

7  business, your Honor.

8          THE COURT:  They just own one ship.

9          MR. QUARTARO:  I'm sorry, your Honor?

10          THE COURT:  They just own one ship, but they charter

11  others --

12          MR. QUARTARO:  I mean I suppose you could call it a

13  ship, but it's not earning revenue, as far as I'm aware.  But

14  there may be an insurance claim or other things that are tied

15  up in that.  It wasn't an issue that any of us really explored

16  or got into.  And it wouldn't have been an issue that would be

17  appropriate for any of us to get into, because they're not

18  represented and they're not a party.

19          But again I think, your Honor, that underlines the

20  central role of Geden Holdings and the fact that they're

21  missing from this action for a reason.

22          THE COURT:  Does that clear it up for you?

23          MR. GAITAS:  It is clear enough for me and it raises

24  even more questions, because two of these ships, your Honor,

25  are in charter, two of (indiscernible) ships are in charter.

1    Actually one of the clients in this case are in charter with --

2    one of them is the -- as I see here, the one to Psara Energy.

3    It is in charter with one of the daughter companies of Geden

4    Holdings.  And she's under arrest in Venezuela for more than

5    one year and there are great concerns on the part of the owner,

6    my client, Psara Energy, what's going to happen with that ship

7    with a company that has no visible assets, it has perhaps some

8    money that it realized from the sale of the liquidation of all

9    its assets, that's something to be worried about, as to whether

10   they're still in business.

11          But Geden Holdings has been in business all along as

12   a holding company and a red herring.  It owns no tangible

13   assets.  It has no personnel.  That's what the witnesses who

14   were examined in deposition testified, the CEO and the CFO and

15   directors.  They have nothing visible, except a portfolio of

16   shares which they liquidated.  And right now they have no

17   substance.  And that's reason enough to pierce the corporate

18   veil and ask for this remedy in these circumstances.

19          And my friend argued that this veil piercing remedy

20   under our law applies only in situations or suggested that it

21   applies only in situations in which there is a

22   parent/subsidiary relationship.  And that is not the case at

23   all.  It applies when corporate business between separate

24   corporations is confused.

25          And, indeed, in the case of predecessor and successor

1    companies, as we have here with Geden Holdings being a

2    predecessor and Advantage Tankers being a successor, we have a

3    Fifth Circuit Court of Appeals case by the name of *Patin v.*

4    *Thoroughbred Power Boats, Inc.*, and it's to be found at

5    394 F.3d 640.  And this is the kind of situation we have here.

6    We have a predecessor -- and this is what is also the situation

7    that was the case in the *Patin* case.  You have a company that

8    transferred all of its assets to another company to avoid

9    liability.

10          Now, they said that -- they argued, my friend argued

11   that Geden Holdings has not been joined as a party.  And this

12   is correct.  It has not been joined as a party.  But this is

13   not essential to reaching those who are behind the current

14   Advantage Tankers group.  And the people who are behind the

15   Geden -- behind the Advantage Tankers group are and have been

16   some people, as you will read in our briefing and you will see

17   in the evidence of production of documents and depositions,

18   were in the world that is before this group got in financial

19   trouble, they were referred to as the Karamehmet family.  And

20   it is only recently on the depositions of Mr. Tugrul Tokgoz

21   (phonetic) and Mr. Mehmet Mat (phonetic) that now Mehmet family

22   just means Mehmet Emin Karamehmet, who is the tycoon, really,

23   behind all of these businesses.

24          Now, my learned friend omitted to mention, but you

25   will find it in my briefing, Mr. Mehmet Emin Karamehmet has two

1 problems. The first problem is that he's a convicted felon who

2 was charged, tried twice, he appealed, he was tried again, he

3 was sentenced last Christmas, December 25, for embezzling from

4 one of his banks that he owned something in excess of $400

5 million. And also you will see amongst the exhibits that we

6 have filed in this case in support of our argument that

7 Mr. Mehmet Emin Karamehmet defaulted on a personal guarantee to

8 Commerce Bank for one of the ships that was part of his group.

9 It was the motor tanker, Blue, and there was -- there is a

10 judgment, an equitable judgment of the High Court in England

11 holds him liable for this. He defaulted. He was found guilty

12 of not honoring his personal guarantee.

13 Now, with this background and in these circumstances,

14 it is small wonder that Mr. Mehmet Emin Karamehmet had to be

15 taken out of all of this equation, because which banker is

16 going to accept as a guarantor a person who has a felony

17 conviction and a person who has been found liable on failing to

18 honor one of the guarantees to one of the financing banks.

19 So who is the closest? Now, we questioned in the

20 deposition the daughter of Mr. Mehmet Emin Karamehmet, who

21 (indiscernible) Williams, because Karamehmet -- her last name

22 is Karamehmet Williams, (indiscernible) Karamehmet anymore.

23 Now, we questioned her. She's the only child, she said, as far

24 as she knows, of Mr. Mehmet Emin Karamehmet. It's a very, very

25 close family. (Indiscernible), of course. But this is the

1   Karamehmet family.  These are the people who, you will see in

2   documents, in the prospectus that my learned friend mentioned,

3   in the structuring plan that AlixPartners (phonetic) made for

4   them, and in a report that was filed with the British authority

5   of overseas corporations called Corporate House, in which

6   Mr. Tokgoz, the director, signed off, and they all stated that

7   the shareholder, the ultimate shareholder of everything is the

8   Karamehmet family.  But when things were bad and it became

9   public Mr. Emin Karamehmet was in trouble, they couldn't keep

10  him there anymore, because it would be simply unacceptable to

11  bring him back and he cannot sit on the board of directors

12  because of this.  He would get disqualification.  Now, the

13  daughter is accordingly in these circumstances a straw man.

14          My friend talked about the -- it is natural for

15  Mr. Tokgoz and Mr. Mat to do all of the work for the successor

16  company because, after all, it is the same business, they are

17  in it, they're executives.  They did all this, your Honor,

18  while they still wore the Geden Holdings Limited hat.  They

19  were employees and officers and directors of Geden Holdings.

20  They procured the (indiscernible).  They made Advantage

21  Tankers.  They reserved the name, they went to the authority

22  that does the incorporation in the Marshall Islands.  So they

23  were not strangers.  And they also negotiated the terms of the

24  financing with all the banks.  And this will be shown because

25  what I'm telling you is, I'm trying to respond to my friend,

1   and it is -- the evidence is written and it is the evidence of

2   the depositions and the documents that were produced in

3   discovery.

4           Now, Mr. Quartaro referred to an Exhibit 1 of his

5   Declaration and he referred to wire transfers between the

6   sellers and the buyers of the ships.  And I will have to make a

7   correction here.  These are not wire transfers.  The records

8   that I have seen that Mr. Quartaro has produced are records of

9   transfers -- they're photocopies, first of all.  They're

10  records of transfers internally, internally, in one bank which

11  happens to be, in Turkish they call it Kredi Bankasi

12  (phonetic).  I suppose Credit Bank would be a good name for it

13  in English.  And they are the bankers of Geden Holdings

14  Limited, the bankers of Ms. Karamehmet Williams, the bankers of

15  the sellers and the bankers of the buyers.  And these are just

16  purporting to be records of internal transfers.  There are no

17  wires here.  They're just debiting one account, crediting the

18  other account.  You don't have the picture until you have seen

19  the full record of the transfer where the money came from and

20  to whom it was sent and what happened to it afterwards.

21          I would argue that in the case involving such very,

22  very large amounts of U.S. dollars, and we are talking

23  approximately $800 million, these transactions, your Honor,

24  would have to be done involving the Federal Reserve Bank here

25  or a clearing house in New York.  There just -- there isn't

1   just all that kind of money laying out in Turkey, dollars, to

2   do these transactions.  And we've asked for records and we

3   haven't seen these records.  We have asked for credible records

4   and we haven't.

5           Now, Mr. Quartaro referred to blurring of lines.  And

6   the blurring of lines, as your Honor will see when you read the

7   excerpts from -- you read the excerpts from the documents that

8   were part of the depositions and you read the testimony of

9   these witnesses from the depositions, the blurring of the lines

10  between Geden Holdings and Geden Lines was quite intentional.

11  And I will tell your Honor why I feel it is intentional, why I

12  understand it is intentional.

13          Geden Lines, which is the nickname of Genel

14  Denizcilik Naklitayi, and I'll have to spell that for the court

15  reporter, is a Turkish company established in Turkey with

16  business premises, with offices, with personnel, with a

17  payroll, that pays taxes, it's a lawfully constituted company.

18  Geden Holdings Limited is an offshore Maltese company that has

19  none of these.  It does not have personnel, it does not have

20  assets, it does not have anything.  It is not -- in dealing

21  with authorities, in dealing with major oil companies, it has

22  no face to show, because it doesn't even have employees.  It

23  does operate ships.

24          So when they were dealing with some people, with

25  Defendants and their predecessors in interest, they told people

1  that they were Geden Lines, or Genel Denizcilik.  You will see

2  one of our first exhibits in which Cukurova, the holding

3  company of Geden Holdings, makes a statement about its

4  business, what it is, it clearly states that we own and operate

5  33 ships.  Mr. Tokgoz is a director of this company.  He's a

6  director of the other company.  They make a distinction, these

7  people.  One they call the operating company, the other they

8  call the holding company.

9       But Geden Holdings Limited was not and is nothing

10  more than a holding company.  It's a portfolio that sticks in a

11  drawer or file cabinet and maybe a seal.  That's what it is.

12  And some shares, perhaps.  It is not a real interest, not a

13  real business.

14       Now, I'm going on my own case and the presentation of

15  my case.  I want to thank the Court for giving us this

16  opportunity to do it.  And I'm grateful to my friend on

17  agreeing on the parameters we don't have to bring live

18  witnesses, although it would be more interesting, I think, with

19  live witnesses, and we may still get that opportunity.  But I

20  will not bore the Court with telling you who the witnesses are,

21  because you have the depositions already and you know that we

22  examined the chief financial officer, the man who is director

23  and chief executive officer of Advantage Tankers, who also wore

24  the same hats, respectively, for Geden Holdings, Geden Lines,

25  and all the individual one-ship companies which were involved

1  in this thing.  Nothing gets done unless these two people do

2  it.

3          Now, very simply -- and I'm doing it, I have a

4  compass as to where I'm going.  The requirements of Rule B(1)

5  are very, very simple.

6          You have to have a claim as a maritime claim against

7  the defendant.  We have that.  I don't think anyone will

8  dispute that.  I thought I heard my friend say that they

9  dispute that, but I think I misheard it.

10          The defendant cannot be found in this District.  And

11  this is going to be a bone of contention and perhaps I should

12  respond to this now.

13          They argue that Geden Holdings Limited was registered

14  in the State and they argue that it had an agent for service of

15  process and we will have to disagree with that, as we have,

16  with the presence of the agent for service of process, because

17  when the original Complaints were served, there was no agent

18  for service of process in the Southern District of Texas.  They

19  had an agent for service of process in Dallas.  So it was

20  proper in every respect in this regard.

21          Now, they have some difficulty with the service of

22  process being effective for the amendment of the Complaint.

23  And I would very, very simply point out to them that there is a

24  Fifth Circuit case right on point of this and it is called

25  *Highmark v. Angelina Ravanotti Dia Momento* (phonetic), and this

1  one, I'll give you the cite for it -- if I might have a moment.

2  There it is.  It is 132 F.3d 264, and specifically look at Page

3  267.  It is a 1998 Fifth Circuit case that addresses this

4  point.  The point is that for Rule B practice the presence in

5  the District of the agent for service of process and the non-

6  presence of the defendant count as of the date of the filing of

7  the complaint.  That's what matters.  Nothing else matters.

8       Now, they -- also my friend tried to make an issue,

9  and I'll address it very briefly, about Plaintiff Tank Punk,

10 Inc. trying to file a complaint that relates back to that time,

11 because in the meantime they did appoint somebody in the

12 District for service of process, last November I think.  And

13 that is Rule 15(c) of the Federal Rules of Civil Procedure and

14 it states that an amendment to a pleading relates back to the

15 date of the original pleading when:

16      The law that provides the applicable statute of

17 limitations allows relation back.  And we don't have a rule in

18 admiralty and we have no problem with statute of limitations

19 (indiscernible) not prejudiced by a few months delay.

20      The amendment asserts a claim or defense that arose

21 out of the conduct, transaction, or occurrence set out, or

22 attempted to be set out, in the original pleadings.  And,

23 your Honor, the transaction or occurrence that we are concerned

24 with in this case is a multiplicity of claims that arise under

25 a charter party involved in arbitration or provides for

1    arbitration.  It is filed -- it relates to a case that is

2    already in arbitration.  The same case.  Nothing has changed,

3    except the ship in the meantime was redelivered and the parties

4    finalized the accounts and the owner of the ship claims that,

5    hey, you didn't fix the ship, you delivered a wreck to me, so

6    you owe me money.  So it is the same complaint (indiscernible)

7    a claim in arbitration in England.

8           And I would also point out as to the relation back in

9    circumstances like this, the Court may want to have a quick

10   look, there are other cases that would sustain our argument,

11   but this is one that is called *Dann*, D-a-n-n, *Ocean Towing*

12   *Inc.*, and you will find this at 2008 U.S. District Court,

13   Lexis 104779, and it is at Star 9 through 12.

14          Now, with this out of the way, going on the

15   requirements of Rule B for attachment that not being found in

16   the District, the big bone of contention is whether the

17   Defendant has property in the District.  We say that the

18   Advantage Arrow, when she was attached, was property of the

19   Defendants.  And the reason why we say that is because the

20   corporation that owns this ship is a successor of the same

21   interests that owned her when she was named the Target.

22          Now, very briefly in responding to the Defendants

23   argument that this was a sale.  When the ship was sold by her

24   previous owners to her new owners, this was a bona fide arm's

25   length transaction.  And I will respectfully ask the Court to

1   look at -- I don't know if your Honor has it.  Do you have the

2   binder?

3           THE COURT:  I have it not in court with me here, it's

4   in my office.

5           MR. GAITAS:  It is Exhibit 4.  It's an item that was

6   called Exhibit 4.

7           THE COURT:  Okay.

8           MR. GAITAS:  And --

9           MR. QUARTARO:  I'm sorry, do you have a spare copy?

10          THE COURT:  Exhibit 4 to what?  It's in one of the

11  binders.  Which binder?

12          MR. GAITAS:  It's the ones that contain all the

13  exhibits following my Declaration, George Gaitas' Declaration.

14          THE COURT:  Okay.  Does that clear it up?

15          MR. QUARTARO:  Thank you, your Honor.  Yes.

16          MR. GAITAS:  And there is a document in there --

17          THE COURT:  Exhibit 4.

18          MR. GAITAS:  Exhibit 4.  And it is a letter, which

19  ultimately has been signed by the respective parties, from

20  Geden Holdings Limited, the shareholder, in quotes "the

21  shareholder," to Shell Western Supply and Trading Limited, the

22  charter.  Now -- and it's at Bates Number 01248.  In the second

23  paragraph of this letter Geden Holdings Limited represents the

24  following:

25          "As part of certain reorganization efforts being

1          conducted by the existing shareholders of each

2          existing owner it has been proposed that each

3          existing owner will sell the vessels, all its title,

4          interest to, and rights in each vessel to the

5          relevant companies listed in Annex 1 hereto as new

6          owners."

7     And if the Court will look then at Annex 1, it is a

8  list of vessels with the existing owner, the new owner, the

9  existing mortgagee, and the new mortgagee.

10    And continuing on Paragraph 2, in parentheses, "(and

11 each wholly owned by the shareholder.)"

12    So, the new companies that are buying the ships,

13 notwithstanding what we are being told, notwithstanding what

14 you were told just a few moments ago, according to this letter,

15 which is a serious commitment between Geden Holdings and Shell

16 Oil Company, Shell Western, Geden Holdings remains the owner

17 and this is not a sale.  It is not an arm's length transaction,

18 your Honor.  It is a reorganization and it is a reorganization

19 because these companies, and Mr. Quartaro admitted, cannot get

20 credit anymore.  They cannot get refinancing because, what, we

21 said to you what, why they cannot get credit.  Because they're

22 identified with Karamehmet.  And Geden Holdings Limited has a

23 huge debt burden, including an onerous burden to my client.

24 They don't want to perform it.  They don't want to be liable.

25 So what's an easy way?  The rearrange the ownership, the ships

are immunized, and as you will see in the depositions of the witnesses, the assets are (indiscernible). So they (indiscernible) to avoid arrests. That's the whole purpose of this thing. And also to provide financing, so they can survive, of course.

But these were conditions that were dictated by the banks and the reason that these very honorable banks wanted this arranged is because Geden, the Geden group and Mr. Karamehmet had them in a fix whereby they were owed half a billion dollars and if Geden Holdings Limited went under, I don't know what the bankers who approved the loans would tell their directors or the bank examiners really. That we loaned money to a guy who turned out to be a felon?

So no -- this document conclusively shows there was no arm's length transaction. And there's something else about this document. If you will look, your Honor, at Page -- still the first page, 1248, under Roman Numerals II and III, respectively, Geden Holdings Limited purports to charter a whole lot of ships. I think there are one, two, three, four, five, six, seven, eight, nine, nine tankers that belonged to itself but are going to be sold and it is making charter parties, five-year term charter parties, on behalf of the successor company that has just been created. It was created December 8th. It was like two months before. This is dated, incidentally, February 6th, 2015. And not only that, but under

1    Roman Numeral III you will see that Geden Holdings is also

2    setting the rate of the charter.  And it is somebody else's

3    business.  It is like I'm buying a house and the seller makes a

4    deal whereby he puts a tenant in the house that I'm buying and

5    I have no idea about it.  Or maybe I had a good idea what was

6    going on.  But that's the sense it makes.  They charter the

7    ships in advance to somebody else because it was a

8    reorganization.  These were the terms that the banks liked.

9             Now, moving forward from this and to another item

10   among the exhibits, and that has to do with the arm lengths --

11   arm's length transaction, Exhibit 20.  This is a -- it is

12   called a fee letter, your Honor, and it is addressed to

13   Advantage Tankers, LLC.  Now, there are some interesting things

14   about this letter.  Advantage Tankers, LLC was created in

15   December of 2014.  This letter is dated November 18th, 2014.

16   It didn't exist really.  So the letter is addressed by CIT

17   Bank, they're office in New York, in care of Geden Holdings

18   Limited at 85 St. Johns Street, Valletta, Republic of Malta.

19   Incidentally, this is a lawyer's office in Malta.  It's not the

20   business address of Geden Holdings.  And this letter is an

21   undertaking to pay the bank's commitment fees.  They are

22   substantial.  Just quickly looking through this, it says, "an

23   instrumentation fee in an amount equal to $250,000 due and

24   payable no later than ten business days after the execution of

25   this commitment by you."  So an upfront fee corresponding to 85

1    percent.  Some big amounts of money that were being promised or

2    the bank requires to be paid by someone.

3         If you go to the last page of this letter, which is

4    at Bates Number CIT92 -- incidentally, we got this document not

5    from our opponents, we got this with subpoena.  It was not

6    voluntarily produced.  We got it through the bank, because here

7    you can serve them here.  If you look at the acceptance, it

8    says executed as a deed by Geden Holdings Limited, acting by

9    Mehmet Mat under authority of Geden Holdings Limited, in

10   accordance with the laws of its place of incorporation, by

11   Mehmet Mat.

12        So Geden Holdings Limited is making deals and is

13   paying the financing fee for the financing of Advantage

14   Tankers.  Where does my friend see this as a arm length --

15   arm's length transaction?  It is (indiscernible) financing.  It

16   is done by Geden Holdings.  They create this creature of theirs

17   that as of this letter doesn't even exist.  They make it a

18   month later.

19        And along the same lines, your Honor, I don't have

20   this in the binders that I brought before the Court, but I have

21   a copy.  It will be -- if I could hand this to the Court.

22        **(Document tendered to Court)**

23        I have a copy of the bank's commitment letter.  This

24   was, incidentally, also brought up in the depositions, but then

25   in preparing the briefs, the briefing, we omitted it.  We

1 didn't refer to it.

2 **THE COURT:** Okay.

3 **MR. GAITAS:** And if you would again, your Honor, look

4 at the third page of this document, it's the same -- the same

5 financing company, CIT Finance, and it is again addressed to

6 Advantage Tankers in care of Geden Holdings Limited, and bear

7 in mind that Advantage Tankers doesn't even exist at the time.

8 And if your Honor will go to page seven of this document -- do

9 you have it before your Honor?

10 **THE COURT:** Yes.

11 **MR. GAITAS:** You will see that it is again accepted

12 and agreed to in all respects by the undersigned on 19 November

13 2014. Geden Holdings Limited by Mehmet Mat, CFO. And this,

14 your Honor, is a commitment letter. It is the terms and

15 conditions under which the bank will lend the money to

16 Advantage Tankers. And these people were in the middle of all

17 of these things, they arranged it, they procured it, and they

18 signed it and committed Geden to all of this. And Advantage

19 Tankers was not yet born. It's like me making commitments on

20 behalf of my grandchildren that have not been born yet.

21 So, there is yet another document that has bearing on

22 this issue of a arm's length transaction, and this is at

23 page -- it is -- it is Exhibit 19; I am sorry. Exhibit 19 of

24 the exhibit bundle. And we needn't go into it in great detail,

25 your Honor. You will -- I'm sure you will look at it in

1   detail, but I want to underline this, underscore this.  This is

2   correspondence between the chief financial officer of Geden

3   Holdings, and it is with a bank called Norddeutsche Landesbank

4   Girozentrale, and for -- and, briefly, it's NORD slash LB --

5   and concerns terms for loans to be extended to Advantage --

6   Advantage Tankers.  And when this correspondence was exchanged,

7   your Honor, Advantage Tankers didn't exist.  This is October,

8   2014.  And the name of Ms. Karamehmet in there is mentioned as

9   owner.  And when we -- we examined Mr. Mat, who authored this

10  thing, the CFO, we asked him if he had ever met Ms. Karamehmet

11  before that.  He said, no, he didn't even know her.  And he was

12  making commitments and representations of a company yet to be?

13  And while he was doing that, your Honor, he couldn't avoid it,

14  he was wearing his Geden Holdings Limited hat because that was

15  the office he had.  He was the CFO of that company.  He was

16  also director at the time, and he was also the chief financial

17  officer of Geden Lines, Genel Denizcilik Nakliyati.  So, these

18  are not arm's length transactions.

19          Now, my friend tried to blur things a little bit

20  about whose veil is being pierced.  And as things are turning

21  out, your Honor, it is very simple.  It is Advantage Tankers.

22  That's whose veil is being pierced.  And who is behind the

23  veil?  Well, it's the Karamehmet family.  And it's Ms. Gulsun

24  Nazli Karamehmet, who is the owner of 85 percent of the shares.

25  That's who is ultimately behind it.

1        Now, there is a red herring that my friend has tried

2   to -- tried to impose as his instructing clients

3   (indiscernible), and that is called Geden Holdings Limited.

4   That's a red herring, your Honor.  That's why it is not named a

5   defendant.  That's why; because Geden Holdings is nothing.  We

6   cannot attach anything that Geden Holdings has, and it is a

7   company that is inside a file drawer.  And that's it.  But,

8   interestingly, it was the guarantor of the performance in all

9   of these charter parties my clients have.

10       Now, focusing on the first part of the two-part test

11  that my friend referred to for corporate veil piercing, the

12  first part is that the corporate form is abused to commit

13  fraud -- fraud or injustice.  And we noted earlier that -- the

14  relationship of predecessor and successor, and we referred to

15  the case of *Patin v Thoroughbred Power Boats, Inc.*  And that's

16  the relationship here.  It is a transfer of -- a massive

17  transfer of assets from one company to another to avoid

18  liability.  It's not a parent subsidiary, because most -- most

19  veil piercing decisions are in that context.  But that's not

20  exclusive.  So, in this case we contend and we have argued and

21  we have offered evidence to the effect that there has been a

22  massive transfer of asset from the Karamehmet group to

23  Advantage Tankers.

24       And then there is domination and control.  And this,

25  again, under -- under several cases; the one that we referred

1   to in our briefing -- we referred to three of them -- but this

2   *Bridas*, or *Bridas v. Government of Turkmenistan*, and that's at

3   447 Federal 3rd 411, and we've taken from there some -- some of

4   the circumstances that show this domination and control.

5           The first one we have is the confusion that we -- we

6   note, is the confusion of corporate identities.  And we have

7   offered documentary evidence that your Honor will see.  That

8   documentary evidence consists of this representation that, "We

9   are the owners of 33 tankers."  And then when we take the

10  depositions, "No, no, it wasn't us; it's a mistake."  We've --

11  they make a representation in the report of AlixPartners, whom

12  they gave the (indiscernible), "Geden Holdings manages a

13  portfolio which consists of 33 ships," et cetera, et cetera.

14  When we examined the witnesses, "Oh, no, no; that's a mistake."

15  There's so many -- so many of their previous statements that

16  they have now changed their tune, and they identify them as

17  mistakes.  That's what's blurring the line.  It is not -- it's

18  not the plaintiff.  It is the Karamehmet group, Geden Holdings,

19  Geden Lines, and the rest of them.

20          Now, we go to the -- to the ordinary, very simple

21  veil piercing laundry list that the courts use to see if there

22  is domination and control.  Common officers and directors.  We

23  don't need to belabor this point.  Mr. Tugrul Tokgoz,

24  Mr. Mehmet Mat; they are in Geden Holdings, Geden Lines, every

25  single one-ship company that owned their -- the fleet of these

1  11 tankers we referred to.  They are likewise officers --

2  they're officers and directors in Advantage Tankers and in

3  every one-ship company that owns Advantage Tanker ships,

4  including the Advantage Arrow that is the issue in this case.

5  So, absolute -- absolute identity of these two people in

6  everything, in all of the assets.

7         The predecessor and the successor.  Common stock

8  ownership.  We -- my friend said that it is not the same, that

9  Mr. Karamehmet and his daughter are the same thing.  But the

10  Karamehmet family includes them.  So, the stock was owned by

11  Karamehmet family, according to their earlier representations,

12  and it is still owned in the loose scheme by the Karamehmet

13  family.

14         Common business departments, another feature that

15  courts take into account in piercing corporate veils.  Geden

16  Holdings Limited, Advantage Tankers Limited, the whole group,

17  they don't -- they don't have an operating office.  They all do

18  their business through Genel Denizcilik Nakliyati; Geden Lines.

19  They are the people that have the chartering department, the

20  technical department, the operations department, the insurance,

21  the accounting, the marine department, and all of the other

22  functions that the company in the business of shipping needs

23  to, to do in order to survive.  They are common.  They are

24  performed by Geden Lines, Genel Denizcilik.  They have -- they

25  have this in every loan agreement with the banks.  You will

1  find that.  They are imposed and required to be the managers.

2  Geden did not want to cede this piece of the pie to anybody

3  else, a third party, another ship management company, like

4  V.Ships.  No; they had to bring their own ship management

5  company, because why?  Because, your Honor, there is money in

6  this business.  That's why.  They charge, I think, in excess of

7  $20,000 a month for each ship.  But also they've got the

8  control.  They've got the ships, they've got the papers, they

9  have the pencils, and they have the business.

10        Now, another thing that is a characteristic in veil

11  piercing companies that courts take into account is financing

12  passing between the companies.  We needn't belabor the point

13  because, your Honor, we saw it.  We saw documents, and I'm sure

14  we haven't seen all of the documents, that the financing was

15  arranged by Geden Holdings Limited, by Mr. Tugrul Tokgoz,

16  Mr. Mehmet Mat.  Now, maybe there will be further discovery, we

17  hope, that will open this, because we've seen a very small

18  glimpse, and we had to use a subpoena to get that.  Our

19  opponents did not produce it voluntarily in discovery.  The

20  predecessor company organizes and sets up a successor.  You

21  have the evidence before you, your Honor.  They were -- they

22  were talking Advantage Tankers and they testified that they --

23  they reserved the name of Advantage Tankers, the Geden Lines

24  people, Tokgoz and Mat, before the company even existed.  But

25  they went and reserved that name.  So, who organized them?

1  Geden Holdings.  Same people.  Karamehmet.

2         Another characteristic is that the successor

3  corporation receives no other business except that that the

4  predecessor allows.  We went over this; we're not going to go

5  over it again, your Honor.  We referred to the consent letter

6  in which the predecessor company set up the business with

7  Shell.  That's it.  They made a commitment for five years.

8         Then, we talked -- we talked about the transfer of

9  the assets.  That's one of the required, but the -- the

10  transfer requirements for piercing the corporate veil, that the

11  transfer of assets must be an arm's length transaction.  We

12  went ad nauseam over this when I spoke a little while ago.  I

13  mean, there are papers that show that it was not an arm length

14  -- arm's length transaction.  It was not a sale; it was a

15  reorganization, as they call.  That's their words.  And they

16  signed it, too.

17         Corporate formalities not being observed.  That's

18  another characteristic of calling for -- for -- in the cluster

19  of characteristics, that if they coalesce up to a certain

20  critical mass, I guess, the Court will say we'll pierce the

21  corporate veil.  Corporate formalities not being observed.

22  When we examined Mr. Tokgoz about what happened, he told us.

23  He said, "Karamehmet told me to sell all the ships."  "Do you

24  have this in a resolution of the board of directors and a piece

25  of paper?"  He says, "No.  I've sold 150 ships this way."  So,

1    it's -- it's like he's the Czar.  Mr. Karamehmet orders, and it

2    happens.  And the ships are like his personal property.  Where

3    are the formalities?  Where are the resolutions of the board or

4    the -- the shareholders' authorization?

5         And the same thing, your Honor, happened with

6    Advantage Tankers.  Mr. Tokgoz and Mr. Mat went into

7    discussions of restructuring debts, of obtaining loans in the

8    hundreds of millions of dollars, speaking on behalf of

9    something that didn't even exist; it was just word of mouth

10   maybe; Mr. Mat had not even talked with Ms. Williams.  She

11   didn't know.  She didn't know.  There is nothing formal.  All

12   of this business was done informally.  I don't want to say

13   "under the table," but it was certainly done informally.  There

14   are not documents that bear it out, except some correspondence,

15   and we haven't seen any of it, or very little.

16        And, then, the last criteria for veil piercing that

17   we have cited in our -- in our evidence and in our -- the

18   argument that we've made in our memorandum is the existence of

19   fraud, wrongdoing, or injustice to third parties.  And in this

20   case it is very obvious.  You have a successor company and the

21   predecessor, and you have a blueprint that was offered by

22   AlixPartners.  They took it; they adopted it; it called about

23   restructuring of ownership.  It's a boring, long document.  But

24   if you look at ring-fencing, if you can search it, go to PDF

25   and you see ring-fencing of assets to avoid arrests and such

1  things, as in South Africa, because they were afraid they were

2  going to get it in South Africa rather than here.  So, that was

3  a point.

4          So, let's sum it up.  You have the Karamehmet Geden

5  group, and you have the Advantage Tankers group.  Look what we

6  have here.  We have the same ships, operated by the same

7  operator, managed by the same officers, having the same -- the

8  same shareholder interests, with the same officers and

9  directors, serving the same customer, Shell, and financed by

10  virtually the same banks.  I would say, your Honor, we're -- we

11  are at the critical mass for piercing the corporate veil.

12          I'll thank you.

13          **THE COURT:**  Thank you.

14          Any response?

15          **MR. QUARTARO:**  Yes, your Honor.

16          Well, at the outset, I think after my colleague's

17  argument it's absolutely crystal clear at this point that Geden

18  Holdings is a central figure in the case.  I mean, we -- we

19  just sat through, I don't know, 50-odd minutes of argument.  I

20  lost track of the number of times that Geden Holdings was

21  mentioned, but I did lose track somewhere around 20.  There is

22  no doubt this is a central player in the case.  They're the

23  owner of the ships.  It's very, very straightforward.

24          Now, before I hit a couple of the points, I also want

25  to make an overarching observation.  What we have here is a lot

1   of -- is a lot of pointing at, "Well, this guy signed something

2   before the company was -- was created," or very sort of small,

3   minor issues.  What we don't have is any dispute that there is

4   new money, new lenders, arm's length sale price for the

5   vessels, and actual payment thereof.  There is no evidence

6   against that.  Nothing.  Nothing at all.  The only thing that

7   we have against that is -- is my colleague, Mr. Gaitas, has

8   speculated that since some of these records come from a bank

9   where the family does business, I think he's trying to imply

10  that they're fraudulent.  There is, again, no evidence

11  whatsoever of that other than counsel's speculation.

12          I would also point out that they're not all bank

13  records from the guarantee bank.  Here, for example, is one

14  from HypoVereinsbank, part of UniCredit.  I suppose the

15  Karamehmet family has penetrated there as well.  Also

16  remarkable, the prescience of such a alleged fraud that they

17  created all of these documents contemporaneously with the

18  transactions that they report and then, I guess, left them in a

19  file awaiting the discovery -- discovery demands.  It's a

20  little difficult to believe that that's -- that that's the

21  case, your Honor.

22          In any event, there is no challenge to that basic

23  fact.  And since there is no challenge to the basic fact that

24  there is an arm's length sale price set for the vessels, that

25  there is new money that comes in, and that the money is

1   actually transferred to the various SPV's on the Geden side

2   that own them by the Advantage buyers, it's -- it's clear.

3   Defendants couldn't have been disadvantaged -- or plaintiffs

4   couldn't have been disadvantaged.  They also, of course, make

5   no effort to address the fact that they actually got the

6   proceeds of some of these sales to pay some of their claims, as

7   I pointed out in my brief.

8           Now, I would also just add that, to the extent

9   plaintiffs have any claims against Geden Holdings, fine.  To

10  the extent that that claim exists, they had the equity that

11  they could have gone after.  They either -- Geden Holdings

12  either had equity in the ships or it had the cash.  At no time

13  did it have neither.  And that's a fundamental point, your

14  Honor.  That's a fundamental point.

15          Now, with respect to presence, again, I would -- I

16  would disagree that the -- that relation back under Rule 15 is

17  permitted.  It's a different cause of action.  They're

18  asserting a delivery complaint and a condition complaint versus

19  a failure to pay charter hire.  They're very different issues.

20  They're very different complaints and they're different

21  arbitrations.  The fact that that complaint is filed on

22  November 20 and that there is absolutely no argument that Geden

23  Holdings did not have an agent in place in the Southern

24  District of Texas at that date, not to mention all of the other

25  stuff -- but, again, I don't think we necessarily need to get

1  to that -- that it's fatal to the Rule B case, assuming that

2  your Honor, agrees, of course, that Geden Holdings is a

3  necessary party.  My opponent, of course, glossed over that

4  fact; "Well, we don't really need to name them."  I think it's

5  obvious at this point why they're not named.  It's crystal

6  clear.

7          Now, let's go on over a couple of points, and I'll

8  try not to go too long.  I don't think there's really all that

9  many that -- that I need to -- that I need to address.  One

10  thing I would comment on though, as a general matter, we made

11  an effort in our evidentiary brief to cite evidence.  The only

12  cases that we referred to were cases that were cited in our

13  motion to dismiss.  Defendants have now -- or plaintiffs have

14  now added a number of new cases to their evidentiary brief.

15  I'm not quite sure how your Honor wants to handle that.  I

16  haven't had an opportunity to review them, although I've seen

17  them cited, but I would say it's not appropriate to add case

18  law during an evidentiary hearing.  We've already briefed the

19  law to your Honor.  But, in any event, I'm not sure that there

20  is actually all that much difference between the legal

21  positions in our motion to dismiss and -- and the new cases

22  that -- that plaintiffs are citing.

23          My opponent makes a -- a number of suppositions that

24  I think ought to be pointed out.  He speculated, for example,

25  that Emin Karamehmet wouldn't be able to get credit because of

1   his legal problems in Turkey.  First, they asked that question;

2   he asked Mr. Mat that question during his deposition.  Mr. Mat

3   testified these problems have been going on for over a decade,

4   and Geden Holdings has literally received billions of dollars

5   in financing during that time.  And, your Honor, I think the

6   plain fact is that a sophisticated international bank is

7   perfectly capable of looking at a company or at a -- like, the

8   Cukurova Group or looking at the individual behind it, like

9   Emin Karamehmet, and seeing that the guy's got political

10  problems with the leader of a country that has been having an

11  increasing number of problems with people that own media

12  enterprises in that country.  I don't think there is any reason

13  to cast doubt on that, and I think if your Honor, you know,

14  looks at -- looks at the Mehmet Mat testimony, you'll see that

15  he testifies they got all kinds of credit during that time, you

16  know, notwithstanding these allegations; which, by the way,

17  your Honor, have been levied, tried, dismissed, levied again,

18  tried, dismissed, gone back up on appeal, come back down.  The

19  implication of political interference in this case is

20  impossible to avoid, and, in fact, that's what Ms. Williams

21  testified to when she was asked a couple of questions about it.

22  Not that she's a lawyer, but, of course, she knows what's

23  happening with her father.

24          My opponents have alleged that Ms. Williams is a

25  straw man.  I think "straw woman" probably would be a more

1  appropriate term, but, nevertheless, there is absolutely no

2  evidence of it.  There is no evidence of it.  If that's the

3  case, how does she put 196-odd million dollars into the

4  Advantage companies?  That doesn't work.  That doesn't make

5  sense.  Why does she look at various risk structures?  Why does

6  she contemplate first a joint venture with NSF and

7  Centerbridge?  That doesn't fall through; here's sort of

8  another iteration based on the amendment of the Shell charters,

9  as I testified earlier, the risk factor goes down, and she goes

10  in -- you know, she goes in for the entire investment.  But

11  this is a progression.  This isn't simply a, "Oh, Dad needs to

12  get rid of some tankers; quick, let's gin up some documents."

13  There's thousands of pages of paper here.

14       Now -- now, with respect to the -- the timeline on --

15  on the formation of companies, I mean, frankly, it's almost a

16  ridiculous argument.  What the plaintiffs would have the Court

17  believe is that for any entity, for any people to get into

18  business, the first thing they've got to do, got to form a

19  company, got to fully fund it, got to hire employees, have to

20  get it all in place.  "Now that it's in place, I can go out and

21  see if there is a market.  Now that it's in place, I can see if

22  I might get a loan."  That's just not how business works.

23  Nobody incurs those upfront fees without knowing they've got

24  something there.  And that's all that happened in this case,

25  your Honor.  Actually happened twice.  Happened with future

1    holdings first, for the joint venture vehicle with NSF and

2    Centerbridge; then it happened again with Forward Holdings when

3    Ms. Williams decided that she was going to make the entire --

4    the entire investment.

5         I think -- again, I think the -- the relation back

6    issue is -- is probably -- is probably squarely covered by the

7    differing allegations between the underlying complaint and the

8    current one.  And I would point out again, as I did in my

9    initial argument, I fail to see how a cause of action that did

10   not exist when the initial complaints were filed could relate

11   back.  I mean, it doesn't -- you know, that just doesn't --

12   that just doesn't line up.

13        I think the only piece of evidence that I really

14   would sort of challenge or I would challenge the conclusion is

15   this Gaitis DAC (indiscernible) Exhibit 4, and, unfortunately,

16   your Honor, I was no more enthusiastic about lugging a large

17   number of exhibits to the court than your Honor.  But,

18   nevertheless, I think I'm familiar with this particular

19   document.  And all I would say is that it's obvious that Geden

20   Holdings could realize a better price for the vessels it was

21   selling if they were under a charter to a gold standard

22   charter.  And, in fact, that raises the price of the assets.

23   It's simply respon -- I mean, that just makes -- makes sense.

24   Obviously, you want to try and get as much out of it as you

25   can.  And, again, that's something that ultimately inures at

1   least partially to the benefit of the plaintiffs because it

2   provides a pool of cash that, incidentally, they do not dispute

3   they were paid from.

4           Many of the other comments that my opponent made

5   really, I think, go back to sort of the introductory facts that

6   I laid out for your Honor.  We have an attempted bond issuing

7   by Geden -- bond issuance by Geden Holdings that doesn't work.

8   We have an attempted financial restructuring their lenders

9   rejected.  Not virtually the same lenders; there's only

10  three -- two or three common lenders between the two groups.

11  There's just not that many shipping banks.  But it's critical.

12  It's not the same group of banks.  It's new money.  It's new

13  lenders.  It's a new loan agreement.  That's a very important

14  fact.  It's not a rollover (indiscernible).

15          And I guess the only other thing that I would point

16  out is the fee letter.  Yeah, that's, obviously, addressed to

17  Advantage Tankers.  Now, whether it existed or not, clearly,

18  all the banks are trying to do -- and this is actually quite

19  common in shipping, although I don't think there is a lot of

20  evidence on this particular point before the Court -- it's very

21  common in shipping and probably in other businesses, too.  A

22  bank doesn't want to, believe it or not, pay its lawyers, who,

23  obviously, work very hard, long hours, and deserve every penny

24  that they're paid, to draft complex loan agreements if they --

25  if the bank doesn't know that it's got a deal.  And, so, it's

1   very common for them to say, "Look, we'll instruct our guys;

2   we'll get the documents going, but that's on your bill.  You've

3   got to promise that you're going to pay."  Notably, that letter

4   is addressed to who?  It's addressed to Advantage Tankers.

5   Maybe Mr. Mat didn't, you know, focus on the signature line or

6   whatever, but the important thing is, who were they looking to

7   have pay that 200 grand, Geden or Advantage Tankers?  Advantage

8   Tankers, or Holdings.  And that's -- that's why the fee letter

9   is made out to them.  Critically, they did not explore,

10  although they could have during the deposition testimony, who

11  actually paid that money.  If they had, they would have learned

12  it was Ms. Williams.

13          I guess my -- my sort of final point in response to

14  my colleague's comments and arguments -- it's probably two-

15  fold.  One, he conceded during his argument -- he tried to

16  cover it, but he conceded.  He said, "Transfer of assets from

17  the Karamehmet Group."  What does he mean by that?  Let's --

18  let's go back to my favorite concrete print visual, transfer of

19  assets from Geden Holdings (indiscernible) defendant, again.

20  Now, we say Karamehmet Group, but there is no doubt, looking at

21  the documents, that it was Geden Holdings that sold all of

22  these vessels, and he tries to characterize it as an assetless

23  company that -- that goes into a drawer, right?  Except that at

24  one time they held the shares of 50 to 60 SPP's, right?  Each

25  one owning an oil tanker.  Why, just the ones that we're

1  talking about transfer today totaled $600 million in ships.

2  That's hardly an assetless company that exists in a drawer.

3  Interestingly, he also mentioned his client thought they were

4  of sufficient substance; they took a guarantee from them.  So,

5  they're issuing guarantees, they're owning ships, they're

6  chartering them.  It is a holding company, that's true, but

7  that's the purpose of the holding company is to hold the shares

8  of the special purpose companies that it owns.

9          I haven't gone through and gotten any sort of

10 valuations over the years, but, at a very minimum, as we can

11 see, just looking at the 11 black oil tankers that -- that are

12 at issue today, we've got $600 million in assets sitting right

13 there, and I'm not counting the other 45, 50 ships that they

14 owned at one time.  Admittedly, they got into difficulty and

15 they had to sell them, but back in '07, '08, '09, that wasn't

16 the case.  And, unfortunately, the business hasn't gone well.

17 It has been a tough economy for shipping.

18          And I think -- I think kind of the last -- the last

19 point is -- is really back to Genel.  You know, Genel

20 Denizcilik is a third party technical manager.  You'll see in

21 Exhibit 1 to our evidentiary brief Mr. Tokgoz mentions, among

22 other things, that Genel provides these services, not just to

23 Geden-owned ships when Geden owned ships, not just the 11 ships

24 that are owned by Advantage.  They provide these services to

25 all kinds of owners, including at least two that are traded

1    on -- that are publicly traded in the United States.  So, this

2    isn't sort of some little in-house office where it's -- you

3    know, they're -- they're playing some sort of shell game with

4    the papers.  It's a legitimate business; it offers its services

5    to third parties.  Interestingly enough, identical to what the

6    plaintiffs do as their own business line.

7         That blurring of the lines of Genel and Geden Lines

8    is exactly what I had noted at the beginning was going to

9    happen.  And, again, it's -- it's just fascinating -- I wish I

10   had been able to keep full track -- that during my opponent's

11   argument he mentioned -- he focused almost exclusively on Geden

12   Holdings.  I mean, it's -- it's obvious that that's -- that's

13   the party that ought -- that ought to be here.  But whether

14   it's here or not, there is no evidence that, other than

15   speculation, that counteracts the facts or counter -- is

16   countervailing to the facts, to the record that's produced,

17   that shows cash payment for the ships to Geden Holdings by

18   Advantage.  There is nothing, other than speculation, that

19   flies in the face of those bank records.  There are dozens and

20   dozens of pages of them.  Counsel's speculation that those are

21   somehow made up or fraudulent, simply meritless, your Honor.

22   There is just no evidence of that other than speculation.

23        What happened here is they thought they were going to

24   wind up with a situation where Ms. Williams knew nothing about

25   shipping, there was no evidence of money coming in, just a

1   change of title.  Instead, there are 6,000 pages of documents,

2   including the loan agreements, money invested into the

3   Advantage Tankers through Forward Holdings, documents including

4   memorandums of agreement, bills of sale, all of the

5   contemporaneous documents one would expect from a transaction

6   of this size and significance.  It's pretty much all there.  Is

7   it perfect?  No.  It's not perfect.  Is there a letter --

8   incidentally, written by a non-party to this proceeding that

9   may be misaddressed or have a wrong (indiscernible)?  Of

10  course.  And that happens.  But, again, we're talking total

11  seven-odd thousand pages of documents.  Not every document is

12  perfect.  But the sum and substance of this transaction has not

13  been challenged with any evidence.  And I think that is the

14  most important thing that's come out from this discovery

15  process.

16          I don't have any further rebuttal, your Honor.  I

17  would thank the Court again for its time.  I would thank the

18  Court for entertaining our arguments, especially given the --

19  the procedural mishmash that we have.

20          **THE COURT:**  You --

21          **MR. QUARTARO:**  I do hope that between plaintiff's

22  counsel and myself we have been able to straighten that out.  I

23  do sincerely believe, and I know my opponents sincerely

24  believe, that we have an active issue before your Honor, and we

25  would be grateful for the Court's resolution.  Thank you.

1      **THE COURT:** Did you express an interest in responding

2  to additional cases that the plaintiff has submitted for me to

3  consider?

4      **MR. QUARTARO:** Well --

5      **THE COURT:** Do you want to --

6      **MR. QUARTARO:** -- I think if your Honor is going

7  to --

8      **THE COURT:** Do you want to do more briefing?

9      **MR. QUARTARO:** I'm sorry, your Honor?

10      **THE COURT:** Do you want to do additional briefing?

11      **MR. QUARTARO:** I'd love to do additional briefing,

12  your Honor.  Perhaps -- perhaps we can leave it like this, if

13  it's acceptable to the Court.  I don't think there's too many

14  cases in addition to what's been cited in the motion to

15  dismiss.  I think I -- I took a very quick run-through, and I

16  believe it's about four.  *Bridas* two, the two he read into the

17  record, and I believe that there is a fourth.  Of course, we

18  focused on the evidence -- on the evidence in the evidentiary

19  argument.  Frankly, I don't know if I'm even at odds with any

20  of the case law that he's cited.  So, if your Honor would

21  entertain -- and I think what I would like to do is have an

22  opportunity to look at those cases, and if we have a different

23  reading of them, we'll keep it to a very short letter brief,

24  and we'll get it to your Honor by Friday.  It may be that there

25  is no letter brief.  Again, you know, for example, the *Oxford*

1    factors; I mean, that's -- we're basically in agreement on

2    that.  *Bridas* one, *Bridas* two; I think we're pretty much in

3    agreement on the applicable case law, and I don't want to

4    inflict either additional briefing on your Honor or, frankly,

5    the bills for it on my client.  Perhaps that's a reasonable

6    response to the addition of additional case law in an

7    evidentiary brief.

8         **THE COURT:**  I think it is.  I'd like you to have a

9    chance to comment on something you didn't -- you feel like you

10   didn't get a chance to comment about.

11        **MR. QUARTARO:**  Thank you very much, your Honor.

12        **THE COURT:**  But I like your plan.

13        **MR. QUARTARO:**  Okay.  Thank you.  Well, if we do have

14   any opposition to that or -- or, shouldn't even say

15   "opposition" -- any observations on it, we will submit that by

16   a -- is a letter brief acceptable, your Honor?

17        **THE COURT:**  It is.

18        **MR. QUARTARO:**  Thank you.  We will submit that by --

19   by Friday.

20        **THE COURT:**  All right.  Thank you.

21        **MR. QUARTARO:**  Thank you.

22        **THE COURT:**  Do you have more comments?

23        **MR. GAITAS:**  Very, very briefly, your Honor.

24        One thing is I -- I would remind my friend that

25   briefs were due by 12 noon I -- yesterday.  I agree that she

1    can (indiscernible) any time she wants.  But in response to

2    that, she's going to have to expect, when we get his -- his

3    briefing, that we're going to -- we're going to have to read it

4    and we'll see there, but he makes reference to some things that

5    made reference to case law.  So, that's why we -- we cited one

6    case, actually, or two.  So, we're happy --

7            THE COURT:  If you have to make a comment on his

8    comments, that's perfectly acceptable to me.

9            MR. GAITAS:  Yes.

10           THE COURT:  But I guess it's cheaper for your clients

11   if you make a letter brief, which is --

12           MR. GAITAS:  I agree.  I fully agree.

13           THE COURT:  -- just fine with me.  It's just fine

14   with me.

15           MR. GAITAS:  There is another -- another thing that

16   maybe your Honor would want to consider.  I have seen, in

17   response to discovery, documents evidencing, supposedly, bank

18   transfers.  They are photocopies.  They are from '13.  I don't

19   know in whose -- if they are genuine or not.  Geden Holdings

20   Limited is here.  They can be ordered to produce originals;

21   they can be ordered to send a letter to their bank to give us

22   access to these documents.  The same thing with -- with --

23   well, Geden Lines is not here, but with Geden Holdings,

24   certainly they are subject to the jurisdiction.  We may be

25   asking the Court for a subpoena on this that will supplement

1   this information, because, frankly, all we have is photocopies.

2   And I don't know how genuine they are, really.  And I don't

3   think you can tell if it's genuine, because I could make one on

4   my -- on my scanner at my house.  So, today.  These are people

5   beyond -- beyond the borders of the United States.  They are

6   not subject to sanctions, so let's have perhaps an order to

7   that effect.

8          **THE COURT:**  You're asking for an order?  For Geden

9   Holdings to provide you with bank documents.

10          **MR. GAITAS:**  Original -- original documents in

11  their -- in the electronic form, and the movement of funds in

12  that bank account subsequent to the sales.  Where did the money

13  go?  That's fair; because they also raised the point that --

14  that they're solvent, they've got $300 million now.

15          **THE COURT:**  Have you subpoenaed them, Geden Holdings?

16          **MR. GAITAS:**  I subpoenaed them for other documents.

17          **THE COURT:**  Other documents.

18          **MR. GAITAS:**  Yes; but not these.

19          **THE COURT:**  Okay.

20          You look like you don't like that idea.

21          **MR. QUARTARO:**  Your Honor, we've had ten-odd weeks of

22  discovery; he served a subpoena on this entity already; they've

23  responded.  I -- frankly, I don't see (a) a need for additional

24  discovery; (b) you know, I think counsel has to articulate

25  something beyond the, "Naaah, I -- this could be fake."  I

1   mean, frankly speaking, we could do the same with every single

2   document they have, and we can spend the next 10 years

3   validating every document that's been produced so far without

4   even getting to any new ones.  There has got to be some

5   articulable basis to believe that the records that have been

6   produced -- frankly, what he's saying is they're fraudulent.

7   And there's got to be some articulable basis other than -- I

8   mean, frankly, it's almost a Jim Carrey moment.  "I don't like

9   the evidence, your Honor."  "Well, why not?"  "It's bad for my

10  client."  There has got to be something beyond speculation,

11  especially for a second subpoena, your Honor.

12          Also, of course, I have to point out the concession.

13  Geden Holdings is present in the Southern District of Texas.

14  That's one of our points, of course, your Honor, and I'm very

15  happy to hear my opponent concede it.

16          Thank you.

17          **THE COURT:**  All right.  We don't have a -- any

18  subpoena that you've issued to enforce right now.

19          **MR. GAITAS:**  I beg your pardon, your Honor?  I didn't

20  hear you.

21          **THE COURT:**  I am -- I don't -- I don't understand

22  that you're asking me to enforce any subpoena that you have

23  issued.

24          **MR. GAITAS:**  No.  I'm talking about a subpoena that

25  would go to producing original documents in electronic form,

1   because these documents they have produced are questionable;

2   they involve the same interests, same bank; issues, really,

3   issues of this case.  And you don't have the evidence -- their

4   defense is that these are arm -- arm's length transactions.

5   They better back it up, because I don't think these documents

6   evidence that.

7          **THE COURT:**  Okay.  Well, I'd have to -- I have to

8   rule based on the documents in front of me.

9          **MR. GAITAS:**  Yes.

10         **THE COURT:**  Anything else?  Any other comments?

11         **MR. GAITAS:**  No.

12         **THE COURT:**  Okay.  All right.  So, I guess my work is

13  cut out for me.

14      **(Laughter)**

15         **THE COURT:**  But I appreciate the enlightenment.  That

16  was very helpful.

17         I -- I have a copy -- this is my little green copy of

18  Schedule 11 original chart.  Do I have a copy of the alleged

19  corporate structure in all of these?

20         **MR. QUARTARO:**  You are -- well, first, in this age of

21  modern technology, actually, I have a fantastic app on my phone

22  which I recommend to everyone, and I -- I think I -- I showed

23  Mr. Chalice (phonetic) when we were in London -- where I can

24  take a picture of that and it will turn it into a PDF and e-

25  mail it to your Honor.

1          **THE COURT:**  Okay.

2          **MR. QUARTARO:**  Which is just a great thing to have on

3    your own iPhone.  It's called TurboScan.  I'm happy to do that

4    right now, perhaps e-mail them to you, Ms. White, and you

5    can -- would that be acceptable?

6          **THE COURT:**  That would be great.  I just would like

7    to be able to look at it and while I'm thinking about all this.

8          **MR. QUARTARO:**  I mean, I'm happy for you to take the

9    exhibits, but I'm sure you have more interesting evidence.

10          **THE COURT:**  I have all the exhibits.  Is that chart

11    in the exhibits already?

12          **MR. QUARTARO:**  I believe so.  I believe it's actually

13    in the universal maritime prospectus.  It may also be in the

14    AlixPartner outline.  And, of course, this is the very first

15    page, the Quartaro DAC X-1.  But why don't we -- why don't I

16    just send you a quick PDF of this and --

17          **THE COURT:**  That would be great.

18          **MR. QUARTARO:**  -- and then you have it.

19          Ms. White, thank you very much.  Appreciate that.

20          **MR. GAITAS:**  Can I have a look at the exhibit?

21          **MR. QUARTARO:**  Sure.

22          **THE COURT:**  Yes.  Please do.

23          **MR. QUARTARO:**  Do you want me to copy you on the e-

24    mail, George?

25          **MR. GAITAS:**  Uh --

1      **MR. QUARTARO:**  And you'll have the PDF as well.

2      **MR. GAITAS:**  Um, I'm trying to --

3      **THE COURT:**  I think you should.  I think it's a good

4  idea.

5      **MR. GAITAS:**  Very well.

6      **MR. QUARTARO:**  It's always a good idea.

7      **THE COURT:**  Please do.

8      **MR. GAITAS:**  Yes.  Your Honor, since I had no view of

9  this exhibit during the hearing, I want to -- and I wanted to

10  point out this --

11      **THE COURT:**  Please do.

12      **MR. GAITAS:**  -- the Advantage Arrow and the Advantage

13  Avenue, they were on the same loan agreement --

14      **THE COURT:**  Okay.

15      **MR. GAITAS:**  -- with -- with the bank.  Now, these

16  prices that are shown as sale -- shown as sale price here, we

17  have the memorandum of agreement for the sale and we have the

18  bill of sale, and they do reflect these prices.  However, in

19  the bank loan documents -- this was brought out in deposition;

20  it's in our brief -- the amount of money shown for the sale

21  price in the bank financing documents, the contract price, is

22  substantially less.  It's about $9 million less.  So, this

23  isn't entirely truthful or it is contradicted by their own

24  document -- their own banker's documents, their own financing

25  banker's documents.  And that's something that needs to be

1  looked into.

2             **THE COURT:** On both vessels?

3             **MR. GAITAS:** On both the Advantage Avenue and the

4  Advantage Arrow, that the sale price --

5             **THE COURT:** Sale price is different --

6             **MR. GAITAS:** -- it is --

7             **THE COURT:** -- from that --

8             **MR. GAITAS:** Yeah, in the --

9             **THE COURT:** -- charge.

10            **MR. GAITAS:** -- in the bank financing documents.

11  Yes.

12            **THE COURT:** I understand.

13            **MR. GAITAS:** It's substantially different.

14            **THE COURT:** Okay.

15            **MR. GAITAS:** We point it out in our brief, so -- and

16  the payment of debt is -- is accurate.

17            **THE COURT:** Right.

18            **MR. GAITAS:** Payment of debt is accurate. And the

19  equity is not accurate.

20            **THE COURT:** It would be higher.

21            **MR. GAITAS:** Yeah, it -- it should be lower.

22            **THE COURT:** It should be lower.

23            **MR. GAITAS:** It should be lower, according to the

24  bank records. According to the bank financing records, it's

25  substantially lower.

1          **THE COURT:**  So, the sale price was lower.

2          **MR. GAITAS:**  Yes.  And if this is -- this is how much

3    money was transferred between the banks, it's questionable what

4    the two companies are doing, really, what money -- what are

5    they paying for.

6          **MR. QUARTARO:**  Just want to be clear about what

7    Mr. Gaitas is saying.

8          **THE COURT:**  All right.

9          **MR. QUARTARO:**  He seems to be saying -- and correct

10   me if I'm wrong --

11         **MR. GAITAS:**  Yes.

12         **MR. QUARTARO:**  -- that this, in fact, was the sale

13   price; that the bank records that were produced, in fact,

14   show -- now, you can disagree with their authenticity; I

15   understand that -- but the records that have been produced so

16   far show the payment of that debt and that amount of equity to

17   Geden Holdings.

18         **MR. GAITAS:**  No.

19         **MR. QUARTARO:**  Hang on.  Hang on.  Let me – let me

20   clarify what you're saying.

21         **MR. GAITAS:**  Yeah.

22         **MR. QUARTARO:**  What you seem to be saying is, is that

23   the loan agreement, the schedule to the loan agreement that

24   lists the amount of -- of the loan being provided to the

25   Advantage buyers is at odds with these numbers.  Is that right?

1   Do I have that right?

2           **MR. GAITAS:**  No.  It is very simple.  That -- and you

3   will see, your Honor; it's in the exhibits.  The schedules to

4   the loan agreements show a sale price which is substantially

5   lower than the bill of sale, bill of sale M.Y. (indiscernible)

6   agreement.  Bill of sale and M.Y. are private documents between

7   Advantage Tankers and Geden Holdings.  The other ones that the

8   bank has filed is public records in the Marshall Islands along

9   with the mortgage.  And it shows a much lower price.  So, these

10  prices here that are paid are according to this sale price if

11  you take out the loan repayment.

12          **THE COURT:**  Oh.

13          **MR. GAITAS:**  We're not at all sure why they would --

14  how could they pay this, because these sale prices are

15  contradicted in the bank loan documents.  And the bank shows a

16  contract sale price much lower.  And it was brought out in the

17  depositions, and we asked -- we asked Mr. Tugrul Tokgoz, and

18  said, "What is this?  It's a discrepancy."  We showed him the

19  records, and he said, "I have no clue."  That's a quote.  "I

20  have no clue."  So, the authenticity of this is very much

21  questionable.  And you will have to decide that, but you will

22  see before you the loan agreement documents show a different

23  sale price than the sale price that they show here.

24          **THE COURT:**  I'll look at the exhibits.

25          **MR. QUARTARO:**  I mean, I'm sorry; I've lost that --

1   I've lost the argument.

2          **THE COURT:**  Okay.

3          **MR. QUARTARO:**  So, I'll have to look at the exhibits.

4          **THE COURT:**  I'll look at the exhibits.

5          **MR. GAITAS:**  You see, if I -- they didn't pay --

6          **MR. QUARTARO:**  But Quartaro DAC-1 --

7          **MR. GAITAS:**  Yeah.

8          **MR. QUARTARO:**  -- has all of the payment records

9   there.  There may be some discrepancy in one of the loan

10  agreements; I don't know.  I'll have to take a look at it.

11         **THE COURT:**  Okay.

12         **MR. QUARTARO:**  But the actual remittance of money and

13  the wire transfer records are all Exhibit 1, and those all line

14  up.

15         **MR. GAITAS:**  Now --

16         **MR. QUARTARO:**  There may be an underlying loan

17  agreement where a schedule is inaccurate; I don't recall.  But

18  I do recall some testimony on that, and it sounds like that's

19  all before your Honor, so you've got the evidence, which is the

20  point of the discovery, and we can go from there.

21         **THE COURT:**  I'll look at it.

22         **MR. QUARTARO:**  Thank you, your Honor.

23         **MR. GAITAS:**  One more point is Mr. Quartaro talked

24  about wire transfers.  There have been no wire transfers.  None

25  of this was done by wire transfer.  They're internal bank

1   documents.  So, there was no money that went to a bank in New

2   York that does a clearing and then sending it on an

3   intermediary bank.  It's not -- it is not really a wire

4   transfer.  It's not a SWIFT.  The documents they put before

5   your Honor are not SWIFT documents.  They are internal Turkish

6   Bank records.

7           **THE COURT:**  Okay.

8           **MR. GAITAS:**  So --

9           **THE COURT:**  Paul, did you want -- one of those

10  parties with a foreign name, we were -- you were promising to

11  spell that for us.

12          **MR. SPEAKER:**  I -- I will.  So, just like it's

13  pronounced.

14          **THE COURT:**  Uh, yeah.  That's -- that's no help.

15  Okay.  Mr. Gaitas.

16          **MR. SPEAKER:**  First of all, I wanted (indiscernible)

17          **MR. GAITAS:**  Genel Denizcilik Nakliyati.

18          **THE COURT:**  Yes.  Spell that one.

19          **MR. QUARTARO:**  He got it.

20          **THE COURT:**  Oh, he's got it.

21          **MR. QUARTARO:**  Well, hope he's got it.

22          **MR. GAITAS:**  He's got it.

23          **MR. QUARTARO:**  He's -- we used to have it

24  (indiscernible).

25          **THE COURT:**  Oh, he's -- he's quicker than me.

1    **MR. QUARTARO:**  Yeah.

2    **THE COURT:**  Thank you, Paul.

3    **MR. SPEAKER:**  Right.

4    **THE COURT:**  All right.  Thank you, everybody.

5    **ALL:**  Thank you, your Honor.

6    **THE COURT:**  Okay.  Good luck catching those planes.

7    **MR. QUARTARO:**  Thank you.

8    **THE COURT:**  All right.  The hearing is adjourned.

9    **ALL:**  Thank you, your Honor.

10   **(Proceeding was adjourned at 4:10 p.m.)**

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

CERTIFICATION


I certify that the foregoing is a correct transcript from the

electronic sound recording of the proceedings in the above-

entitled matter.




_____          _July 12, 2016_



TONI HUDSON, TRANSCRIBER